CHORPENNING, GOOD, CARLET &
GARRISON, ESQS.
Michael J. Zaretsky, Esq. - MZ7098
645 Fifth Avenue - Suite 703
New York, New York 10022
Telephone:  (212) 869-2147
Attorneys for American Express Financial
Advisors, Inc

| | |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS, INC., | UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK |
| Plaintiff, -versus- FRANK P. MARZANO, Defendant. | Civil Action No: 04 CV 1401 (LDW)(MLO) |

**MEMORANDUM OF LAW IN SUPPORT OF AMERICAN EXPRESS FINANCIAL
ADVISORS INC.'S SECOND MOTION TO VACATE OR, IN THE
ALTERNATIVE, TO MODIFY NASD ARBITRATION DECISION[1]**

---

[1] Defendant Frank Marzano has filed a Motion to Confirm the Arbitration Award that this Motion seeks to have vacated.  American Express Financial Advisors Inc. will file, prior to the April 7, 2006 response date set by the Court regarding the Motion to Confirm, a separate response to that Motion.

# TABLE OF CONTENTS

I.   FACTS: ........................................................................................................... 1

   A.   The November 2004 Hearings ................................................................. 4
   B.   The Fall 2005 Hearings ........................................................................... 8
      1.   Remaining Claims After November 12th Decision ....................... 8
      2.   Marzano's Damages Claims .......................................................... 9
      3.   The January 13th Decision ........................................................... 15
   C.   The Panel's Conduct During the Hearings .......................................... 16
      1.   The Arbitrary Limiting of Hearing Dates .................................... 16
      2.   The Requirement that AEFA's Expert Testify Without Being Given Ample to Complete his Evaluation ................................................................. 18

II.   STATEMENT OF THE LAW ...................................................................... 20

   A.   The GLB Prevents AEFA from Simply Turning Over Copies of the Files to Marzano without Client Consent .................................................................................. 22
   B.   The Panel's Refusal to Hear Certain Evidence and Refusal to Postpone the Hearings to permit AEFA's Expert Witness Time to Prepare was Improper and is Grounds for Vacation 22
   C.   All Monetary Relief Granted in the January 13th Decision was for AEFA's Refusal to Provide Copies of Client Files to Marzano, an Obligation it Did Not Have Under any Contract and Which was Prohibited by GLB. .................................................................. 24

III.  CONCLUSION ........................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**

*Areca, Inc. v. Oppenheimer & Co., Inc.*, 960 F. Supp. 52, 55 (S.D.N.Y. 1997) .......................... 23

*Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 265 (2d Cir. 1989) ........................................................................................................................ 21

Halligan v. Piper Jaffray, Inc., *148 F.3d 197 (2d Cir. 1998)*.................................................. 20, 21

*McDaniel v. Bear Sterns & Co.*, 196 F. Supp. 2d 343 (S.D.N.Y. 2002) ...................................... 21

*Merrill Lynch v. Jaros,* 70 F.3d 418, 420 (6th Cir. 1995) ............................................................ 21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986)......... 21

Puerto Rico Ports Authority v. Misener Marine Construction, Inc., 233 F. Supp. 2d 266 (D. P.R. 2002) ........................................................................................................................ 21

*Reichman v. Creative Real Estate Consultants, Inc.*, 476 F. Supp. 1276, 1285 (S.D.N.Y. 1979) 23

*Transit Cas. Co. v. Trenwick Reins. Co.*, 659 F. Supp. 1346, 1354 (S.D.N.Y. 1987), aff'd, 841 F.2d 1117 (2d Cir. 1988) ................................................................................................ 23

**Statutes**

9 U.S.C. § 10.................................................................................................................. 6, 20, 22, 23

9 U.S.C. § 11........................................................................................................................ 20, 21

**Rules**

NASD Rule 10321(c)........................................................................................................... 18

NASD Rule 10335(a).............................................................................................................. 3

## I.     FACTS:

This matter arises out of a bifurcated arbitration.  There is presently pending before the Court, a Motion to Vacate, filed January 28, 2005 ("First Motion to Vacate"), an award rendered by a National Association of Securities Dealers ("NASD") Arbitration Panel (the "Panel") dated November 12, 2004 in favor of the Defendant Frank Marzano ("Marzano") against the Plaintiff (the "November 12th Decision").  (A copy of the November 12th Decision was attached to the Declaration of Michael J. Zaretsky, dated December 14, 2004, which was filed in support of the First Motion to Vacate ("December 14th Zaretsky Dec.") as Exhibit A).  The parties were before the Court on December 8, 2005, at which time they advised the Court that additional hearings had been held before the Panel in the Fall of 2005 and that they anticipated a decision shortly. The Court then reserved decision and did not hear argument of the First Motion to Vacate, and it informed the parties that it would take jurisdiction of any motions to vacate the award resulting from the Fall 2005 Hearings and that it would hear argument as to both motions at a later date. On January 13, 2006, the Panel issued a separate award relating to the proceedings conducted in the Fall of 2005 (the "January 13th Decision").  (A copy of the January 13th Decision is attached to the Declaration of Michael J. Zaretsky, dated March 20, 2006 ("March 20th Zaretsky Dec.") as Exhibit A).

Marzano, a former registered representative and franchisee of Plaintiff, American Express Financial Advisors Inc. ("AEFA"), resigned his affiliation with AEFA in a letter dated Friday, March 26, 2004.[2]  The Franchise Agreement he signed at the outset of his affiliation with AEFA, and to which he was subject at the time of his resignation, permitted AEFA to secure and take possession of files maintained by Marzano for any AEFA clients he serviced.  Accordingly,

---

[2] AEFA changed its name to Ameriprise Financial Services, Inc. in August 1, 2005.

1

upon his resignation, on March 29, 2004.[3]  AEFA personnel went to Marzano's office and began removing the client files.  However, Marzano prevented the removal of a number of the client files on March 29th.  At the time he resigned, Marzano was being investigated by AEFA in conjunction with an AEFA internal investigation into conduct that was focused on possible violations of company policy.  When Marzano resigned, AEFA was required by NASD Rules to file a form known as a Form U-5 ("U-5") with the NASD's Central Records Depository.  In that U-5, filed on March 31, 2004 ("March 31st U-5"), AEFA disclosed, in response to a question regarding whether Marzano was subject to an internal review, that: "[t]he Advisor resigned during the course of our open internal review that focused on industry and company sales practice violations and violations of company policy."[4]  (A true and accurate copy of the March 31st U-5 is attached to the March 20th Zaretsky Declaration as Exhibit B).[5]

Marzano has maintained that a letter dated July 6, 2000 ("July 6th Letter") served as an addendum to his Franchise Agreement.  (A copy of the July 6th Letter is attached to the March 20th Zaretsky Declaration as Exhibit D).  He claims that language in the July 6th Letter, which states that he "owned" the clients he was servicing while he was affiliated with AEFA provided him with a contractual right to keep copies of the clients' files upon his resignation.

In accordance with its regulatory responsibilities, AEFA was required to secure client files when Marzano resigned, but since he prevented AEFA personnel from securing all the client files from his office on March 29, 2004, on or about April 2, 2004, pursuant to Rule

---

[3] Those facts recited herein that do not cite to any affidavit, transcript or pleading, are either already before the Court as part of the First Motion to Vacate or, it is believed, are not in dispute.

[4] As a result of the investigation, AEFA had determined to suspend Marzano on March 29, 2004 but he resigned on March 26, 2004, prior to being notified of the suspension.

[5] On July 27, 2004, AEFA filed an amended U-5 ("July 27th U-5") and amended the response to the question regarding internal reviews and stated: "[t]he firm conducted a review that focused on industry and company policy violations.  The Firm's review concluded the registered representative violated AEFA company policy by facilitating personal transactions on behalf of clients." (A true and accurate copy of the July 27th U-5 is attached to the March 20th Zaretsky Declaration as Exhibit C).

10335(a) of the NASD Rules of Arbitration Procedure, AEFA filed the instant action and on April 5, 2004 applied for an Order to Show Cause for Preliminary Injunction with Temporary Restraining Order (the "TRO"). The Court issued the TRO on April 5, 2004 which directed Marzano to return all client files, including copies, to AEFA, immediately.

The NASD Rules permit a party to seek *temporary* injunctive relief in court, while simultaneously initiating an NASD arbitration against Marzano (the "Arbitration") by filing a Statement of Claim with the NASD Office of Dispute Resolution. AEFA did just that and sought both a permanent injunction and "[a]n Award of such further equitable and legal relief as the Arbitrator or Panel deems just and proper to award." The TRO, effectively, provided AEFA all that it sought by way of both preliminary and permanent relief, because Marzano permitted AEFA to remove the remaining client files after he was served with the TRO.

On May 4, 2004, Marzano answered AEFA's Statement of Claim in the Arbitration and also filed a counterclaim in which he alleged nine "causes of action" for: (1) breach of contract damages based on Marzano's claim that AEFA owed him "monies, for compensation allegedly earned by Marzano during his association with AEFA"; (2) breach of contract damages based on Marzano's claim that AEFA wrongfully took files from his office and "disrupted [his] business"; (3) that AEFA "stole away" Marzano's client records and accounts; (4) breach of contract damages for AEFA's alleged failure to provide Marzano with copies of the client records and an inventory of those records; (5) breach of contract damages based on Marzano's claim that, after his resignation, AEFA "solicited" the clients that he serviced while he was at AEFA; (6) damages based on his claim AEFA had made "defamatory" statements about him; (7) punitive damages (8) an injunction to prevent AEFA from contacting any of the clients Marzano serviced by during his affiliation with AEFA and to require it to return copies of the client files to him

3

along with certain personal property he claimed AEFA personnel took from his office; and (9) an order expunging allegedly erroneous information contained on his U-5.

A.   **The November 2004 Hearings**

On November 3, 4, and 9, 2004, the Panel held Hearings (the "November 2004 Hearings") on the parties' requests for injunctive relief.  Inasmuch as AEFA had already received the client files through the TRO, AEFA withdrew its Arbitration Statement of Claim prior to the commencement of the Hearings.  The November 2004 Hearings thereafter dealt only with Marzano's request for an order from the Panel directing AEFA to furnish him with copies of the client files, and an inventory of those files.  The alleged basis for his claim that he was entitled to the client files was the statement in the July 6th Letter that he "owned" the clients. The pertinent section of the July 6th Letter reads:

> Sections 14, 18 and 19.  Those sections, without question, are the most critical for Mr. Marzano.  As discussed on numerous occasions, it is of utmost importance that the clients obtained by Mr. Marzano while operating under the System ("Clients") are owned by Mr. Marzano, not American Express.  Accordingly, as noted in Section 19 (Covenants) page 30, 4th paragraph) [sic] American Express, "in its complete discretion [may] release [Marzano] from all of the provisions *of Section 19*"  Kindly note that this letter serves as our formal request to be released from said *Covenants*, and your agreement to execute the appropriate documents and/or addendums to ensure Mr. Marzano's ownership of said Clients.

(July 6th Letter, p. 2) (emphasis added).  The July 6th Letter does not define what the word "owned" meant, nor does it make any reference to client files.  (*Id.*).

At the time Marzano resigned he was not affiliated with any broker-dealer.  As such, he was not entitled to the files and could not have serviced any of the clients.  In fact, because the clients were all still AEFA's clients, AEFA was responsible to service and oversee those accounts upon Marzano's resignation which it could not have done without the client files.  In addition, as discussed below, the Gramm-Leach-Bliley Act prohibited AEFA from providing copies of the files to Marzano without the consent of those clients whose files were involved.

4

The November 12, 2004 Decision, which adjudicated the issues presented in the November 2004 Hearings, granted, *inter alia*, the following relief:

> At the conclusion of this hearing and after deliberation by the Panel the following relief has been granted:
>
> 1) The Statement of Claim has been withdrawn and is therefore dismissed,
>
> 2) The Respondent's [Marzano] request for relief has been granted as follows: (a) The Claimant [AEFA] will turn over to the Respondent a list of clients. This list is to include those clients that were first clients of Respondent prior to his joining Claimant, clients brought into American Express Financial Advisors, Inc., by Respondent and clients inherited or assigned to Respondent *while at American Express Financial Advisors, Inc.*; (b) the files *maintained* by Respondent *for these clients* will be copied at the expense of the Claimant and *forwarded to the Respondent*; and (c) no inventory of these files will be required.
>
> 3) The Claimant will have ten (10) business days from receipt of this Order to comply.

(December 14th Zaretsky Dec., Exhibit A).

Upon receiving the November 12th Decision, AEFA noted that the requirement to turn client files over to Marzano without client consent would be in violation of the GLB.  Because of these concerns, on November 19, 2004, AEFA filed a Motion Seeking Clarification and Amendment of the Panel's Order of November 12, 2004 ("Motion to Clarify") with the NASD which is incorporated herein by reference.[6]  The Motion to Clarify asked, *inter alia*, GLB issues and AEFA's concerns that compliance with the November 12th Decision could constitute a violation of GLB and subject AEFA to liability.  The Motion to Clarify asked the Panel to consider two alternatives that AEFA believed would alleviate any GLB concerns: (i) require consent from the clients prior to providing copies of the files to Marzano; or (ii) provide the copies directly to the clients and allow those individuals to provide them to Marzano if they so desired.  In response to the Motion to Clarify, the Panel issued the following decision, which stated, in pertinent part:

---

[6] A copy of the Motion to Clarify is attached to the previously filed December 14th Zaretsky Dec. as Exhibit B.

On December 6, 2004, the Panel convened a telephone session for the purposes of discussion and deliberation of the Motion [to Clarify] and response.  The Panel, after consideration of all the foregoing materials submitted, hereby rule [sic] to the extent that it was not clear from the original Order that the files in question should be delivered as of the date Respondent ceased to be employed by American Express Financial Advisors *and for all other purposes DENY the Claimant's Motion.*

(December 7, 2004 Decision ("December 7th Decision"), December 14th Zaretsky Dec. Exhibit D) (emphasis added).

Pursuant to 9 U.S.C. §§ 10-11, the First Motion to Vacate was filed in this Court on January 28, 2005.[7]  That Motion is fully incorporated herein by reference.  On December 8, 2005, counsel for the parties appeared before the Court to argue the First Motion to Vacate.  At that hearing, the Court did not hear argument of the Motion, but stated that it would hold ruling on the First Motion to Vacate in abeyance until the entire arbitration was decided.  With regard to the GLB issue, however, at that conference the Court asked counsel, pointedly, whether that issue was mentioned during the November 2004 Hearings and directed the parties to determine where it was mentioned and submit that in further briefing

During the November 2004 Hearings, AEFA presented evidence and argument on the confidentiality and privacy issues.  In addition, GLB was mentioned during the Hearings.  There is no stenographic record of the November 2004 Hearings as they were recorded on a cassette tape recorder operated by a designated member of the Panel, as is standard procedure for NASD arbitrations, if no party makes their own arrangements for a stenographic record taken by a court reporter. (Declaration of Eliott R. Good, executed on March 17, 2006 ("Good Dec.") ¶ 4). AEFA has been advised, as evidenced by the letter from the NASD Office of Dispute Resolution, a copy of which is attached to the Good Dec. as Exhibit A, that the tapes numbered one and two from the November 2004 Hearings, as delivered to the NASD by the operating

---

[7] Pursuant to the Court's individual rules, the moving papers were served on Marzano December 17, 2004, but the Motion, fully briefed by both sides, was not filed until January 28, 2005.

designated member of the Panel, are blank and, therefore, there is no recording of the proceedings for a portion of the November 3rd Hearing date.  At the first session of the November 2004 Hearings, the parties made opening statements, and it is believed that they were made during that part of the hearing on November 3, 2004 for which the tapes are blank, so they are not available to review.  (Good Dec. ¶ 5).  At the November 3, 2004 Hearing session, Marzano's counsel argued that the GLB did not apply but that client consent is what is required. (Good Dec. ¶ 7).   As such, it is clear that GLB was addressed by way of argument by the parties before the Panel. In addition, the tapes that are available for the November 3, 2004 Hearing include the testimony of a witness named Sander Ressler, the Chief Compliance Officer of MFS, who was called by Marzano.  (Good Dec. ¶ 8).  Mr. Campbell questioned Mr. Ressler as to whether he believed that GLB prevented a broker-dealer from permitting a registered representative who resigned from taking copies of client files when he or she left the firm. (Good Dec. ¶ 8).  It is, therefore, clear that GLB was not only mentioned by the parties before the Panel, but was argued as well.

It is therefore clear that both GLB and AEFA's policy were raised during the November 2004  Hearings and the Panel chose to ignore that testimony and federal law when it issued the November 12th Decision.  It is equally clear that AEFA raised those issues again in the Motion to Clarify and the Panel again chose to ignore federal law by refusing to require client consent prior to copies of the files being forwarded to Marzano.  The Panel was thereby given at least two opportunities to follow the law in this regard so that AEFA would not have been in violation of GLB by giving copies of the files to Marzano.

AEFA's compliance with the November 12th Decision, and the December 7th Decision would subject it to potential liability for violating the requirements of GLB.  For that reason,

AEFA filed the First Motion to Vacate, or in the alternative, to modify the November 12th and December 7th Decisions.

**B.**      **The Fall 2005 Hearings**

      **1.**      **Remaining Claims After November 12th Decision**

Between September 2005 and December 2005, eleven hearing days (the "2005 Hearings") were held on Marzano's remaining Counterclaims.  In light of the rulings contained in the November 12th Decision, the following claims remained when the Hearings resumed in September 2005: (1) breach of contract; (2) breach of contract damages based on Marzano's claim that AEFA wrongfully took files from his office and "disrupted [his] business"); (3) AEFA's alleged "stealing away" of the client records; (4) breach of contract for AEFA's alleged failure to provide Marzano with copies of the client records and an inventory of those records; (5) breach of contract damages based on his claim that AEFA "solicited" the clients that he serviced while he was at AEFA; (6) defamation in conjunction with statements on the U-5; (7) punitive damages; (9) expungement of alleged erroneous information contained on the U-5.

At the close of Marzano's evidence during the 2005 Hearings, AEFA made a Motion to Dismiss on the record.  (Tr. p. 1740).  In response to the Motion to Dismiss, Marzano voluntarily withdrew the First, Third, Fourth and Seventh Causes of Action of his Counterclaim and he "changed" the claim in the Sixth Cause of Action from defamation to "failure to explain" the information on the form U-5's to prospective employers.  The Panel ruled that the only remaining Causes of Action were 1) for any damages that flowed from breach of contract (Cause of Action No. 2);  2) potential liability for "failure to explain" the information on the U-5 (Cause

of Action No. 6); and 3) the request to expunge the information on the U-5 (Cause of Action No. 9).  (Tr. pp. 1822-24).[8]

On November 22, 2005, the Panel dismissed the "failure to explain" claim and further stated that the issues had been narrowed to 1) damages, if any, that were caused by a breach of contract and 2) whether the U-5 should be amended.  (Tr. pp. 1850-53, 1890).  The Panel also stated that it had determined as a part of its November 12th Decision that the contract had been breached by AEFA's failure to provide Marzano copies of the client records at the time he left and that the purpose of the hearings was to determine the damages that flowed therefrom.  (Tr. pp. 2038-41).[9]  Even though the January 13th Decision awarded damages allegedly resulting from the withholding of the client files, Marzano put on numerous days of testimony and exhibits that allegedly went to other damages he claimed to suffer, and notwithstanding the fact that most of his causes of action were dismissed or withdrawn, an overview of his claimed damages is instructive of the Panel's refusal to provide AEFA enough time to completely defend the case, as described below.

### 2.   Marzano's Damages Claims

During discovery, AEFA specifically requested documents that evidenced Marzano's damages claims. In a letter dated April 6, 2005 ("April 6th Letter"), which was sent to AEFA's counsel in response to a document request seeking information regarding Marzano's alleged damages, Marzano stated that at the time of his resignation clients he had been servicing at AEFA had $70 million under management and that $50 million of that had transferred to him at

---

[8] The Fall 2005 Hearings were stenographically recorded and complete copies of the transcripts are attached to the March 20th Zaretsky Declaration, collectively, as Exhibit I.  While each hearing date was separately transcribed, the transcripts are consecutively paginated and will thus be referred to herein simply by page number as "Tr. p. XX".  It appears that in creating the transcripts, the court reporter numbered the indexes which caused some duplicate numbers.  All page references herein are to actual transcript page and *not* to any numbered indexes.

[9] This was the first time that the Panel ever announced that it had made such a determination as part of that Decision, which did not state any findings of fact or conclusions of law.

MFS.  (April 6th Letter, p. 3) (a true and accurate copy of the April 6th Letter is attached to the March 20th Zaretsky Declaration as Exhibit E).  No other documents or information regarding damages were received until October 5, 2005 (October 5th Letter), after the 2005 Hearings were well under way, when Marzano's counsel sent to AEFA's counsel a document which consisted mainly of bar charts and graphs, without an explanation of what the document was or its purpose. (A copy of the October 5th Letter is attached to the March 20th Zaretsky Declaration as Exhibit G).

Beginning with the October 26, 2005 Hearing session, Marzano testified that he suffered two types of damages: 1) "clear and quantifiable" and 2) "clear and unquantifiable."  (Tr. p. 996).  Marzano defined "clear and quantifiable damages," as the loss of an opportunity to receive an alleged $650,000 bonus he claimed he would have received if he had been hired by AXA Securities; (Tr. p. 997); alleged "lost revenue" in 2004 of $450,000 (Tr. p. 1001); attorney fees (Tr. pp. 1035-40); the cost of an administrative assistant at $36,000 that he allegedly had to hire because he did not have copies of the client files (Tr. pp. 1040-42); and compensation for time he himself was allegedly forced to expend due to not having the files.  (Tr. p. 1047).

The only attempt that Marzano made to quantify these allegedly "quantifiable" damages was by the introduction of the October 5, 2005 information sent to AEFA, which, as it turned out was prepared by Marzano.  (Tr. p. 1009).  He referred to this document as a "trendline" and it was introduced in the Arbitration as Respondent's Exhibit 12.  (Tr. pp. 1006, 1008).  He did not provide any proof or support for the figures on the trendline, despite being served with requests for such documents months before the Hearings began.  Under cross-examination, he later identified the methodology used to create the trendline as a "least squares regression analysis." (Tr. p. 1162) (a true and accurate copy of this analysis, which was entered in the arbitration as Respondent's Exhibit 12, is attached to the March 20th Zaretsky Declaration as Exhibit H).

Using this method, Marzano completely ignored the damages information that he provided in the April 6th Letter. AEFA repeatedly objected to Exhibit 12 and any testimony regarding it based primarily on two grounds: 1) that Marzano presented no evidence that he knew how to create this "trendline" or what it meant, i.e., that he was not an expert witness regarding the use of this type of analysis and 2) because he had not provided any support for the figures he used in the analysis or even provided the components or bases for the data included in Exhibit 12. (*See, e.g.*, Tr. pp. 1005, 1006, 1008, 1010, 1017, 1023 and 1025).[10]   These objections were, for the most part, overruled.

Marzano also testified that he suffered additional "clear and quantifiable" damages, as a result of his telling his clients about the information on his U-5. Those damages allegedly stemmed from his claim that some clients no longer gave him referrals after receiving this information, thus damaging him. (Tr. pp. 107-31). However, he admitted on cross-examination that no client had ever told him they were no longer going to refer anyone to him based upon the information on the U-5 or any other reason. (Tr. pp. 1205, 1229). The best he could do was assert that some clients told him this "non-verbally" by not referring people to him. (Tr. p. 1205). He also admitted however, that it was possible that these people did not refer anyone to him because they simply did not know any more people that needed or wanted his services. (Tr. p. 1205).[11]

Marzano also claimed that he was "clearly and quantifiably" damaged because some clients did not immediately transfer their investments to him at MFS after his resignation. He based this on his claim that he had to "fight" with AEFA to keep the clients because AEFA was

---

[10] Marzano also testified that his employees had assisted him in creating Exhibit 12 but he provided no testimony from these individuals regarding their participation in developing Exhibit 12. Instead, he was permitted to provide lengthy unassailable hearsay testimony about their participation. (Tr. p. 1009).

[11] Marzano presented no testimony from any clients to support his story.

"soliciting" those clients to stay at AEFA. (Tr. pp. 1026-28). Marzano was only able to specify four clients that did not transfer money to MFS: Ed Youngling, Clara Goodwin, Ken Pigaga and Thomas Cipolla (Tr. pp. 1331-32). However, he admitted that no other client that he claimed had been solicited did not transfer money to MFS. (Tr. p. 1281). In fact, he admitted that other than the above four individuals, the only clients that left funds at AEFA did so because of surrender charges they would have incurred and other potential penalties for early liquidation and that no client left money at AEFA as the result of any alleged breach by AEFA. (Tr. p. 1309).[12]

Belying Marzano's claims that everyone would have transferred every penny they held at AEFA had AEFA not "interfered" by either not providing files to Marzano or by "soliciting" clients was the testimony of several AEFA Advisors who had been assigned Marzano's accounts after he left. Scott Kaufman, who had been assigned Ed Youngling's account testified that Mr. Youngling told him that he did not transfer his money to MFS because "1, he liked [AEFA], 2; he liked the investment that he had currently been invested in, and 3; he was uncomfortable with the situation of leaving American Express and going someplace else because he liked what he had where he was." (Tr. 2129). In addition, Bert Bowler, the AEFA advisor who was assigned to service Thomas Cipolla's account after Marzano resigned testified that after Marzano's departure, Mr. Cipolla transferred a large portion of his assets to Smith Barney but left a small amount at AEFA. (Tr. p. 2547). He further testified that it was his recollection of his conversations with Mr. Cipolla that there was a time when "there wasn't a lot of communication" from Marzano to Mr. Cipolla and that "he seemed to be upset about that." (Tr. p. 2548).

---

[12] In his direct testimony, Marzano claimed that money was left at AEFA by some clients because they had been "solicited" by AEFA. However, when called by AEFA during its case, Marzano was questioned regarding specific clients who had left money at AEFA. Marzano admitted that none of these individuals left money at AEFA because of any breach of contract by AEFA. (Tr. pp. 2421-26).

William Martin, the AEFA advisor who had been assigned Mr. Pigaga's account testified that Mr. Pigaga had told him that he was upset about how he found out that Marzano had left AEFA and that he had been upset with Marzano's services of late. (Tr. p. 2850). Clearly, then, there were other reasons why the few people who did not transfer their assets to MFS did not do so. More importantly, however, in light of the above-referenced determination by the Panel that the only damages it was being asked to determine were those that allegedly flowed from AEFA's not providing copies of the client files to Marzano, Marzano provided *no* evidence that he suffered any such damages from that conduct. In fact, the opposite is true; that is, despite not having copies of the client files, every client that wanted to move money to MFS did so, in huge numbers in fact, and apparently most of them still have large amounts of money invested with him today.[13] As such, the evidence was uncontradicted and, indeed conceded, that Marzano suffered no damages as a result of not having the client files. In fact, Marzano had client telephone numbers and information from the Client Data System.

Because Marzano changed his damages theory in mid-case, AEFA presented the expert testimony of Owen Dahl, a chartered financial analyst who concentrates his practice mainly in business valuation. (Tr. pp. 2629-30). Mr. Dahl testified on November 30th and December 5th and was called primarily for the purpose of rebutting Marzano's damage calculations. In his testimony, Mr. Dahl first noted that he had no way of verifying the numbers that Marzano had used to make his calculations because Marzano had not provided AEFA with those documents. (Tr. p. 2637). Mr. Dahl also noted flaws in the assumptions that Marzano used in his calculations since neither Mr. Dahl nor AEFA had ever been provided with the documents Marzano allegedly used in crafting his least squares regression analysis. For example, Mr. Dahl

---

[13] Evidence presented at the 2005 Hearings indicated that the total value of the investments by the AEFA clients that invested funds with him at MFS was over $94 million. (Tr. p. 1021).

noted that he looked at four different indexes to determine market growth over the period of time covered by Marzano's damages claims, noting that the market indexes grew at a rate of about 45 percent from February 2003 through February 2004 but only grew at about 3.5 percent over the next twelve months, the period right after Marzano's resignation. (Tr. pp. 2638-39).  Mr. Dahl then explained the mechanics of a least squares regression analysis and noted that Marzano's "analysis" took into account only one variable: time.  (Tr. p. 2648).  He testified that "a regression analysis requires significant data points.  And if you shrink a time frame and focus a time frame on a variable – especially when time is your independent variable, you failed [sic] to capture, as I mentioned, all of the other independent variables."  (Tr. p. 2649).  He further stated that other variables that Marzano should have taken into account were the average age of Marzano's clients and the number of clients and potential for growth.  (Tr. pp. 2649-50).

Mr. Dahl continued his testimony on December 5, 2005, the last day the Panel permitted testimony. During that testimony, Mr. Dahl also noted several inherent flaws regarding Marzano's calculations.  Most importantly, that Marzano had not factored in enough variables to make his calculation reliable or an accurate prediction of what "should" have happened to the value of Marzano's assets under management at MFS.  (Tr. p. 2691-93).  In other words, by using more variables, Mr. Dahl's model was a much more accurate predictor of the amount of money Marzano could have expected to have under management.[14]  Some other material flaws in Marzano's damage calculation noted by Mr. Dahl were: the assumption that 100 percent of his book of business would transfer with Marzano (Tr. p. 2703); and that Marzano did not make adjustments to his calculations to account for the fact that some clients would stay at AEFA due to the surrender charges or other fees.  (Tr. pp. 2711-12).  The result of Mr. Dahl's calculation

---

[14] In addition, as part of Mr. Dahl's testimony, AEFA introduced Claimant's Exhibits 11, 12 and 13 attached to the March 20th Zaretsky Declaration as Exhibit F which evidenced Mr. Dahl's calculations.

was that Marzano's book of business would have grown to between $90.2 and 92.2 million by September 2005, *not* the $124 million claimed by Marzano and actually, less than the $94 million he had actually had in September 2005.  Accordingly, Mr. Marzano was better off than what the analysis predicted, and he suffered no damages.

### 3.    The January 13th Decision

As will be addressed more fully below, the Panel arbitrarily determined that the 2005 Hearings would come to a close on December 5, 2005 because, at least in part, one of the Panel members winters in Florida and was leaving on December 8, 2005.  The parties presented their summations on December 5th and the Panel reserved decision.  On January 13, 2006 the Panel issued its decision.  It first noted the award made in the November 12th Decision and then stated:

> After considering the pleadings, the testimony and evidence presented at the hearing and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:
>
> 1. Claimant is liable for and shall pay Respondent compensatory damages in the amount of $230,000.00, plus interest at the New York State statutory rate of 9% per annum, commencing thirty days from the service of this Award until the date of payment.
>
> 2. The Panel recommends that the language contained in Part 1, item 3 of the Internal Review DRP's submitted to Central Registration Depository ("CRD") as part of the amended Forms U5 filed, on behalf of Respondent Frank P. Marzano with CRD by Claimant American Express Financial Advisors, Inc., on July 27, 2004 and November 10, 2004 be expunged.  Replacement language for Part 1, Item 3 of the Internal Revenue DRP's is as follows: "The firm conducted a multi-broker review that focused on industry and company policy violations.  The firm's review concluded that the registered representative violated AEFA company policy by facilitating personal transactions on behalf of clients."  The expungement recommendation is being made to clarify that the firm's review was a "multi-broker" review.
>
> The panel makes the recommendation above with the understanding that Respondent Frank P. Marzano must obtain confirmation from a court of competent jurisdiction before CRD will execute the expungement directive.
>
> 3. Any and all relief not specifically addressed herein, including punitive damages, is denied.

As noted previously, at the November 22, 2005 hearing session, the Panel stated that it had already determined that AEFA had breached its contract with Marzano when it did not

provide copies of the files to Marzano when he resigned and that the purpose of the 2005 Hearings beginning in September was to determine the amount of damages that flowed from that breach.  (Tr. pp. 1853, 1890).  The fact that the Panel made no further rulings regarding any other alleged breach is made clear by its statement in paragraph three of the January 13th Decision which states, in pertinent part: "[a]ny and all relief *not specifically addressed herein* . . . is denied."  (January 13th Decision, ¶ 3) (emphasis added).

Because the January 13th Decision was supposed to award damages resulting from not having copies of the files, if this Court grants the First Motion to Vacate, determining that AEFA was not required to give Marzano copies of the files, the January 13th Decision must also be vacated because if AEFA was not required to give Marzano copies of the files at that time, then he is not entitled to compensation for "failure to return" those files.  In addition, as discussed below, the January 13th Decision should be vacated because Marzano did not put on evidence that would entitle him to any award of damages and by awarding damages to him, the arbitrators so imperfectly executed their powers, a mutual, final, and definite award upon the subject matter submitted was not made.

### C.    The Panel's Conduct During the Hearings

#### 1.    The Arbitrary Limiting of Hearing Dates

At sessions held on September 13th, 14th, 20th and 21st, October 26th,  27th and 28th, 2005, Marzano put on his case-in-chief with no restrictions as to the time he was taking to do so.  Marzano's presentation of his case-in-chief ended on October 28, 2005 because that is when he and/or his counsel determined that he had no further evidence to put on, not because of any restriction placed on him by the Panel.  Soon after the 2005 Hearings began, the parties were informed that Arbitrator Cohen winters in Florida and would not be available after December 8, 2005 until June 2006.  (Tr. p. 1271).  On October 27, 2005, the Panel stated that the Hearings

would continue on that date, October 28, November 22 and would conclude on November 28, 2005. (Tr. p. 1270). AEFA's counsel noted that he was not sure whether AEFA could complete its case by November 28th and the Panel and counsel discussed whether additional hearing dates would be necessary. (Tr. p. 1270-75). The Panel then tabled determining the issue of additional dates. (Tr. p. 1275). At the Hearing the next day, the Panel ruled that the Hearings had to end by December 5, 2005, including time for summation. (Tr. p. 1603). Because of Thanksgiving and the parties' and Panel's schedules, this meant only one additional day (actually less because of summations) for AEFA's case.

AEFA began the presentation of evidence in its defense on November 22, 2005. At that session, the Panel reiterated that it would allow only three additional hearing dates, November 28, November 30 and December 5, 2005, including summations. (Tr. pp. 1835, 1848). The Panel ruled that despite the fact that Marzano had not been limited in his time to present his case and had taken seven days to do so, AEFA's defense would be limited to just over three days. AEFA objected to the limitation on hearing dates, not only because such a limitation potentially prejudiced the case, but also because AEFA's attorneys were scheduled to argue an appeal before the South Carolina Court of Appeals on December 6, 2005 and could not participate on December 5, 2005. (Tr. p. 1841-42). The objection was overruled and the Panel insisted that no hearing would be held after December 5, 2005. (Tr. p. 1848).[15]

AEFA was prepared to call more witnesses for the purpose of rebutting claims made by Marzano in his case, particularly those related to damages. However, the Panel's decision to limit the number of days for AEFA's defense prevented AEFA from being able to call all of the witnesses it believed it needed.

---

[15] Perhaps a harbinger of the Decision, and the Panel's unfair process, is illustrated by one Arbitrator's comments to AEFA's attorney that evidence that was "on the record" was "of interest" but "not necessarily controlling," showing a clear misapprehension of his duties and the law. (Tr. pp. 2043-44).

At 3:15 on December 5, 2005, just prior to summations, the Panel asked "[d]oes American Express have any further evidence or testimony to present to this Panel?" (Tr. p. 2891). AEFA's attorney noted that AEFA did have additional evidence to present but in light of the Panel's determination that no additional hearing dates were going to be granted, AEFA did not feel it could put on any more witnesses and still allow time for closing arguments. (Tr. p. 2892). The Panel essentially ignored AEFA's attorney's statement. (Tr. p. 2893). After closing arguments the Panel asked that the parties affirmatively state whether they had been given a full and fair opportunity to be heard, to which AEFA's attorney responded "[w]ith due respect, no. We believe that we could have produced, offered more evidence had we been given a chance." (Tr. pp. 2956-57).

### 2. The Requirement that AEFA's Expert Testify Without Being Given Ample to Complete his Evaluation

The Panel also limited AEFA's presentation of expert testimony regarding Marzano's damages. Because the "calculation" he included in the April 6th Letter was purely arithmetic, AEFA determined that it would not need to retain an expert witness on damages. However, after being ambushed by Marzano's testimony regarding Respondent's Exhibit 12 at the October 26th Hearing, AEFA determined that it would need to hire an expert witness to address that Exhibit and Marzano's regression analysis calculations. As noted *supra*, the least squares regression analysis documents were sent to AEFA's counsel on October 5, 2005, allegedly as part of a 20-day disclosure of witnesses and exhibits but the document was merely a series of numbers and graphs and contained no explanation as to its basis or purpose. As such, AEFA could not determine by looking at the face of the document, what, if any, testimony would be needed to address the document.[16]

---

[16] NASD Rules require a party to provide a list of its exhibits at least 20 days before the "first scheduled hearing date." NASD Rule 10321(c). Since the 2005 Hearings commenced on September 13, 2005, Marzano should have

Marzano testified regarding that analysis beginning on October 26, 2006 and after Marzano's testimony, both on direct and cross, it became clear that AEFA needed to hire an expert to review the calculations and the methods Marzano used. However, as the hearings were scheduled to resume on November 22nd, AEFA had, essentially, three and one-half weeks to identify and interview potential experts, retain an expert, get documents to him, have him analyze all the data and prepare a report before the next set of hearings. Despite the artificial deadlines imposed by the Panel, and the fact that Marzano changed his damage calculation so late, the Panel ruled that AEFA's expert would have to testify during the three remaining hearing dates. (Tr. pp. 2056-60). [17] As such, he had only a few days to complete his assignment and testify by the last day of the Hearings on December 5, 2005.[18]

It was abundantly clear that there was no reason, other than one arbitrator's apparent need to go to Florida for the Winter on December 8th, that the Hearings could not have been extended by an additional few days early in 2006 so that AEFA's expert could have thoroughly prepared his report and prepared for testimony and AEFA could have called the additional fact witnesses it believed it needed. In light of the fact that the Panel was limiting the hearing dates because one of the arbitrators was leaving for Florida on December 8th, at the beginning of the November 28, 2006 Hearing AEFA proposed two options to the Panel that would allow AEFA to present its case completely and also permit the case to be fully submitted to the Panel in early 2006. The first option was for AEFA to pay all of the expenses of all the participants, including the

---

submitted the exhibits regarding his least squares regression analysis on or before August 24, 2005, *not* October 5, 2005, after there had been four days of hearings in September.

[17] One result of the Panel's arbitrary determination was that AEFA's expert, who lives and works in the Seattle, Washington area, was forced to come to New York twice, for both the November 30th Hearing Session, at which he testified only briefly (Tr. pp. 2628-51), and the December 5th Session.

[18] AEFA's attorney was forced to spend nearly one-half day of the November 22nd Hearing date arguing to the Panel why it should be permitted to put on an expert. (Tr. pp.1902-39; 2023-2056). After the Panel grudgingly decided to permit the testimony, it determined that the testimony must be presented at one of the three remaining days it arbitrarily determined would be permitted. (Tr. pp. 2056-60).

Arbitrators, to travel to Florida in January 2006 to finish the Hearings.  The other option was to

pay for that Arbitrator to participate by video conference from Florida.  (Tr. pp. 2079-80).  After

holding an executive session, the Panel rejected those options and ruled that the case must end on

December 5th despite AEFA's contention that by being limited in the number of days to present

its case it would be prejudiced in presenting its defense.   Because of the unreasonable decision

to prohibit additional hearing dates, AEFA was not permitted to present all of the evidence it

believed it needed to defend against Marzano's Counterclaim.

## II.    STATEMENT OF THE LAW

The Federal Arbitration Act ("FAA") authorizes this Court, to vacate or modify an

arbitration award.  *See, e.g., Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197 (2d Cir. 1998).

The FAA states in pertinent part:

### § 10.    Same: vacation; grounds; rehearing

In any of the following cases the United States court in and for the district wherein the
award was made may make an order vacating the award upon the application of any
party to the arbitration –

. . .

(3) Where the arbitrators were guilty of misconduct in *refusing to postpone the hearing*,
upon sufficient cause shown, *or in refusing to hear evidence pertinent and material to
the controversy*; or of any other misbehavior by which the rights of any party have been
prejudiced; or

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a
mutual, final, and definite award upon the subject matter submitted was not made.

### § 11.    Same; modification or correction; grounds; order

In either of the following cases the United States Court in and for the district wherein
the award was made may make an order modifying or correcting the award upon the
application of any party to the arbitration –

a)  Where there was an evident material miscalculation of figures or an evident material
mistake in the description of any person, thing, or property referred to in the award.

b)  Where the arbitrators have awarded upon a matter not submitted to them, unless it is
a matter not affecting the merits of the decision upon the matter submitted.

c)  Where the award is imperfect in matter of form not affecting the merits of the
controversy.

20

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. §§ 10-11.

In addition to the grounds set forth in the statutory list, it is well-established that an arbitration award may be vacated or modified by a district court when the award reflects the arbitration panel's "manifest disregard for the law." *Halligan*, 148 F.3d at 202. *See also*, *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 265 (2d Cir. 1989); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986).

The authority of a district court to vacate or modify an arbitration award was set forth in *McDaniel v. Bear Sterns & Co.,* 196 F. Supp. 2d 343 (S.D.N.Y. 2002).  In that case, the court held that a federal court may vacate an arbitration award if certain statutory or judicially-created grounds for vacation are present, including manifest disregard for the law.  *Id*. at 351.

Other circuits have also recognized this  standard.  In *Merrill Lynch v. Jaros,* 70 F.3d 418, 420 (6th Cir. 1995), the United States Court of Appeals for the Sixth Circuit held that:

> A mere error in interpretation or application of the law is insufficient:  Rather, the decision must fly in the face of clearly established legal precedent. When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.

*Id.* at 421.

In *Puerto Rico Ports Authority v. Misener Marine Construction, Inc.*, 233 F. Supp. 2d 266 (D. P.R. 2002), the court reached a similar conclusion as to the authority of a Court to vacate or modify an arbitration award.  The court stated:

> Rather, an arbitration award can only be vacated or modified in rare circumstances such as when the arbitrator has engaged in misconduct as specified in the Federal Arbitration Act . . . or when it is clear from the record that the arbitrator recognized the applicable law, and ignored it.

*Id.* at 268.

The "legal principle" ignored here, the applicability of GLB, was clearly defined and presented to the Panel.  It is clear that the Panel had actual knowledge of GLB and the effect of exposing AEFA to liability under it if AEFA complied with the Award prior to both the November 12th Decision and the December 7th Decision.  It is equally clear that the Panel simply ignored GLB when it made the November 12th Decision and the December 7th Decision and therefore, each of these decisions are subject to vacation under 9 U.S.C. § 10, as a "manifest disregard of the law."

### A.  The GLB Prevents AEFA from Simply Turning Over Copies of the Files to Marzano without Client Consent

AEFA fully briefed this issue in the First Motion to Vacate.  However, at the December 8th 2005 Conference the Court specifically asked the parties whether GLB had been mentioned during the November 2004 Hearings.  As noted previously, although there is no stenographic record of the 2004 Hearings and two of the tapes used to record the Hearings are blank, AEFA's counsel notes, along with the recordings that are available, show that GLB was discussed during the 2004 Hearings.  In addition, as noted in the First Motion to Vacate, and above, the GLB's applicability was argued in the Motion to Clarify.  Thus, even if the Panel was not fully aware of, or focused on, the effects of GLB at the time it issued the November 12th Decision, it is beyond dispute that the Panel was fully aware of GLB and its effects when it made the December 7th Decision, which completely disregards the GLB's effects on AEFA's compliance with the Decision.  Because the Panel was aware of the applicable law and chose to ignore it, the November 12th Decision is subject to vacation as being in "manifest disregard" of GLB.

### B.  The Panel's Refusal to Hear Certain Evidence and Refusal to Postpone the Hearings to permit AEFA's Expert Witness Time to Prepare was Improper and is Grounds for Vacation

The Federal Arbitration Act also permits the court to vacate an arbitration award when:

the arbitrators were guilty of misconduct in *refusing to postpone the hearing*, upon sufficient cause shown, *or in refusing to hear evidence pertinent and material to the controversy*; or of any other misbehavior by which the rights of any party have been prejudiced; or

9 U.S.C. § 10(a)(3) (emphasis added).

If the arbitrator refuses to hear pertinent and material evidence to the prejudice of one of the parties, the court may vacate that award. *Areca, Inc. v. Oppenheimer & Co., Inc.*, 960 F. Supp. 52, 55 (S.D.N.Y. 1997). It has also been held that "the misconduct must amount to a denial of fundamental fairness of the arbitration proceeding to warrant vacating the award." *Transit Cas. Co. v. Trenwick Reins. Co*., 659 F. Supp. 1346, 1354 (S.D.N.Y. 1987), aff'd, 841 F.2d 1117 (2d Cir. 1988); *Reichman v. Creative Real Estate Consultants, Inc.*, 476 F. Supp. 1276, 1285 (S.D.N.Y. 1979).

It is well-settled that arbitrators enjoy "broad discretion to determine whether to hear evidence," *Areca, Inc*., 960 F. Supp. at 55; *see Trade Transp., Inc. v. Natural Petroleum Charterers Inc.*, 738 F. Supp. 789, 792 (S.D.N.Y. 1990), aff'd, 931 F.2d 191 (2nd Cir. 1992), and that the arbitration process may proceed

with only a summary hearing and with restricted inquiry into factual issues ... Although arbitrators must have before them enough evidence to make an informed decision, they need not compromise the speed and efficiency that are the goals of arbitration by allowing the parties to present every piece of relevant evidence.

*Areca, Inc.*, 960 F. Supp. at 55 (citations omitted; internal quotations omitted).

Fundamental fairness was not met in this case. Marzano presented his case over the course of seven days without any restriction on how much time he was allotted. If he would have had more witnesses, there is no indication that he would not have been permitted to use more days to do so. AEFA, however, was arbitrarily and, frankly, unfairly, only permitted less than four days to present its defense, despite the fact that, on several occasions, it advised the Panel that it needed more time for its expert to perform his analysis, and that it had additional witnesses who could not testify within the time allowed. What makes this situation particularly

23

unfair is that the only reason for this limitation was because one of the Arbitrators winters in Florida and was scheduled to leave the New York area on December 8, 2005 and not return until June 2006.  By placing this unreasonable limitation on AEFA's case, the Panel refused to hear pertinent and material evidence to the undue prejudice of AEFA.

The patent unfairness of the Panel is highlighted by its rejection of AEFA's two options that would have allowed AEFA to present its case completely and also permit the case to be fully submitted to the Panel in early 2006. However, the Panel summarily and unreasonably rejected even those options and reiterated that AEFA had to finish its case by December 5th.[19]   Therefore, the Panel, with no justification, refused to hear pertinent testimony to the prejudice of AEFA and failed to provide sufficient time for AEFA to defend itself, and the January 13th Decision should be vacated for that reason alone.

**C.    All Monetary Relief Granted in the January 13th Decision was for AEFA's Refusal to Provide Copies of Client Files to Marzano, an Obligation it Did Not Have Under any Contract and Which was Prohibited by GLB.**

As is typical of NASD arbitration awards, the Panel made no factual or legal  findings in the January 13th Decision.  However, at the November 22, 2005 hearing session, the Panel informed the parties that the only damages that it was being asked to consider were damages flowing from AEFA's breach of contract for not giving copies of the files to Marzano and whether the Panel should recommend the expungement of the U-5. The January 13th Decision awarded Marzano $230,000.00 in compensatory damages.  Because the Panel's only "decision" regarding AEFA's conduct was that it breached a contract, presumably the July 6th Letter, by not providing copies of the files, that is, obviously,  the only conduct for which Marzano could have been compensated by the Panel.  Further, the January 13th Decision clearly states that any and all

---

[19] The refusal to allow the Arbitrator to participate by video conference from Florida was particularly puzzling, and troubling, considering the very minor inconvenience that would have entailed.

relief *not specifically addressed* therein, including punitive damages, was denied.  As such, any relief sought for any other allegedly actionable conduct had to have been denied because the Panel did not specifically address it.

As discussed in both the First Motion to Vacate and above, AEFA could not simply turn over copies of the files to Marzano without client consent.  Furthermore, at the time Marzano left AEFA, and for three weeks thereafter, he was not affiliated with another broker-dealer and was, therefore, not entitled to the files under any circumstance.  AEFA could not have contracted to violate GLB and the Panel's interpretation of the July 6th Letter as requiring that, plainly disregards GLB.  For those reasons, the November 12th Decision should be vacated.  Moreover, because the entire $230,000.00 award provided by the January 13th Decision was to compensate Marzano for AEFA not giving him copies of the files, that award must be vacated if the Court grants AEFA's First Motion to Vacate.

## III.   <u>CONCLUSION</u>

For all of the above reasons AEFA respectfully requests that the Court vacate both the November 12th Decision and the January 13th Decision.

> CHORPENNING, GOOD, CARLET
>  & GARRISON
> Attorneys for Plaintiff
>
>
>  _/s/Michael J. Zaretsky_____
> Michael J. Zaretsky, Esq.

Dated: March 21, 2006