Page 356

Ruplin - cross

1
2      Q.   Did you ask him what he was asked at
3   these interviews?
4      A.   Well, I asked him to relate the nature
5   of the investigation that was going on.
6      Q.   I understand.
7           But when he told you that he had been
8   interviewed by compliance people, did you ask him
9   what it was he had been asked in these interviews?
10     A.   I don't know if I asked it specifically
11  that way. But I think the idea was for him to
12  relate to me what happened during the course of that
13  investigation or the interviews, yes.
14     Q.   Did Mr. Marzano tell you at all what he
15  was asked at the interviews?
16     A.   I believe he related to me that the
17  interviews revolved around this situation of the
18  money issue, you know, I want to say as I sit here
19  now, that it had something to do with maybe a loan
20  with a client or something like that. That's the
21  best I recall of it.
22     Q.   You recall that what he told you was
23  that the AEFA compliance people had raised with him
24  something about a loan with a client?
25     A.   Correct.

Page 357

Ruplin - cross

1
2      Q.   Do you recall, was he saying that AEFA
3   had raised with him whether he had made a loan to a
4   client?
5      A.   I believe, you know, I don't recall the
6   exact specifics. But it had something to do, if I
7   recall, with a loan either to or from a client.
8      Q.   Did you ask Mr. Marzano if he had ever
9   made any loans to any clients?
10     A.   I know I asked him to explain the
11  circumstances of whatever happened.
12     Q.   What did he tell you? What was his
13  explanation if you remember?
14     A.   I don't remember, as we sit here today,
15  the exact specifics of the case. You know. And
16  what it was.
17     Q.   Do you recall that his explanation of
18  this transaction sufficiently explained it insofar
19  as you were concerned as to remove it as a question
20  with respect to registering him with Axa?
21     A.   I believe that my impression was that I
22  felt it was a satisfactory explanation. Yes.
23     Q.   Did he tell you that he had made any
24  loans to any clients?
25     A.   You know, I don't really recall whether

Page 358

Ruplin - cross

1
2   it was loans to or from, or what the exact specifics
3   of the case. I just remembered that it had
4   something to do with that.
5      Q.   If he had told you that he had made a
6   loan to a client, is that an activity that would
7   create a problem for Axa?
8      A.   Not necessarily.
9      Q.   What if he had borrowed money from
10  clients, would that have been something that would
11  have created a problem for Axa?
12     A.   Not necessarily.
13     Q.   What if he had been involved with loans
14  between clients; one client making a loan to or from
15  another?
16          Would that have been something that
17  would have been a problem for Axa?
18     A.   I guess it would depend on the nature
19  of the circumstances.
20     Q.   Do you recall if he told you that he
21  had been questioned about the signatures
22  endorsements of clients of his on checks?
23     A.   Now that you mention that, I believe
24  that may have been discussed also, yes.
25     Q.   Do you recall any more specifics than

Page 359

Ruplin - cross

1
2   that?
3           What did he say about that?
4      A.   You know, I do not recall any specifics
5   of it. I didn't really remember it until you just
6   mentioned it now.
7      Q.   Did he ever say to you that he had been
8   accused of putting a client's endorsement on a
9   check?
10     A.   You know, I don't really recall if that
11  was a specific, as I say, it sounds vaguely familiar
12  now that you bring up the issue. But I don't recall
13  the circumstances of it.
14     Q.   Just so we're clear, so you don't
15  recall the specifics of what he said to you about
16  the signatures of clients, the endorsements on
17  checks.
18     A.   No.
19     Q.   About whether the specifics of what the
20  American Express people were asking him about that?
21     A.   I don't recall as we sit here today,
22  no.
23     Q.   Did he ever tell you that he placed a
24  client's signature and endorsement on a check?
25     A.   No, I don't recall that.

36 (Pages 356 to 359)

Page 360

Ruplin - cross

1
2     Q.    If an individual who was being
3  recruited indicated that they had placed a client's
4  signature as an endorsement on a check, is that
5  something that Axa would accept?
6            How would that affect the recruitment
7  process, do you think?
8     A.    Well, I would think that if somebody
9  came right out and indicated that they put a
10  signature or essentially forged a signature on any
11  document or instrument, I would think that that
12  would be a major problem.  We would not normally
13  pursue a candidate that would have an issue like
14  that.
15    Q.    Now, if you look at Respondent's
16  Exhibit, I believe it's 5, that's the one that Mr.
17  Campbell first showed you.
18    A.    Yes.
19    Q.    Now, these are documents that Mr.
20  Marzano furnished to you; is that correct?
21    A.    Correct.
22    Q.    Were they unsolicited?
23            In other words, had you asked him to
24  get any of these things for you?
25    A.    No.  I don't believe I asked him

Page 361

Ruplin - cross

1
2  specifically for these documents.  I think they were
3  provided during the course of our conversations
4  about the nature of the investigation that was
5  pending.
6     Q.    Well, the first, and let's go through
7  them because they don't have numbers on them.  But
8  the first document appears to be a letter of April
9  5, 2004 addressed to you from an attorney named
10  Richard Feldman at a firm called Todtman,
11  T-o-d-t-m-a-n, et al., let's just say for the
12  record.
13            Do you see that letter?
14    A.    Yes.
15    Q.    Do you recall receiving that letter?
16    A.    Yes.
17    Q.    Did Mr. Marzano hand you this letter or
18  did you receive this in the mail from Mr. Feldman
19  directly, do you recall?
20    A.    I don't recall how I received it.
21    Q.    Did you have any explanation or
22  advanced notice that you would be receiving this
23  letter before you got it?
24    A.    I believe Mr. Marzano did indicate that
25  he was going to be giving me information that he

Page 362

Ruplin - cross

1
2  felt would shed additional light on the pending or
3  open investigation.
4     Q.    Did you ever discuss the contents of
5  this letter with Mr. Marzano?
6     A.    I believe so.
7     Q.    Did you furnish a copy of this letter
8  to the home office?
9     A.    Yes.
10    Q.    So the Axa home office would have had
11  this letter as well; is that right?
12    A.    Yes.
13    Q.    You don't recall specifically
14  discussing it though with Mr. Marzano?
15    A.    Well, I believe I did discuss it with
16  him, yes.
17    Q.    Do you recall the substance of those
18  discussions?
19    A.    Well, as I mentioned earlier, I think
20  that we spoke a number of times about the substance
21  of the pending investigation and his response to it.
22    Q.    So this letter was part of his response
23  to questions you had about the substance of the
24  pending investigation; is that correct?
25    A.    That's correct.

Page 363

Ruplin - cross

1
2     Q.    Did you ever speak to Mr. Feldman?
3     A.    No.  Not that I recall anyway.
4     Q.    Now, the next document is a letter
5  dated April 5, 2004 addressed to Mr. Marzano,
6  correct?  And it's signed by an attorney named
7  Martin Kaplan.
8            Do you see that?
9     A.    Yes.
10    Q.    On a letterhead of a firm called Gusre,
11  G-u-s-r-e, Kaplan, et cetera?
12    A.    Yes.
13    Q.    Do you recall, did Mr. Marzano himself
14  furnish a copy of this letter to you as opposed to
15  you receiving it in the mail?
16            I ask it because it's not addressed to
17  you in the first instance.
18    A.    Yes.  I believe that was the case.
19    Q.    Did you read this letter when you got
20  it?
21    A.    Yes, I did.
22    Q.    Did you furnish a copy of this letter
23  to the home office of Axa?
24    A.    I believe so.
25    Q.    Did you ever speak to Mr. Kaplan about

Page 364

Ruplin - cross

1  Ruplin - cross
2  the contents of this letter?
3      A.   Martin Kaplan?
4      Q.   Correct.
5      A.   No, I do not believe I did.
6      Q.   Now, you see a reference in the first
7  sentence to Amex's counsel Eliot Good in the first
8  sentence in the letter.
9      A.   Yes.
10     Q.   And this letter is purporting or it
11 says in that sentence that he's relating an analysis
12 of conversations that Mr. Kaplan had with Mr. Good,
13 right?
14     A.   It appears to be, right.
15     Q.   Did you ever make any effort to contact
16 Mr. Good?
17     A.   No.
18     Q.   Other than your good fortune of meeting
19 him today, obviously.
20     A.   No, I never did.
21     Q.   Turn back several pages in the document
22 after Mr. Marzano's resume.  And after a table or
23 chart that says assets under management.
24          See a couple of those graphs and stuff?
25     A.   Yes.

Page 365

1      Ruplin - cross
2      Q.   It's kind of the last several pages.  I
3  guess it's the last three pages.  One is a letter of
4  April 5, 2004 on the letterhead of something called
5  Seligson and Gianntazzio.
6          Do you see that letter --
7      A.   Yes.
8      Q.   -- dated April 5, 2004, signed by
9  Donald Gianntazzio?
10     A.   Yes.
11     Q.   Then the next thing is a letter on the
12 letterhead of Keyspan Corporation dated April 5,
13 2004.
14     A.   Yes.
15     Q.   And it looks like it's signed by
16 somebody named Wallace Parker, correct?
17     A.   Right.
18     Q.   And his name is printed on the top
19 right corner of the letterhead?
20     A.   Yes.
21     Q.   Then there's another letter addressed
22 to Frank Marzano on Keyspan letterhead as well.
23 Looks like it's from someone named Robert Fani, I
24 believe, F-a-n-i?
25     A.   Correct.

Page 366

1      Ruplin - cross
2      Q.   Correct?
3          Now, were each of these letters
4  furnished to you by Mr. Marzano?
5      A.   Yes, they were.
6      Q.   Did you read them when you received
7  them?
8      A.   Yes, I did.
9      Q.   Did you furnish copies of them to Axa?
10     A.   I believe so.
11     Q.   Do you know what the purpose of these
12 letters were?
13     A.   They were, you know, they were
14 character references.
15     Q.   Did they have any meaning to you?  Were
16 they in any way significant?
17     A.   Well, I found them to be very
18 impactful, yes.
19     Q.   So you felt these were people who were
20 making, frankly, complimentary statements about Mr.
21 Marzano and his integrity?
22     A.   Yes.
23     Q.   Did you ever know any of these
24 individuals who wrote these letters before you
25 received them?

Page 367

1      Ruplin - cross
2      A.   No.
3      Q.   Have you ever spoken to any of them?
4      A.   No.
5      Q.   Now, do you know Donald Gianntazzio?
6  Let's look at that letter first, right?
7      A.   Okay.
8      Q.   And that's on letterhead of Seligson
9  and Gianntazzio, correct?
10     A.   Correct.
11     Q.   Certified public accountants?
12     A.   Hmm-hmm.
13     Q.   I'm not going to read the letter into
14 the record.  But he's very complimentary and talks
15 about Mr. Marzano's ethics and integrity, correct?
16     A.   Correct.
17     Q.   And how he thinks quite highly of him;
18 is that right?
19     A.   That is true.
20     Q.   And this meant something to you, is
21 that correct, at Axa when you got this?
22     A.   Yes.
23     Q.   Did you know when Mr. Gianntazzio wrote
24 in letter to you that he was a business partner of
25 Mr. Marzano's in a separate business?

38 (Pages 364 to 367)

Ruplin - cross

1
2    A.   I'm not sure whether I knew that at
3    that time or not.
4        Q.   Did you subsequently find that out?
5        A.   Well, you just mentioned it now.
6        Q.   I didn't tell you anything.  I asked
7    you a question.
8        A.   Well, it sounds like you were saying
9    that.
10       Q.   Did you have any information from any
11   sources when you got this letter or at any time
12   before today that Mr. Gianntazzio was Mr. Marzano's
13   business partner?
14       A.   I really don't recall if I did or not.
15       Q.   Would it have had any impact on you
16   when you read this letter that was a character
17   reference for Mr. Marzano if you knew that this was
18   coming from Mr. Marzano's business partner?
19       A.   You know, it may have.  I guess it
20   would depend on the situation.
21       Q.   Well, let me give you this
22   hypothetical:  If you got this letter and you were
23   seriously considering hiring Mr. Marzano and you had
24   even gotten to the point of making an offer to Mr.
25   Marzano, and then you later discovered that Mr.

Ruplin - cross

1
2    Gianntazzio was, in fact, his business partner, and
3    you discovered it through no disclosure by Mr.
4    Marzano, would that have impacted the recruiting
5    process at all?
6        A.   In a negative way you mean?
7        Q.   Correct.
8        A.   Not necessarily.  I don't think so.
9        Q.   Do you think that --
10            MR. CAMPBELL:  Mr. Chairman, if I
11       can just interpose again, these are all very
12       interesting hypotheticals.  No foundation for
13       them at all whatsoever by the way.  You have
14       no evidence one way or the other on this.  If
15       we can get evidence it will be Donald
16       Gianntazzio wasn't his partner certainly in
17       April 2004, but is that right?
18            MR. MARZANO:  Yes.
19            MR. CAMPBELL:  We got a guy who's
20       been sitting out there since 10 o'clock this
21       morning from Denver.  And we have to go
22       through all of these hypotheticals
23       foundation, groundless hypotheticals with
24       this witness.  I think it's just wasting
25       time.  We should move away from hypotheticals

Ruplin - cross

1
2    that have no basis in evidence before the
3    panel.
4            THE CHAIRMAN:  Mr. Zaretsky, you
5    want to continue?
6            MR. ZARETSKY:  Did I get an
7    answer to the question?  I don't know.
8            MR. CAMPBELL:  Got an answer to
9    the question.
10       Q.   All right.
11            Did Mr. Marzano in describing this,
12   remember this loan to a client that you think he
13   told you about?
14       A.   Yes.
15       Q.   Did he tell you that a company that he
16   and Mr. Gianntazzio were partners and may have been
17   involved in this loan transaction?
18            MR. CAMPBELL:  Objection.  Again,
19       Mr. Chairman, he's got a question based on
20       nothing.  He didn't.
21            MR. ZARETSKY:  It's not based on
22       nothing.
23            MR. CAMPBELL:  A loan to/from
24       whatever.  Something to do with a loan
25       involving a client.  Don't know what it was.

Ruplin - cross

1
2    And now he's building a whole hypothetical
3    case around it that is not grounded, in fact,
4    and asking the witness hypothetical
5    questions.  Not relevant.
6            THE CHAIRMAN:  Go ahead, Mr.
7    Zaretsky.  Proceed, continue.
8            MR. ZARETSKY:  Could you read the
9    question back, please.
10            (Question read.)
11       Q.   The loan transaction that he told you
12   about --
13       A.   Right.
14       Q.   -- that was at issue?
15       A.   Right.
16            I don't recall who the parties exactly
17   were loaning to or from.  And whether it was a firm
18   or not, that I can't tell you.
19       Q.   Do you remember him ever mentioning the
20   name?
21            By the way, did you ever discuss with
22   Mr. Marzano any of his outside business activities
23   as part of the recruitment process?
24       A.   Yes.
25       Q.   Do you remember him mentioning the name

39 (Pages 368 to 371)

Page 372

1          Ruplin - cross
2  of an entity called GM Financial?
3      A.   It doesn't sound familiar as we sit
4  here today.
5          MR. ZARETSKY:  Just a moment, Mr.
6  Chairman.
7          I don't have any other questions,
8  Mr. Chairman.  Thank you.
9          THE CHAIRMAN:  Mr. Campbell?
10         MR. CAMPBELL:  Thank you, Mr.
11  Chairman.
12         Mr. Ruplin, just a couple of
13  quick follow-ups.
14  Ruplin - redirect
15  REDIRECT EXAMINATION
16  BY MR. CAMPBELL:
17     Q.   These meetings that you were describing
18  with various people at the home office at the
19  headquarters of Axa, is that something you do with
20  every potential recruit?
21         MR. ZARETSKY:  Mr. Chairman --
22         THE CHAIRMAN:  Answer the
23  question, please.
24     A.   No.
25     Q.   Is this something that you laid on

Page 373

1
2  specially for Mr. Marzano?
3      A.   Yes, it was.
4      Q.   Why did you do that?
5      A.   Well, because of the nature of the
6  inquiry that was pending on his NASD CRD, it
7  necessitated headquarter's review and approval be in
8  order to move forward in the process.
9      Q.   Did you do it because you really wanted
10  to affiliate him if you could?
11     A.   Yes.
12     Q.   Let me see if I can jog your memory
13  about a couple of things that Mr. Zaretsky asked you
14  about.
15         You work with a headhunter as part of
16  your normal recruiting efforts?
17     A.   Yes, I have.  From time to time.
18     Q.   See a headhunter who appears to be in
19  your own building downstairs?
20     A.   Downstairs?  I don't recall that, no.
21     Q.   A gentleman of East Indian descent?  I
22  beg your pardon.  Someone who's affiliated with Axa?
23         MR. ZARETSKY:  Object.  Now, I
24  don't understand the question.
25         MR. CAMPBELL:  I'm trying to

Page 374

1
2  refresh the witness' recollection by
3  suggesting traits that may jog his memory as
4  to a particular headhunter.
5          Excuse me, Mr. Chairman.  Okay,
6  forget it.  I misunderstood.
7      Q.   Is there a person who works with Axa
8  who's in your building?
9      A.   Yes.  I mean, there are people.
10         MR. CAMPBELL:  I'm not going to
11  make a lot of progress here, Mr. Chairman.
12  Don't worry about it.  I'll drop it.
13     Q.   Do you remember having a meeting with
14  Mr. Marzano in which he told you that he was
15  involved in an ongoing investigation while he was
16  still affiliated with American Express?
17     A.   Yes.
18     Q.   And is that the meeting that was
19  arranged by the headhunter?
20     A.   I really don't recall.
21     Q.   Do you recall having meetings with Mr.
22  Marzano after he actually separated from American
23  Express?
24     A.   Yes.
25     Q.   Are those the meetings that you were

Page 375

1
2  describing in which you received the documents
3  contained in Respondent's Exhibit 5?
4      A.   Yes.
5          MR. CAMPBELL:  I have no further
6  questions, Mr. Chairman.
7          MR. ZARETSKY:  No questions.
8          ARBITRATOR COHEN:  I have a
9  question.
10         MR. ZARETSKY:  I'm sorry.  I
11  spoke too quickly.
12  RECROSS-EXAMINATION
13  BY MR. ZARETSKY:
14     Q.   This meeting at the home office that
15  you described that was special because of the
16  inquiry...
17     A.   Yes.
18     Q.   Mr. Marzano didn't attend; did he?
19     A.   Yes, he did.
20     Q.   Was he asked questions about, well, did
21  you already have this CRD report?
22     A.   Yes.
23     Q.   At the time of that meeting had you
24  already talked to Mr. Marzano about his explanation
25  for what was on the CRD information?

40 (Pages 372 to 375)

Ruplin - recross

1
2     A.   Yes.
3     Q.   Did you discuss it with the individuals
4  at that meeting?
5     A.   Yes.
6     Q.   Did Mr. Marzano make statements at that
7  meeting?
8     A.   Yes.
9     Q.   What did he say at that meeting?
10    A.   I believe he reiterated the same things
11 that we discussed prior in answer to the pending or
12 open investigation.
13    Q.   All of the things that you've already
14 testified to in response to my questions to you
15 about what specifics or explanation Mr. Marzano gave
16 you?
17    A.   Correct.
18    Q.   Nothing more than that?
19    A.   I don't believe so.  No.
20    Q.   Did anyone ask him any questions at the
21 meeting that you recall?
22    A.   Yes.
23    Q.   What was he asked at the meeting?
24    A.   Questions about the nature of his
25 business.  Questions about the nature of the pending

Ruplin - recross

1
2  investigation.  All the things that we've been
3  discussing.
4     Q.   So all these things, those were
5  discussed at this meeting at the home office,
6  correct?
7     A.   Yes.
8     Q.   There was nothing more discussed at
9  that home office meetings than which you've already
10 testified to; is that correct?
11    A.   Not that I recall.
12    Q.   Just so I'm clear, the people who were
13 at that meeting were the ones you told us about
14 earlier as you can remember it.
15        Anthony Sages, Jim Bodovitz, and
16 Merrill Tesler, yes?
17    A.   Yes.
18        THE CHAIRMAN:  Yes or no?
19        THE WITNESS:  Yes.
20        MR. ZARETSKY:  No further
21 questions.  Thank you.
22        THE CHAIRMAN:  Thank you.
23        ARBITRATOR COHEN:  Mr. Chairman,
24 I have one more question just for information
25 purposes.

Ruplin

1
2        First of all, thank for your
3  testimony and thank you for coming today.
4        In your experience and to your
5  knowledge is it the obligation of the member
6  firm to provide any additional information
7  other than a U-5 and a CRD and/or both, and
8  is other information traditionally provided
9  to you when you go back to that firm to find
10 out about the prospective employee?
11        THE WITNESS:  Obligation, no.  I
12 don't think so.
13        ARBITRATOR COHEN:  How about
14 tradition in your experience?
15        THE WITNESS:  You know,
16 historically we've checked references in the
17 past of prior employers.  And, you know, in
18 most cases they decline to give very much
19 information, you know.  But, you know, in
20 some cases they have given information.
21        ARBITRATOR COHEN:  Okay.  Thank
22 you.
23        THE WITNESS:  You're welcome.
24        THE CHAIRMAN:  Thank you, Mr.
25 Ruplin.  Thank you very much.

Ruplin

1
2        (Witness excused.)
3        THE CHAIRMAN:  Mr. Campbell, call
4  your next witness, please.
5        (Short recess.)
6        THE CHAIRMAN:  Back on the
7  record.
8        Mr. Campbell, will you call your
9  next witness, please.
10        MR. CAMPBELL:  Mr. Chairman, Mr.
11 Marzano calls Mr. Rick Kundracik as the next
12 witness.
13 R I C H A R D   K U N D R A C I K,   called on
14 behalf of the Respondent, being first duly
15 sworn, testified as follows:
16        THE CHAIRMAN:  Mr. Kundracik, can
17 you give your name, address, and spelling for
18 the court reporter, please?
19        THE WITNESS:  Richard Kundracik,
20 K-u-n-d-r-a-c-i-k.  Address is 1290 Broadway,
21 Denver, Colorado 80203.
22        THE CHAIRMAN:  Before we begin,
23 Mr. Campbell, I see Mr. Kundracik is
24 accompanied by another individual.
25        His name for the record?



Page 380

1     Ruplin
2         MR. CHASE:  Donald Chase with
3     Morrison Cohen here in New York City, 909
4     Third Avenue, New York, New York.  I am Mr.
5     Kundracik's attorney.
6         THE CHAIRMAN:  I didn't get the
7     name of the firm.
8         THE WITNESS:  Morrison Cohen.
9         THE CHAIRMAN:  Very good.
10        ARBITRATOR COHEN:  No conflict.
11        THE CHAIRMAN:  Mr. Campbell, you
12    made proceed.
13        MR. CAMPBELL:  Thank you, Mr.
14    Chairman.
15 DIRECT EXAMINATION
16 BY MR. CAMPBELL:
17    Q.   Mr. Kundracik, with all apologies for
18    the amount of time that you have been kept waiting,
19    I thank you for being here this afternoon.
20    A.   You're welcome.
21    Q.   Frank also appreciates it as well.
22    I'll try to keep you for as little time as possible.
23        Can you please tell the panel --
24        THE CHAIRMAN:  Can we switch
25    seats, do you mind?

Page 381

1         Kundracik - direct
2         MR. CHASE:  No.
3         THE CHAIRMAN:  Having you sit
4     close to the witness.  Just leaning around
5     you.
6         THE WITNESS:  I'll try to keep my
7     head back.
8         THE CHAIRMAN:  Thank you.  I'll
9     appreciate that.
10        Sorry, Mr. Campbell.
11    Q.   Can you tell the panel what your
12    current business affiliation is, please, Mr.
13    Kundracik?
14    A.   I am at present the vice president
15    national sales manager of MultiFinancial, an ING
16    broker-dealer headquartered in Denver.
17    Q.   What was your position in March and
18    April of 2004?
19    A.   Same.
20    Q.   Have you been in arbitration before?
21    A.   Yes.
22    Q.   So you know that there are arbitrators,
23    that there are opposing counsel, and the gentleman
24    across from you is the court reporter?
25    A.   We didn't have the luxury of that in

Page 382

1         Kundracik - direct
2     Denver.  It was tape.
3     Q.   We have the luxury of both today.
4         If you could direct your comments
5     generally to the panel when I ask you the questions.
6     A.   Okay.
7     Q.   You don't need to be looking at me.
8         Did you meet with Mr. Marzano in the
9     spring of 2004?
10    A.   Yes.
11    Q.   Can you tell the panel how it came
12    about that you met with Mr. Marzano?
13    A.   We were introduced to Frank.  And there
14    was an opportunity since we were conducting a
15    meeting of our reps in Philadelphia that Frank could
16    come down and visit with us from New York.
17        First time I met Frank was at dinner
18    in, excuse me, it was Philadelphia, and met for
19    dinner with Frank in Philadelphia.
20    Q.   Did you call him or did he call you for
21    that first meeting?
22    A.   I reached out to Frank a number of
23    times and never really connected with him.  Our
24    recruiter at that time is who connected with him and
25    set up the meeting.

Page 383

1         Kundracik - direct
2     Q.   Who was that recruiter?
3     A.   Josh Hays.
4     Q.   When you say you reached out several
5     times, you mean before the spring of 2004?
6     A.   Before that meeting I had tried to get
7     ahold of Frank.  And those conversations didn't
8     happen.  And I turned it over to Josh.  And Josh is
9     the one who initially made contact formally.
10    Q.   Over what period of time are we talking
11    about?
12    A.   It was less than a week.
13    Q.   You're not saying that you had meetings
14    with him in the prior year or anything?
15    A.   No.
16    Q.   So can you tell me what you and Mr.
17    Marzano discussed at that first meeting in
18    Philadelphia?
19    A.   The opportunity at Multi, how we
20    operate, what resources/tools he would have
21    available if he were to consider joining us.
22    Q.   Did you make him an offer?
23    A.   I think we agreed to continue to have a
24    discussion at that time.
25    Q.   Did you have any information about Mr.

42 (Pages 380 to 383)

Page 384

Kundracik - direct

1  Marzano at that time?
2  A.   I think the decision that we made then
3  was there were three pieces that had to be
4  addressed. We always involve Compliance and Legal.
5  And then my function is the sales piece of it.
6  What's available. And then after that you have
7  discussions about what we can do to facilitate the
8  transfer. So the next decision was the gathering of
9  those teams and having individual conversations.
10 Q.   Tell me what transpired following your
11 meeting in Philadelphia.
12 A.   Went back to Denver. We were, I think,
13 genuinely excited about Frank from the standpoint of
14 his business model. And we were looking forward to
15 further discussions with him about affiliating.
16 Q.   Can you recollect when the meeting in
17 Philadelphia actually took place?
18 A.   Yes. I believe it was April. I
19 couldn't give you the exact date. It was our April
20 regional meeting. Or it possibly could have been
21 the first week in May. But it was in the late
22 spring of 2004.
23 Q.   Do you recollect, as you sit here
24 today, when Frank actually affiliated with

Page 385

Kundracik - direct

1  MultiFinancial?
2  A.   I couldn't give you the exact date.
3  Within 30 days of that meeting.
4  Q.   So what's the next event that you were
5  involved in that you recollect?
6  A.   Trying to think. From the standpoint
7  of once Frank joined us?
8  Q.   No. Before Frank joined you.
9  A.   Oh, our process at Multi, any time we
10 talk to a rep. Three prongs. We got together and
11 had a meeting and discussed what's the next step
12 from a standpoint of our ability to help, if Frank
13 chooses to join us, in facilitating that transfer.
14 Q.   Did you get information from Frank?
15 A.   The information that we got from Frank
16 at that meeting was really focused around his
17 business mix. Because each person's business create
18 unique opportunities and challenges for us to
19 transition somebody. So that's where my focus was
20 at that time.
21 Q.   Did you learn about the circumstances
22 under which Mr. Marzano had separated from American
23 Express?
24 A.   You know, not all the details. Now,

Page 386

Kundracik - direct

1  what we focused on is this was imminent. I can't
2  recall whether it had happened at that point. But
3  we needed to do further due diligence on our end,
4  you know, to make sure we were in a situation to
5  accommodate Frank.
6  Q.   Did you on your end get information
7  about Frank's affiliation with American Express and
8  his history in the securities business in general?
9  A.   Yes. I mean it's part of the process
10 of what we do when we talk to anyone.
11 Q.   Tell the panel what you got and when
12 you believe you got it if you could remember?
13 A.   Our process is we get an authorization
14 to check credit and check their U-5 or U-4. That
15 request goes in from the compliance side of the
16 business. And Compliance takes it from there. And
17 then they report back to us what their
18 recommendation is, whether moving forward or stop.
19 Q.   What was the report back?
20 A.   The recommendation from the Compliance
21 and the Legal teams were to go ahead and proceed.
22 We needed some additional information or they needed
23 some additional information at that point.
24 Q.   They needed additional information from

Page 387

Kundracik - direct

1  whom?
2  A.   From Frank, I believe. You know,
3  usually if there's any issues. That's the first
4  step, is to have a conversation.
5  Q.   About what?
6  A.   There was some issue that related to
7  the nature, you know, of Frank's leaving American
8  Express.
9  Q.   What do you mean by "the nature?"
10 A.   What was filed apparently after he left
11 or at the time of his departure.
12 Q.   What was the issue as best you can
13 recall?
14         MR. ZARETSKY: Objection, Mr.
15 Chairman. Just a foundation.
16         THE CHAIRMAN: Let him answer the
17 question. You can answer the question.
18 A.   My understanding, again, you know,
19 there were as it came back to me, I couldn't even
20 really give you the exact reason. So I'd rather not
21 comment on it at this point.
22 Q.   Did you see a copy of the CRD report or
23 of Frank's U-5?
24 A.   I did not.

43 (Pages 384 to 387)

Page 388

Kundracik - direct

1
2   Q.   Have you ever seen it?
3   A.   I have not.
4   Q.   That's one document you don't have to
5   look at.
6        Did there come a point, well, tell me
7   whether or not you had discussions with Frank about
8   the compensation package or the transition package
9   that might be available to him were he to affiliate
10  with MultiFinancial?
11  A.   Okay. You know, typically the process
12  that I'm involved in is discussing various options
13  on the transition side. What we can/can't do now.
14  Today everybody's limited a little bit by resources.
15  But my focus was based on his block of business.
16  There were certain tools of certain things that we
17  could do for Frank after he did the things he needed
18  to do to put him in a position to transition to us.
19  Q.   You told him what those things that you
20  could offer to him were?
21  A.   Yes.
22  Q.   Tell the panel what they were.
23  A.   At that stage in the conversation, you
24  know, our focus was trying to figure out if we had
25  the internal resources or if Frank needed to have

Page 389

Kundracik - direct

1
2   temps or temporary assets there. Discussions around
3   who and how we might be able to help defray some of
4   those costs.
5        As you can imagine, when you change
6   broker-dealers or make a switch, there's volumes of
7   paperwork that need to be processed. And, you know,
8   there's mail costs. Things like that associated
9   with it. So we discussed those issues. And taking
10  care of E&O, possibly. You know, and possibly the
11  registration fees. The typical things that somebody
12  incurs when they transition.
13  Q.   Was MultiFinancial in a position to
14  offer a signing bonus at that time?
15  A.   At that point in time, really from the
16  time I got there, we weren't doing and actively
17  seeking signing bonus arrangements.
18  Q.   That's not what I asked you.
19        Was a bonus arrangement available to
20  somebody who could negotiate it and qualify for it
21  at that time?
22  A.   We discussed --
23        MR. ZARETSKY: Objection, Mr.
24  Chairman. I think Mr. Kundracik just
25  answered that question.

Page 390

Kundracik - direct

1
2        MR. CAMPBELL: He said he wasn't
3   actively doing it. I didn't ask him if he
4   was actively doing it. I asked him what was
5   available. And I think he's about to tell
6   under the circumstances what he discussed.
7        THE CHAIRMAN: You can answer the
8   question, Mr. Kundracik.
9   A.   We always listen to proposals from our
10  advisors on what might be available in addition to
11  what we traditionally do.
12  Q.   What was available?
13  A.   At that time?
14  Q.   At that time. Right.
15  A.   At that point we had not. What you
16  typically would do would be forgivable loans, et
17  cetera. And we had not done one of those since I
18  was there at that point in 2004.
19  Q.   Didn't you discuss with Frank 10
20  percent of GDC front money?
21  A.   In terms of a total transition package
22  that is, it was accountable, you know, those were
23  our guidelines at that time. It wasn't structured
24  as a forgivable transaction like you see pretty
25  regularly today. You know, just by the time you add

Page 391

Kundracik - direct

1
2   up all the components, it could be that much.
3   Q.   Thank you.
4        What package did MultiFinancial
5   eventually agree with Mr. Marzano?
6        MR. ZARETSKY: Objection, again.
7        Mr. Chairman, if he has a
8   foundation, the witness has a foundation for
9   knowing what that was.
10       THE CHAIRMAN: Ask a few
11  preliminary questions, Mr. Campbell.
12  Q.   Do you have that knowledge?
13  A.   Yes.
14  Q.   Did you negotiate that package?
15  A.   Not by myself. But most them all.
16       MR. CAMPBELL: That was a good
17  enough foundation, Mr. Chairman.
18       MR. ZARETSKY: I don't think Mr.
19  Campbell yet has been made the arbiter of
20  these things.
21       THE CHAIRMAN: Ask the question.
22       MR. CAMPBELL: Do I have to call
23  all five people in here?
24       THE CHAIRMAN: Mr. Campbell.
25  Q.   The question was what was the package

44 (Pages 388 to 391)

Page 392

Kundracik - direct

1  that Mr. Marzano finally got?
2      A.  As we discussed in the first serious
3  meeting, it was expenses for airborne or
4  overnighting, you know, paperwork that were
5  particular to the transfer once the proper
6  arrangements were done.  Support in some client
7  meetings after the transfer occurred.  E&O.
8  Registration fees.  And that was pretty much it.
9      Q.  No signing bonus?
10      A.  No signing bonus.
11      Q.  No other transition compensation
12  payments?
13      A.  No.  I mean, it was limited to
14  verifiable expenses associated with those efforts on
15  his part.
16      Q.  Any enhanced payout?
17      A.  No.  Payout commensurate with his
18  verified gross production.
19      Q.  On the grid?
20      A.  On the grid.
21      Q.  Nothing in excess of the grid?
22      A.  No.
23      Q.  Now, is it true to say that your job is
24  primarily recruiting?

Page 393

Kundracik - direct

1      A.  It's probably 25 percent of what I'm
2  responsible for.
3      Q.  Any other aspects?  What are the other
4  aspects of your job?
5      A.  Strategic sponsor relationships,
6  enterprise relationships, conferences, meetings,
7  anything that is really associated with how we can
8  facilitate a rep's business enhancement that join
9  us.
10      MR. CAMPBELL:  Stop for a second.
11      THE CHAIRMAN:  Continue, please.
12      Q.  So you're there to help the producers
13  produce as well as to recruit?
14      A.  Yes.
15      Q.  As part of the recruitment of Mr.
16  Marzano, did you or did you ask someone on your
17  behalf to get information from American Express with
18  regard to the disclosures on Frank's U-5?
19      MR. ZARETSKY:  Objection, Mr.
20  Chairman.  Mr. Kundracik has testified that
21  he's never seen the U-5.
22      MR. CAMPBELL:  I didn't ask him,
23  okay.  Mr. Chairman, if that's his objection,
24  that's his objection.

Page 394

Kundracik - direct

1      THE CHAIRMAN:  Could you rephrase
2  the question.
3      Q.  Let me repeat the question so everybody
4  knows what it is.
5      When you say the U-5 or not, or did he
6  ask someone at MultiFinancial on his behalf to get
7  additional information from American Express with
8  respect to any information reported on the U-5?
9      A.  I did not.
10      Q.  Do you know if MultiFinancial did make
11  an effort to gain additional information from
12  American Express about any information reported on
13  the U-5?
14      A.  We have a standard process that
15  Compliance/Legal handles that piece.  I handle mine.
16      Q.  You're involved?
17      A.  I'm uninvolved.
18      MR. ZARETSKY:  You are involved
19  or not involved?
20      THE WITNESS:  Uninvolved in that
21  process.
22      MR. CAMPBELL:  One second, Mr.
23  Chairman.
24      Q.  Who made the final decision that it was

Page 395

Kundracik - direct

1  okay to affiliate Mr. Marzano with MultiFinancial?
2      A.  Our rep review team.
3      Q.  And who's on the rep review team?
4      A.  Compliance, myself, and the president
5  and CEO of Multi.
6      Q.  Is Mr. Ressler on that list?
7      A.  Yes.
8      MR. CAMPBELL:  No further
9  questions, Mr. Chairman.
10      THE CHAIRMAN:  Thank you.
11      Mr. Zaretsky, do you need a few
12  moments?
13      MR. ZARETSKY:  Just a moment.
14      MR. CAMPBELL:  For the record, 16
15  minutes.
16  CROSS-EXAMINATION
17  BY MR. ZARETSKY:
18      Q.  Mr. Kundracik, just so I understand,
19  you were involved in the negotiation of the ultimate
20  package that was provided or offered to Mr. Marzano?
21      A.  I had input.
22      Q.  Am I correct in understanding this was
23  a standard set of terms that you provided to new
24  recruits who had experience in the business

45 (Pages 392 to 395)

Kundracik - cross

1  obviously?
2
3      A.   Yes.  More or less.
4      Q.   And you say at the time that
5  MultiFinancial was not doing signing bonuses,
6  correct?
7      A.   Correct.
8      Q.   Not doing forgivable loans, correct?
9      A.   Correct.
10     Q.   When I say not doing them, that was the
11  standard practice, was to not do that, at the time,
12  correct?
13     A.   It was an issue of funding.
14     Q.   Regardless of the reasons?
15     A.   Correct.
16     Q.   I understand that.  And I appreciate
17  you're telling us that.
18         But, in fact, the result was signing
19  bonuses, forgivable loans.  Those types of things
20  were not being given?
21     A.   Correct.
22     Q.   And you say it was a funding issue?
23     A.   Correct.
24     Q.   And just so I have clarification, there
25  was some testimony here.  Mr. Campbell asked you

Kundracik - cross

1
2  about a 10 percent transition package or something?
3      A.   Hmm-hmm.
4      Q.   Was that offered to Mr. Marzano?
5      A.   What we offered was what we came with
6  accountable expenses associated with those specific
7  items.
8      Q.   Did you ever tell Mr. Marzano that
9  there was a 10 percent transition package available?
10     A.   We during negotiations or discussions
11  rather discussed that that would be our cap.
12     Q.   I see.
13         So, in other words, it's this expense,
14  these expenses that you'll provide, but the cap is
15  10 percent of GDC?
16     A.   Yes.
17     Q.   Not that you just get 10 percent if the
18  expenses don't meet that?
19     A.   Yes.
20         MR. ZARETSKY:  No further
21  questions.  Thank you.
22         THE CHAIRMAN:  Thank you.  Mr.
23  Campbell, any follow-up?
24  REDIRECT EXAMINATION
25  BY MR. CAMPBELL:

Kundracik - redirect

1
2      Q.   Frank asked for a bonus, didn't he, for
3  a signing bonus?
4      A.   In discussions with me, I honestly
5  can't recall whether he and I talked about it
6  specifically.
7         MR. CAMPBELL:  Okay.  No further
8  questions, Mr. Chairman.
9         ARBITRATOR COHEN:  Mr. Kundracik,
10  you are still in the same position you were
11  in at the time you hired Mr. Marzano?
12         THE WITNESS:  Yes.
13         ARBITRATOR COHEN:  That was
14  approximately a year-plus ago?
15         THE WITNESS:  Eighteen months.
16         ARBITRATOR COHEN:  Eighteen
17  months ago.
18         Mr. Marzano's production, where
19  does he stand relative to the rest of your
20  reps, or shall I ask you how many reps you
21  have and then ask you the question?
22         THE WITNESS:  We have just shy of
23  a thousand producing reps.
24         ARBITRATOR COHEN:  Presently he
25  stands where?

Kundracik - redirect

1
2         THE WITNESS:  Frank is in the top
3  five.
4         ARBITRATOR COHEN:  Thank you.
5         MR. CAMPBELL:  Want to
6  renegotiate that deal now?
7         MR. ZARETSKY:  I think I passed
8  the witness.
9         THE CHAIRMAN:  Thank you, Mr.
10  Kundracik.
11         (Witness excused.)
12         THE CHAIRMAN:  Mr. Campbell.  Any
13  other order of business here today?
14         MR. CAMPBELL:  Mr. Nicolosi will
15  be our next witness.
16         Mr. Chairman, whether it's this
17  afternoon or some other day.
18         THE CHAIRMAN:  Is Nicolosi
19  outside?
20         MR. ZARETSKY:  Yes.
21         (Short recess.)
22         THE CHAIRMAN:  Mr. Campbell, you
23  ready to proceed?
24         MR. CAMPBELL:  Yes.
25         THE CHAIRMAN:  Call your next

Page 400

1    witness, please.
2        MR. CAMPBELL: Mr. Marzano calls
3    Mr. Nicolosi.
4    T H O M A S   N I C O L O S I,   called as a
5    witness on behalf of the Respondent, being
6    first duly sworn, testified as follows:
7        THE CHAIRMAN: Mr. Nicolosi,
8    could you give your first and last name,
9    spell it please for the reporter and business
10   address?
11       THE WITNESS: Thomas Nicolosi.
12   T-h-o-m-a-s  N-i-c-o-l-o-s-i.  500 Mamaroneck
13   Avenue, Harrison, New York 10528.
14       THE CHAIRMAN: You may proceed,
15   Mr. Campbell.
16       MR. CAMPBELL: Thank you, Mr.
17   Chairman.
18   DIRECT EXAMINATION
19   BY MR. CAMPBELL:
20       Q.   Mr. Nicolosi, can you please state your
21   current business affiliation and address?
22       A.   I'm with Ameriprise Financial Services
23   at 500 Mamaroneck Avenue, Harrison, New York.
24       Q.   What is your current position with a

Page 401

1        Nicolosi - direct
2    Ameriprise Financial Services?
3        A.   I am a group vice president.
4        Q.   And Ameriprise Financial Services is
5    the successor firm to American Express Financial
6    Advisors?
7        A.   Yes, it is.
8        Q.   Same company, just change of name; is
9    that right?
10       A.   It's changing a name.  And they are
11   spinning off to an independent company.
12       Q.   Has that happened yet?  Has the
13   spin-off occurred yet?
14       A.   No.
15       Q.   Can you please tell the panel what your
16   functions are as the group vice president?
17       A.   As the group vice president I am
18   responsible for running what we call a market group
19   which has P-1 independent, P-1 employee advisors and
20   P-2 independent advisors.
21       Q.   P-2 advisors, are those who are
22   franchisees?
23       A.   That is correct.
24       Q.   Like Mr. Marzano was a franchisee?
25       A.   Yes, he was.

Page 402

1        Nicolosi - direct
2        Q.   So he was a P-2 advisor?
3        A.   Everything's a P-2 advisor.
4        Q.   Did you recruit Mr. Marzano?
5        A.   I was involved in recruiting him.  Yes.
6        Q.   In fact, isn't part of your job at
7    Ameriprise Financial, I'll just use the new name
8    from now on, if I occasionally slip into AEFA,
9    please understand it's just so new, part of your job
10   is recruitment; isn't it?
11       A.   Yes, it is.
12       Q.   Recruiting for both the employee
13   platform and the franchisee platform?
14       A.   That is correct.
15       Q.   When you say you run the market group,
16   explain to the panel, please, since it's a slightly
17   different organization to retail brokerage, not
18   necessarily warehouse retail brokerage, what
19   comprises your market group and how is it organized?
20       A.   I have approximately 400 advisors
21   between the two platforms.  I work through six field
22   vice presidents.  One of my field vice presidents is
23   responsible for the P-2 platform, the franchisee
24   platform.  And five of my field vice presidents are
25   responsible for the employee platform.

Page 403

1        Nicolosi - direct
2        Q.   Am I right in thinking that Mr.
3    Mascielo at the time Mr. Marzano was hired was the
4    FVP who was responsible for the P-2 advisors?
5        A.   Yes.
6        Q.   Is he still in that job today, by the
7    way?
8        A.   Yes.
9        Q.   How many officers are in your market
10   group?
11       A.   Approximately, 15 or more.
12       Q.   Fifteen plus?
13       A.   Hmm-hmm.
14       Q.   Give or take one or two; is that what
15   you mean?
16       A.   I don't know the exact number.  But
17   it's north of 15.
18       Q.   You said you had 400 advisors.  How
19   many of them are franchisees?
20       A.   Approximately, 265.
21       Q.   Has that number changed appreciably
22   from when the time Mr. Marzano separated from
23   American Express?
24       A.   It's probably 280, in that
25   neighborhood.

47 (Pages 400 to 403)

Page 404

Nicolosi - direct

1
2  Q.  Have you affiliated any new franchisees
3  since Mr. Marzano left?
4  A.  Yes.
5  Q.  So you've lost some, but you've also
6  added some?
7  A.  Yes.
8  Q.  Are you aware of the American Express
9  franchise agreement and its various addenda?
10  A.  I'm aware there is a franchise
11  agreement.
12  Q.  Well, that's 265 of your producers are
13  producers pursuant to such a franchise agreement,
14  right?
15  A.  That is correct.
16  Q.  Would you agree with me that all of the
17  top producers or on pursuant to the franchise
18  agreement?
19  A.  Say that again, please.
20  Q.  All of the top producers in your market
21  group are franchisees?
22  A.  How do you define a top producer?
23  Q.  Everybody who's a franchisee is a
24  better producer than anybody who's an employee; is
25  that a good analogy?

Page 405

Nicolosi - direct

1
2  A.  That is not correct.
3  Q.  That was a wild one.
4  Your top hundred producers, all
5  franchisees?
6  A.  You want an exact answer.  I can't give
7  you an exact answer.
8  Q.  Are you telling us that you don't
9  really know much about the franchise agreement?
10  A.  I know it exists.  I'm telling you that
11  if you want me to quote it, I cannot do it.
12  Q.  Have you ever seen it?
13  A.  I have.
14  Q.  Did you, for example, see the franchise
15  agreement that Mr. Marzano signed?
16  A.  Don't know if I saw his particular
17  franchise agreement.
18  Q.  In fact, all the franchise agreements
19  are the same; aren't they?
20  A.  To my understanding, yes.
21  Q.  Yes.
22  If you saw one, you've seen them all,
23  right?
24  A.  I don't believe I saw Frank's.
25  Q.  I didn't ask you that.

Page 406

Nicolosi - direct

1
2  I asked if you've seen one you've seen
3  them all.  Because they're all identical except for
4  the signatures?
5  A.  They're the same.
6  Q.  Yes
7  Some people have addenda/addendums, if
8  you want to put it that way, to their franchise
9  agreements; don't they?
10  A.  Not to my knowledge.
11  Q.  Never heard of an addendum to a
12  franchise agreement?
13  A.  No.
14  Q.  Never heard of addendum 3-R?
15  A.  No.
16  Q.  Never heard of addendum 3-V?
17  A.  No.
18  Q.  Are you sure you run a market group at
19  Ameriprise Financial Services?
20  MR. ZARETSKY:  Objection, Mr.
21  Chairman.
22  THE CHAIRMAN:  Sustained.
23  Q.  Let me show you a couple of documents.
24  See if it is something that you might have
25  recognized that you might recognize.  And I hope I

Page 407

Nicolosi - direct

1
2  have them.
3  When was the last time you saw a
4  franchise agreement?
5  A.  Don't know.  I don't know.
6  Q.  A wild guess.  Is it in the last six
7  months?
8  A.  No.
9  Q.  A year ago?
10  A.  Don't recall.
11  Q.  When was the last time you affiliated a
12  new franchisee?
13  A.  The past couple of months.
14  Q.  And you didn't see any franchise
15  agreement in connection with that new franchisee
16  getting him to sign it?
17  A.  No.
18  Q.  And talking to them about it?
19  A.  I'm not required to.
20  Q.  A franchise agreement is part of a
21  uniform franchise offering circular; isn't it?
22  A.  I believe so.
23  Q.  So one book, all bound together with
24  spiral binding?
25  A.  Yes.

48 (Pages 404 to 407)

Page 408

Nicolosi - direct

1
2      Q.   Everything is together in one package?
3      A.   Yes.
4      Q.   Let me show you a document and see if
5  it refreshes your recollection about anything.  It's
6  a document entitled, Addendum 3-R (Rollout)
7  Restrictive Covenant Addendum.  And it has a date at
8  the bottom 10/25/1999.
9           Can you take a look at that?
10          MR. ZARETSKY:  Let the witness
11     take a look at it.
12          MR. CAMPBELL:  I was going to ask
13     him a question while he was looking at it.
14     But let him look at it.
15          THE CHAIRMAN:  There's no
16     question.  Let us know when you're finished
17     looking at it, Mr. Nicolosi.
18          THE WITNESS:  Okay.
19          THE CHAIRMAN:  He's ready, Mr.
20     Campbell.
21     Q.   In 1999, specifically on 10/25/1999,
22  were you a group vice president?
23     A.   Yes.
24     Q.   In the same market group?
25     A.   Yes.

Page 409

Nicolosi - direct

1
2      Q.   So you were here when the franchise
3  agreement was rolled out; weren't you?
4      A.   Yes.
5      Q.   And it was rolled out over a period of
6  time in the fall of 1999 into the spring of 2000,
7  right?
8      A.   I actually don't recall.
9      Q.   Can we just try to refresh your
10 recollection.
11          Nobody at American Express was a
12 franchisee before the franchise agreement, right?
13     A.   That is correct.
14     Q.   The entire company was set up on an
15 entirely different set of contracts; isn't that
16 right?
17          MR. ZARETSKY:  Objection to the
18     form, Mr. Chairman.  Mr. Nicolosi is not an
19     attorney.
20          MR. CAMPBELL:  It's not a legal
21     question.  The man is a group vice president.
22          MR. ZARETSKY:  He's asking him if
23     it was an entirely different set of contracts
24     it would require.
25          MR. CAMPBELL:  Totally  separate.

Page 410

Nicolosi - direct

1
2          THE CHAIRMAN:  Do you know if
3  there was a different document than the one
4  before you being used.
5      Q.   Than the franchise agreement?
6      A.   There was a different document.
7      Q.   And the company decided, a sea change
8  on a certain date, everybody's going to cancel all
9  the other contracts and everybody becomes either a
10 P-1 employee advisor or a becomes a franchisee.
11          Do you remember that?
12          MR. ZARETSKY:  Mr. Chairman, I
13     don't want to prolong this, but he's asking
14     about a time period before Mr. Marzano had
15     any affiliation with American Express.  This
16     is a lot of stuff that I don't know how it
17     has any relevance whatsoever to Mr. Marzano's
18     claims.
19          MR. CAMPBELL:  Mr. Chairman, I'm
20     trying to refresh the witness' recollection
21     about the foundation document for the
22     relationship between his company of which --
23          THE CHAIRMAN:  Can you phrase
24     your question --
25          MR. CAMPBELL:  -- 265 of his.

Page 411

Nicolosi - direct

1
2          THE CHAIRMAN:  -- Mr. Campbell to
3  encompass only the period of time only when
4  Mr. Nicolosi worked for AEFA.
5          MR. CAMPBELL:  Mr. Nicolosi was
6  the GVP at the time this happened.
7          THE CHAIRMAN:  I thought that's
8  what the question referred to.
9          MR. CAMPBELL:  It does.
10          MR. ZARETSKY:  He's asked him.
11     Mr. Nicolosi was an employee and a GVP at
12     American Express before Mr. Marzano ever
13     joined the company.  He's asking him about
14     the rolling out of a contract in 1999 which
15     is eight, nine months before even Mr. Marzano
16     became affiliated with the company.
17          My objection is I don't see what
18     the relevance is.
19          MR. CAMPBELL:  It started in
20     1999.  It wasn't signed until 2000.
21          THE CHAIRMAN:  Mr. Campbell, go
22     ahead.
23     Q.   I'm trying to refresh your
24 recollection, Mr. Nicolosi.
25          In the period at the end of 1999

49 (Pages 408 to 411)

Page 412

Nicolosi - direct

1    beginning of 2000, franchise agreement was being
2    rolled out companywide; wasn't it?
3    A.    Yes.
4    Q.    It was a huge deal, wasn't it?
5         MR. ZARETSKY:  Object to the
6    form.
7    Q.    It was a huge deal.  You know it was.
8    Didn't you have dozens of meetings
9    about it, Mr. Nicolosi?
10        THE CHAIRMAN:  Mr. Campbell.
11        MR. ZARETSKY:  Object.
12        THE CHAIRMAN:  Mr. Campbell.
13        MR. CAMPBELL:  Mr. Chairman.
14        THE CHAIRMAN:  Start with
15   something preliminary.  You don't need to be
16   argumentative at this point.
17        MR. CAMPBELL:  Mr. Chairman, I am
18   amazed that this man who's been a group vice
19   president for years, including at the time
20   when the biggest change this company had gone
21   through in a hundred years took place, that
22   he claims to have no knowledge whatsoever
23   about the key foundation document pursuant to
24   which most of his market group operates.

Page 413

Nicolosi - direct

1         And as a result, I'm trying,
2    albeit maybe a little aggressively, and I'll
3    tone that down a bit, to refresh his
4    recollection so that maybe we can get a
5    glimmer that maybe this guy who was a GVP in
6    one of the biggest market groups in the
7    country, actually paid attention to his
8    business.
9         MR. ZARETSKY:  Mr. Chairman, I
10   need to jump in.  I'm sorry.  And I see from
11   the Chairman, I don't want to interrupt you,
12   but, perhaps Mr. Campbell's threshold for
13   amazement is low.  I don't know really where
14   it is on that scale.  But he's now making
15   statements that Mr. Nicolosi never testified
16   to.
17        THE CHAIRMAN:  Thank you.
18        MR. ZARETSKY:  He asked a
19   question: Is it a huge deal.  That's not a
20   proper question.
21        THE CHAIRMAN:  Mr. Campbell, Mr.
22   Campbell.
23        MR. CAMPBELL:  Yes, Mr. Chairman.
24        THE CHAIRMAN:  The Chair has

Page 414

Nicolosi - direct

1    given you the opportunity to question this
2    witness about a document in existence prior
3    to the one that's going to be at issue in
4    this arbitration.  Could you please --
5         MR. CAMPBELL:  Same one, Mr.
6    Chairman, same one.
7         THE CHAIRMAN:  -- ask the
8    questions in a less aggressive fashion so we
9    can get these preliminary matters out of the
10   way.
11        MR. CAMPBELL:  Just so you
12   understand, Mr. Chairman, he testified that
13   all the franchise agreements are the same.
14   Frank Marzano signed exactly the same
15   franchise agreement.  This is just a part of
16   the package which he also testified is one
17   package.  Everything is together in one set.
18   Same package that Frank Marzano signed.  But
19   this is a different part of the package to
20   the one that's actually in issue here.  But
21   it's related to the issues.
22        MR. ZARETSKY:  You just keep
23   saying what Mr. Nicolosi testified to.  The
24   record's going to say that.  And he's

Page 415

Nicolosi - direct

1    mischaracterizing it.  Let him ask the
2    question which I know the panel, the Chairman
3    has directed him to do.
4         MR. CAMPBELL:  The record will
5    reflect that he testified there's one
6    franchise agreement.  It's in one package,
7    all bound together.  That's not a
8    mischaracterization.
9         THE CHAIRMAN:  Mr. Campbell.
10        ARBITRATOR COHEN:  Continue, Mr.
11   Campbell, please.
12        MR. CAMPBELL:  Yes, Mr. Cohen.
13   Q.    Mr. Nicolosi, would you agree that the
14   franchise agreement that Frank Marzano signed would
15   be the same franchise agreement that everyone else
16   signed?
17   A.    Yes.
18   Q.    And it was in the same package, all
19   bound together with a uniform franchise offering
20   circular?
21   A.    I would assume so.
22   Q.    Tell me, as best you can recall, what's
23   in that package of papers that is part of what Mr.
24   Marzano signed?

Page 416

Nicolosi - direct

1    Nicolosi - direct
2        MR. ZARETSKY: Mr. Chairman, if
3    he's got a document, show it to him. What's
4    the relevance of having Mr. Nicolosi say
5    what's in an offering circular?
6        MR. CAMPBELL: Well, he doesn't
7    have to. He just has to say it contains an
8    offering circular.
9    Q.   Does it contain an offering circular?
10        MR. ZARETSKY: He's already
11   answered the question.
12        THE CHAIRMAN: Mr. Nicolosi, can
13   you answer that question?
14        THE WITNESS: Yes.
15   Q.   Does it contain a franchise agreement?
16   A.   Yes.
17   Q.   Does it a contain addendums to the
18   franchise agreement?
19   A.   Apparently it does.
20   Q.   Well, you've been working with this
21   agreement for years. You've got 265 people who have
22   signed it. Marzano signed it. Every time you
23   recruit somebody --
24        ARBITRATOR COHEN: Mr. Campbell,
25   if I may interrupt, Mr. Nicolosi is not on

Page 417

Nicolosi - direct

1    Nicolosi - direct
2    trial. He is a witness. He is trying to
3    answer your questions. Please give him the
4    benefit of the doubt. I understand your
5    frustration. But it's not helping this case
6    at all.
7        MR. CAMPBELL: It's not my job to
8    give him the benefit of the doubt, Mr. Cohen.
9    You may do that. My job is to challenge the
10   bounds. And I will try to keep it in the
11   bounds that the panel expects.
12   Q.   Have you heard of an addendum pursuant
13   to which advisors are permitted to leave American
14   Express if they have six years or more seniority
15   with the firm, and to retain copies of their client
16   documents, assuming they meet the criteria of the
17   addendum?
18   A.   I'm familiar with the six years. I'm
19   not familiar with the copies.
20   Q.   The six years meanings after, if
21   they've been here more than six years, they can
22   leave. And there's a certain addendum that
23   addresses that?
24   A.   I don't know what you call it. But I
25   know after six years they can leave.

Page 418

Nicolosi - direct

1    Nicolosi - direct
2    Q.   Let me direct your attention to a piece
3    of Addendum 3-R.
4        MR. CAMPBELL: Mr. Chairman, I
5    just brought the pieces. I have the entire
6    franchise agreement. I only have one copy.
7    It's about an inch and a half thick. To cut
8    down on giving you 800 pages you don't need,
9    I didn't bring it all. But if you insist
10   that I bring it, I'll bring it. It is
11   available.
12   Q.   If you can look at the document that
13   I've asked you to address Addendum 3-R. See part C
14   there?
15   A.   Hmm-hmm.
16   Q.   "Terms of forbearance agreement."
17   A.   Yes.
18        MR. ZARETSKY: Just for the
19   record, you're referring to the first page of
20   the document which has got a page No. 41 at
21   the bottom.
22        THE CHAIRMAN: Yes.
23        Would someone choose to give the
24   panel something to look at too.
25        MR. ZARETSKY: Has it been marked

Page 419

Nicolosi - direct

1    Nicolosi - direct
2    as an exhibit?
3        MR. CAMPBELL: It hasn't. Maybe
4    we'll mark it for identification, Mr.
5    Chairman.
6        THE CHAIRMAN: You're referring
7    to in talking about it --
8        MR. GOOD: Let me give you my
9    copy.
10        MR. CAMPBELL: I have copies for
11   everybody.
12        THE CHAIRMAN: Mr. Good, here's
13   your copy back. We have copies for
14   everybody.
15        Perhaps you can mark one, Mr.
16   Levine.
17        (Excerpt from Addendum 3-R marked
18   Respondent's Exhibit 6 in evidence as of this
19   date.)
20   Q.   On the first page of what we marked as
21   Respondent's No. 6 for identification, paragraph C,
22   terms of forbearance agreement:
23        "As a mitigation of this irreparable
24   harm, AEFA agrees to forbear from enforcement
25   of its right against advisor under the

51 (Pages 416 to 419)

Nicolosi - direct

1
2 restrictive covenant, if advisor timely and
3 fully complies with the following
4 conditions."
5         You see that?
6     A.   Hmm-hmm.
7         THE CHAIRMAN:  You have to answer
8 yes or no for the record.
9     A.   Yes.
10    Q.   And if you look at number 2(a) under
11 paragraph C, length of service, "have served at
12 least six consecutive years."
13        Do you see that?
14    A.   Yes.
15    Q.   Having reviewed the exhibit and the
16 items that I've directed your attention to, does
17 this refresh your recollection that this is the
18 addendum that addresses the outside the six-year
19 provision that you were describing earlier?
20    A.   This appears to be a copy of that.
21 Yes.
22    Q.   Now, if I can have you turn to the
23 second page, No. 42 at the bottom from the section
24 numbered 3.
25    A.   Hmm-hmm.

Nicolosi - direct

1
2     Q.   Second paragraph:
3         "To the extent consistent with privacy
4     laws and policies in order to allow advisors
5     to serving portable products and to fulfill
6     compliance duties, advisor may retain copies
7     of..."
8         Then it goes on to list statements,
9     plans, and so on.
10        Do you see that?
11    A.   Yes.
12    Q.   Mr. Nicolosi, the people in your market
13 group who meet the criteria and who have separated
14 from American Express with more than six years of
15 service, consistent with whatever policy was in
16 place with respect to privacy, have left your market
17 group and retained copies of documents identified in
18 section 3; isn't that right?
19    A.   Ask me that again.
20    Q.   Franchisee advisors within your market
21 group who meet the criteria set out in section C
22 that we're looking at have, in fact, left American
23 Express, and consistent with whatever privacy
24 policies were in effect at the time, retained copies
25 of the documents identified in second paragraph of

Nicolosi - direct

1
2 subsection 3, correct?
3     A.   I don't know that.
4     Q.   You don't know that?
5     A.   I don't know that.
6     Q.   So they may not have been.  You're
7 simply unaware; is that right?
8     A.   I'm not aware of that.
9     Q.   Are you aware whether or not American
10 Express has lived up to its obligation to permit
11 franchisees who qualify for Addendum 3-R to retain
12 copies under the conditions imposed by Addendum 3-R?
13        MR. ZARETSKY:  Object to the form
14    of the question.  In the sense that he said
15    "lived up to its obligation," he's
16    characterizing what he believes the
17    obligation to be.  Mr. Campbell is.  And I
18    think there's no foundation for that
19    question.
20        MR. CAMPBELL:  I'll withdraw it
21    because I can see how it might be confusing.
22        THE CHAIRMAN:  Thank you.
23    Q.   Mr. Nicolosi, how many advisors have
24 left in let's say since Mr. Marzano resigned in your
25 market group, 40?

Nicolosi - direct

1
2     A.   I couldn't give you an exact number.
3     Q.   Give me your best estimate.  30?
4     A.   I'd have to think it through.
5     Q.   Please think.
6     A.   Say, probably close to 30.
7     Q.   Did any of them have lengths of service
8 more than six years?
9     A.   Yes.
10    Q.   In fact, close to all of them, correct?
11    A.   I don't know that.
12    Q.   Well, think about it.
13    A.   I wouldn't be able to.  It would be
14 total speculation.
15    Q.   Have you charged any of them with
16 violation of Addendum 3-R?
17    A.   I don't know.
18    Q.   You're the GVP.
19        Have you authorized any lawsuits to be
20 filed or proceedings to be commenced in the NASD, or
21 anything like that?
22    A.   Have I authorized anything?
23    Q.   Yes.
24    A.   No.
25    Q.   It's your market group.  You're in

Page 424

1  Nicolosi - direct
2  charge of such proceedings, other than Mr. Marzano.
3  We won't talk about him.
4      A.  Again, anyone?
5      Q.  Has your market group been charged back
6  for any such proceedings that have been commenced by
7  American Express in the last year?
8      A.  What do you mean by that?
9      Q.  As an expense, charged back by home
10 office for legal fees or other fees in connection
11 with enforcement of Addendum 3-R?
12     A.  Not to my knowledge.
13     Q.  Do you sometimes recruit or attempt to
14 recruit from the competition?
15     A.  Yes.
16     Q.  American Express has another addendum
17 that applies to recruits from the competition;
18 doesn't it?
19     A.  I'm not aware of that.
20     Q.  Well, let me try to refresh your
21 recollection about that one.
22          MR. CAMPBELL:  To try to move
23     things along, Mr. Chairman, I'll just have it
24     marked for identification immediately.
25     There's one for you, Mike.

Page 425

1  Nicolosi - direct
2          I'm going to show the witness a
3  document entitled, Addendum 3-V (veteran
4  advisor recruits), also dated 10/25/1999.  It
5  has page 46 at the bottom.  And runs through
6  page 50.
7          If there are no objections, Mr.
8  Chairman, I have three copies for the panel.
9          MR. ZARETSKY:  Mr. Chairman, if I
10 can just interject, and I gather Mr. Campbell
11 wants to offer this in evidence, but these
12 are blank documents.  And we have very
13 limited claims that are made by Mr. Marzano
14 in this case.
15          Why aren't we seeing the
16 contract?  I mean, if there's a signed
17 contract, which we know there is, and if
18 there are addenda that are signed or whatever
19 they are, isn't that the issue?  Why are we
20 just dragging this out on frankly irrelevant
21 questions in light of the fact that
22 everybody's trying to get through this
23 witness today, I know.  It seems to me even
24 more wasteful.
25          But that's not the point.  If

Page 426

1  Nicolosi - direct
2  it's relevant, it's relevant.  But I don't
3  see the relevance of going into all these
4  forms of documents just to have Mr. Nicolosi
5  say, yes, that's a form of this and a form of
6  that.
7          (Series of blank form contracts
8  marked Respondent's Exhibit 7 in evidence as
9  of this date.)
10          THE CHAIRMAN:  Mr. Campbell, is
11 there an equivalent document that's secured
12 by your client as part of his employment with
13 American Express Financial Advisors?
14          MR. CAMPBELL:  There is a
15 different document.  And we all know what
16 those documents are since they've been
17 presented in evidence at one time already.
18 And they'll be presented again but through
19 Mr. Marzano.  Or maybe we will just
20 incorporate them from the first set of
21 exhibits rather than overburden the record
22 with additional documents.
23          These are relevant not to the
24 specific document that Mr. Marzano signed
25 because obviously he didn't sign these.  He

Page 427

1  Nicolosi - direct
2  wasn't a veteran advisor.  He didn't have
3  more than six years of service.  But it goes
4  to other aspects of his claim with respect to
5  his files and what American Express' alleged
6  policies and practices were with respect to
7  copies of files.  And this is the document,
8  these are the documents that are part of the
9  entire package, proportions of which Mr.
10 Marzano did sign.
11          THE CHAIRMAN:  It's the same
12 question, Mr. Campbell.  The documents that
13 Mr. Marzano signed should be the ones that
14 are in issue; not ones that may have existed
15 but were not signed by him.
16          MR. CAMPBELL:  It is an issue in
17 this case and has been from the beginning
18 whether or not American Express, and I
19 believe it was a claim whether or not
20 American Express ever allowed advisors to
21 retain copies of documents.  And whether or
22 not American Express' privacy policies ever
23 allowed advisors who are terminated to retain
24 copies of their documents.
25          We tried to put these documents

Page 428

Nicolosi - direct

1 Nicolosi - direct
2 in the first time around. It was ruled that
3 they couldn't be put in then, or partly,
4 because Mr. Nicolosi was on the telephone and
5 couldn't look at any documents that we were
6 presenting him. But also because we were
7 limiting ourselves to a very narrow set of
8 issues during this first three days.
9       American Express' argument is
10 going to be or is that it hasn't breached any
11 obligation to Frank to allow him to retain
12 his files because he didn't have that right
13 because it violated American Express policy.
14       And I'm going to demonstrate by
15 whatever means are available to me that, in
16 fact, American Express' policy was the
17 opposite. It was to permit retention of
18 files. And that American Express has
19 consistedly permitted retention of files.
20 And the only policy that I've ever seen, and
21 I'm not sure if it was ever presented to this
22 panel, but I know it was presented to the
23 Eastern District, was a policy that was put
24 into effect after Mr. Marzano terminated
25 about six months after. About a year from

Page 429

1 Nicolosi - direct
2 this month. A year ago this month.
3       So this is the only witness that
4 I'm going to get, I believe, who was a senior
5 officer in the market group who deals with
6 this addendum and the policies that have to
7 be implemented by American Express in
8 connection with the addendum and Mr. Marzano
9 as well.
10       MR. ZARETSKY: So, in other
11 words, I guess Mr. Campbell is saying the
12 relevance of these documents is that they
13 somehow demonstrate that American Express
14 breached a contract that Mr. Marzano never
15 signed with it. I don't understand.
16       MR. CAMPBELL: I didn't say that.
17       MR. ZARETSKY: If he's saying
18 that these documents, they're forms, American
19 Express cannot have breached a document, an
20 unsigned agreement that it never signed with
21 Mr. Marzano, Mr. Marzano's rights can't be
22 created by a contract that he didn't have.
23       Now, I mean that will be an
24 ultimate legal issue. But it seems to me
25 from a relevance standpoint, right now at

Page 430

1 Nicolosi - direct
2 this stage of the proceeding I haven't heard
3 how these are relevant. And we would
4 continue to maintain this objection.
5       MR. CAMPBELL: You heard what I
6 said. I did not say that American Express
7 breached these addenda. Because as I said,
8 Frank didn't sign these addenda.
9       THE CHAIRMAN: Go ahead.
10       ARBITRATOR COHEN: Please
11 continue.
12       MR. CAMPBELL: As part of its
13 attempt to vacate the panel's earlier award
14 with respect to the documents, American
15 Express has presented to the District Court a
16 privacy policy that it claims means that it
17 cannot be held responsible for failing to
18 provide copies and can't be required to
19 provide copies of Mr. Marzano's client
20 records to Mr. Marzano because of its privacy
21 policy.
22       The only privacy policy that they
23 put in is a privacy policy that was not in
24 effect at the time Mr. Marzano left. And as
25 a counter to that defense which they put in

Page 431

1 Nicolosi - direct
2 already and I know is out there, and I'm
3 going to address as part of my case in chief,
4 I will demonstrate that American Express, in
5 fact, permitted this, obligated itself
6 contractually to permit this, and until last
7 September 2004, did not have a policy with
8 respect to privacy that prevented it from
9 happening.
10       That is at the time Mr. Marzano
11 left there was, the policy that American
12 Express points to was not in effect.
13       THE CHAIRMAN: Forgive me, Mr.
14 Campbell, but isn't that what we litigated
15 back in the fall of last year and that you
16 got a ruling from this panel which is now
17 apparently taken to the District Court? I
18 thought we're beyond that point now. That
19 that ruling is still good as far as this
20 arbitration goes. And that you're now at a
21 different stage. And that is the stage of
22 damages.
23       MR. CAMPBELL: A certain
24 unclarity in my mind with respect to that,
25 Mr. Chairman. But if it's the case that

Page 432

1    Nicolosi - direct
2    we're no longer litigating the issue of
3    breach on that part, I drop it.
4         THE CHAIRMAN:  Am I mistaken?  I
5    thought that had been resolved last time.
6         MR. CAMPBELL:  Res adjudicata,
7    going forward.  That's fine.  I'll drop it.
8         MR. ZARETSKY:  So far as I
9    understand it, the panel issued a decision
10   and a temporary injunctive hearing which is
11   what, last fall, was directing American
12   Express to turn over copies of client files
13   to Mr. Marzano.  That's been decided.
14        With all due respect, I don't
15   know whether the panel decided there was a
16   breach of any contract by American Express.
17   There's an award that says turn over copies
18   of the client files.  And that's the award
19   that we've challenged in the District Court
20   because we believe it would force American
21   Express to violate federal law.  The
22   Graham-Leach-Blyley Act.
23        THE CHAIRMAN:  To the extent the
24   panel do not have to go to an award --
25        MR. ZARETSKY:  Understand that.

Page 433

1    Nicolosi - direct
2         THE CHAIRMAN:  I think we can
3    defer to the fact that documents told to be
4    turned over to Mr. Marzano indicate that
5    there was some right he had that had to be
6    enforced.  And that we were enforcing that
7    right.
8         I don't see why we're going over
9    this again, Mr. Campbell.
10        MR. CAMPBELL:  I think you're
11   right.  Let me just clarify one point, Mr.
12   Chairman.  That wasn't a temporary injunction
13   hearing last year.  That was a final award on
14   the injunction issued, full and complete.
15        MR. ZARETSKY:  I misspoke.  It
16   was a permanent injunction.  But it was an
17   injunction hearing.
18        MR. CAMPBELL:  It was a final
19   award, we've all agreed on that, in the
20   District Court.  It's a final award.  It can
21   be vacated or confirmed as opposed to an
22   interim award.
23        MR. ZARETSKY:  I misspoke.
24        MR. CAMPBELL:  Mr. Nicolosi,
25   you're off the hook on Addendum 3-R and 3-V.

Page 434

1    Nicolosi - direct
2         And I'm glad we cleared that up, Mr.
3    Chairman.  I thought I still had to do
4    something, but apparently I didn't.
5    BY MR. CAMPBELL:
6         Q.   Now, with respect to Mr. Marzano's
7    specific agreement, Mr. Nicolosi, did you have any
8    involvement, directly or indirectly, in negotiating
9    it?
10        A.   No.
11        Q.   Did you sign it?  I don't believe you
12   did.  Mr. Mascielo signed it, correct?
13        A.   What are you talking about?
14        Q.   The agreement that was made with Mr.
15   Marzano.
16        A.   My signature is not on that.
17        Q.   Can you explain to the panel what you
18   understand about the CPA Alliance program?
19        A.   CPA Alliance program, that was an
20   initiative to attract CPAs into our business as
21   financial advisors.
22        Q.   Was that a companywide initiative?
23        A.   It could have been done companywide,
24   yes.  It was available companywide.
25        Q.   Did you have any goals for 2004 that

Page 435

1    Nicolosi - direct
2    involved making specific progress with respect to
3    the CPA Alliance program?
4         A.   There were no allocated goals for that.
5         Q.   How many CPAs were recruited into the
6    CPA Alliance program in your product group?
7         A.   I can give you an approximation.  I
8    don't have an exact number.  I don't know how
9    accurate this is going to be.  Maybe five, six.
10        Q.   In fact, wasn't Mr. Marzano the first
11   CPA to be recruited into the CPA Alliance program in
12   your market group?
13        A.   He could have been.
14        Q.   You don't have any understanding to the
15   contrary; is that right?
16        A.   If you're asking me do I know he was
17   the first, I don't recollect if he was the first.
18        Q.   Do you recollect that following his
19   affiliation with American Express, Frank became
20   something of a leader in your market group with
21   respect to the CPA Alliance program?
22        A.   Yes.
23        Q.   In fact, he helped you to recruit those
24   other CPAs; didn't he?
25        A.   He helped.  He helped us, yes.

Page 436

Nicolosi - direct

1
2     Q.    He didn't only help your market group,
3  he helped other market groups too; didn't he?
4     A.    Yes, he did.
5     Q.    He was in demand to go to market groups
6  and give talks on the CPA Alliance program and how
7  it could be utilized to benefit the company; isn't
8  that right?
9     A.    He did go to other market groups and
10 speak, yes.
11    Q.    He was in demand from other market
12 groups; wasn't he?
13    A.    He was.
14    Q.    You didn't send him out to other market
15 groups; did you?
16          MR. ZARETSKY:  There are two
17    questions pending now.
18          MR. CAMPBELL:  I'm trying to help
19    the witness.  He seems to be confused.
20          THE CHAIRMAN:  One question at a
21    time, Mr. Campbell, would help everyone.
22    Q.    Did you send him out to other market
23 groups to "beat the drum" for the CPA Alliance
24 program?
25    A.    He did go to other market groups.

Page 437

Nicolosi - direct

1
2     Q.    Because they asked for him or because
3  you told him to go?
4     A.    Because they requested him.
5     Q.    He was in demand; wasn't he?
6     A.    If you want to say so, that's fine.
7     Q.    And you were happy to let him go
8  because you perceived him as a useful tool for the
9  CPA Alliance program; isn't that right?
10    A.    I didn't see anything wrong with
11 letting him go.
12    Q.    Will you describe him as something of a
13 posterboy for the program nationwide?
14    A.    I think he was recognized as supporting
15 that initiative, yes.
16    Q.    And he was recognized throughout the
17 company for that particular aspect?
18    A.    I don't know at what level he was
19 recognized by.
20    Q.    I don't think Ken Chennault would
21 recognize him.  But among the market groups of vice
22 presidents like yourself?
23    A.    I don't know to what extent other
24 market groups knew of Frank.
25    Q.    Did you compensate Frank for his

Page 438

Nicolosi - direct

1
2  activities in supporting the CPA Alliance program?
3     A.    I don't believe so.
4     Q.    Frank, in fact, was keen to do this on
5  his own behalf; wasn't he?
6     A.    Yes.
7     Q.    He volunteered it to a large part?
8     A.    He did.
9     Q.    Do you remember a business opportunity
10 related to PriceWaterhouseCoopers?
11    A.    What specific?
12    Q.    Do you recall a time when American
13 Express was engaged to provide financial planning
14 advice to the partners of PriceWaterhouseCoopers
15 when PriceWaterhouseCoopers merged with another
16 entity?  Was it IBM?
17          MR. MARZANO:  When they sold IBM.
18    Q.    When they sold to IBM.
19    A.    I remember we had some initiative.  I
20 don't remember the specifics.
21    Q.    But was it, would you agree, a
22 significant opportunity for American Express, and
23 for those advisors who could be part of it?
24    A.    Sure.
25    Q.    A lot of partners at

Page 439

Nicolosi - direct

1
2  PriceWaterhouseCoopers?
3     A.    Yes.
4     Q.    A lot of wealthy people?
5     A.    I would imagine.
6     Q.    In the New York market group, Frank was
7  tagged to be your point person on that, wasn't he,
8  among the advisors?
9     A.    I don't remember that.
10    Q.    You don't remember?  You didn't have
11 any role in deciding that?
12    A.    I may have.  I just don't remember
13 that.
14    Q.    Do you remember that, in fact, Frank
15 was involved in your market group with the
16 PriceWaterhouseCoopers partners in setting up the
17 whole scheme for delivering this financial planning
18 advice to the PriceWaterhouseCoopers partners?
19    A.    I don't recall who was involved with
20 that.
21    Q.    To put your position in perspective,
22 could you please tell us as of now, as of today
23 under Ameriprise Financial, you told us the
24 structure in your market group.  GVP, six FVPs, and
25 so on.

56 (Pages 436 to 439)

Page 440

Nicolosi - direct

1
2   Q.   On the up, who is senior to you?  Who
3   do you report to?
4        A.   We have a senior vice president.
5        Q.   Who is that for your market group?
6        A.   Mike Woodward.
7        Q.   And above Mike Woodward, that's Mr.
8   Cracciola?
9        A.   No.  General sales manager.
10       Q.   Who's the general sales manager?
11       A.   Brian Heath.
12       Q.   And Mr. Heath reports to Mr. Cracciola;
13  is that it?
14       A.   That is correct.
15       Q.   That hasn't changed when it was called
16  AEFA, by the sounds of it?
17       A.   No.
18       Q.   I may have asked you this the first
19  time around, but we don't have a transcript so I
20  want to make sure that we have it on the record
21  here.
22            Can you tell us, please, where in the
23  rankings by production Frank Marzano stood in the
24  market group as of March 2004?
25       A.   He was one of our top advisors.

Page 441

Nicolosi - direct

1
2        Q.   One of the top 10?
3        A.   Yes.
4        Q.   How long had he been a top 10 advisor
5   as of March 2004?
6        A.   I don't remember.
7        Q.   Do you know what his standing was in
8   2003?
9        A.   I don't remember his exact standing.
10  No.
11       Q.   But you do know that he joined American
12  Express in the year 2000?
13       A.   Hmm-hmm.
14       Q.   By the year 2004 he was one of the top
15  10 advisors in your market group?
16       A.   Yes.
17       Q.   In American Express as a whole, where
18  does your marketing group rank by production/GDC?
19       A.   Currently?
20       Q.   No.  Let's say as of March 2004.
21       A.   We were 1, 2, or 3.
22       Q.   You were either number 1 or number 2,
23  or number 3?
24       A.   Yes.
25       Q.   By number of advisors in March 2004,

Page 442

Nicolosi - direct

1
2   same thing; 1, 2, or 3?
3        A.   In the top 5.
4        Q.   And the company tracks advisors
5   companywide ranking by production also; doesn't it?
6        A.   Yes.
7        Q.   Do you recollect where Mr. Marzano was
8   companywide in March 2004?
9        A.   He was considered one of the top
10  advisors.  I don't know what his rank was.
11       Q.   Top 50?
12       A.   He could have been top 50.
13       Q.   Would you agree that within American
14  Express as it was at the time that it was something
15  of a record for an advisor to join as a newcomer to
16  the business and in four years become a top 50
17  producer?
18            MR. ZARETSKY:  Mr. Chairman, at
19       this point I have to say, and I know we have
20       time constraints, what is the relevance of
21       whether it was a record for Mr. Marzano to
22       become a top 50 in the company producer
23       within four years?
24            THE CHAIRMAN:  Mr. Campbell.
25            MR. CAMPBELL:  As I think I've

Page 443

Nicolosi - direct

1
2   already explained and will be explaining more
3       in detail when Mr. Marzano testifies, we're
4       going to show that he had an upward
5       trajectory momentum that was toppled in 2004
6       because of the breaches by American Express.
7       And is part of the measure of damages.
8            THE CHAIRMAN:  Go ahead, Mr.
9       Campbell.
10           THE WITNESS:  Could you rephrase
11       the question.
12       Q.   It's something of a record at American
13  Express for a new advisor, new to the business,
14  within four years to become a top 50 nationwide
15  producer?
16       A.   I don't know if it was a record.  But
17  it was a great accomplishment.
18       Q.   The CPA Alliance, was that closed down?
19       A.   That is, as of right now, shut down,
20  yes.
21       Q.   Was it shut down shortly after Mr.
22  Marzano separated?
23       A.   I believe it shut down either just
24  prior to or after.  I'm not sure of the time line.
25  But it was in that --

Page 444

Nicolosi - direct

1      Q.    General time period?
2      A.    General time period.  Might have been
3  before.  I'm not sure.
4      Q.    Let's see if I brought it.
5            Would you agree, Mr. Nicolosi, that the
6  client files created by an advisor as part of his
7  financial planning practice are an important tool
8  for use in servicing the clients?
9      A.    Yes.
10     Q.    Would you agree that if you didn't, for
11  example, you as a market group vice president after
12  an advisor leaves and you had the task of ensuring
13  that the clients were properly serviced following
14  the advisor's termination, that you would be
15  significantly hampered in your ability to do that if
16  you didn't have the client files?
17     A.    I would want the client files.
18     Q.    Say again?
19     A.    I would want the client filings.
20     Q.    In fact, wouldn't you agree that you
21  would need the client files in order to ensure that
22  the clients are properly serviced?
23     A.    Yes.
24     Q.    American Express requires advisors to

Page 445

Nicolosi - direct

1  maintain comprehensive files on their clients; don't
2  they?
3      A.    Yes.
4      Q.    All the notes of meetings are required
5  to be retained in the files?
6      A.    Yes.
7      Q.    All the communications back and forth
8  between the clients and the advisor are required to
9  be maintained in the file?
10     A.    Yes.
11     Q.    Financial plans are required to be
12  maintained in the file?
13     A.    Yes.
14     Q.    American Express expects to have those
15  files available for it to give to other advisors
16  should an advisor leave, right?
17     A.    Yes.
18     Q.    Now, directing your recollection to
19  March of 2004.
20           Did you become aware of an internal
21  review that was commenced by American Express into
22  Mr. Marzano?
23           MR. ZARETSKY:  It's a yes or no.
24           Just say no.

Page 446

Nicolosi - direct

1      A.    Yes.
2      Q.    When did you become aware?
3      A.    My recollection is sometime in March
4  of that year.
5      Q.    Do you have a specific date or event in
6  mind that led to you becoming aware?
7      A.    I don't know the exact date.
8      Q.    Did you get anything in writing
9  informing you?
10     A.    I don't believe so.
11     Q.    Did you have any role in connection
12  with that investigation?
13           MR. ZARETSKY:  Object to the
14  form.  I think he asked the question
15  originally, internal review.
16           MR. CAMPBELL:  I apologize if I
17  slip from one to the other.
18     Q.    I mean to reference, Mr. Nicolosi, the
19  internal review that you described.
20     A.    That I described?
21     Q.    Well, that I described and you agreed
22  that you became aware of.
23     A.    Okay.
24     Q.    Did you get anything in writing

Page 447

Nicolosi - direct

1  informing you that an internal review was initiated?
2      A.    Not to my recollection.
3      Q.    Can you tell us how you became aware
4  that the internal review had been initiated?
5      A.    My recollection --
6            MR. ZARETSKY:  I'm just going to
7  object, Mr. Chairman.  Or note that I would
8  like the witness to be admonished that to the
9  extent that it night require him to disclose
10  matters that we've been discussing obviously
11  before Mr. Nicolosi got here that implicated
12  the USA Patriot Act, the Bank Secrecy Act, to
13  the extent that this answer might require him
14  to disclose information about that, that the
15  witness should not disclose that, even though
16  the question might call for it.
17           THE CHAIRMAN:  Do you understand
18  your counsel's comment, Mr. Nicolosi?
19           THE WITNESS:  I think so.
20           THE CHAIRMAN:  With that
21  admonishment, go ahead, Mr. Campbell.
22     Q.    What was the question?
23     Q.    How did you become aware that an
24  internal review had been initiated?

58 (Pages 444 to 447)

Page 448

Nicolosi - direct
1
2       A.   Through a phone call.
3       Q.   From who?
4       A.   My recollection is Tim Dodds.
5       Q.   In the home office?
6       A.   Hmm-hmm.
7       Q.   Had there been prior to this date in
8  March, whatever date it was, had there been any
9  other internal review of Mr. Marzano?
10      A.   Not to my recollection.
11      Q.   Are you aware of any compliance issues
12 relating to Mr. Marzano before you got notice that
13 an internal review had been initiated?
14      A.   Compliance issues?
15      Q.   With respect to Mr. Marzano, yes.
16      A.   There was an issue related to some
17 corporation that he had.
18      Q.   His CPA practice?
19      A.   Yes. I don't recall exactly. He had a
20 corporation that the company wanted him to dissolve.
21 And that was an issue that was compliance related.
22      Q.   Is that the only one that you can
23 recollect?
24      A.   The only one that comes to mind.
25      Q.   That compliance related issue, it was

Page 449

Nicolosi - direct
1
2  addressed by the company and by Frank?
3       A.   In the process of.
4       Q.   You were in the process of addressing
5  it?
6       A.   Yes. It wasn't fully resolved yet.
7       Q.   Did that particular issue result in the
8  initiation of an internal review?
9       A.   I don't know that.
10      Q.   Well, did you initiate any internal
11 review within the market group as opposed to being
12 initiated from outside the market group with respect
13 to that compliance issue with Mr. Marzano?
14      A.   I did not.
15      Q.   In March 2004, compliance at American
16 Express is accomplished as an initial matter through
17 Series-24 individuals who called themselves OSJs;
18 isn't that correct?
19      A.   Registered principals.
20      Q.   Yes.
21           And the OSJs were, tell me, were they
22 employees of American Express?
23      A.   Some were and some were not.
24      Q.   Some were independent franchisees?
25      A.   Yes.

Page 450

Nicolosi - direct
1
2       Q.   With respect to these OSJs, what was
3  the arrangement pursuant to which, for example, Mr.
4  Marzano was supervised by such a registered
5  principal?
6       A.   What do you mean by that?
7       Q.   Was there an arrangement? Did you
8  assign an OSJ to Frank? Did Frank pick his own OSJ?
9           How did it work?
10      A.   We approved who the registered
11 principals are. And then the advisor contracts
12 either with the market group who would work for the
13 market group as an employee in the company or the
14 independent registered principal.
15      Q.   So you approved a group of people to be
16 the registered principals in the market group. Some
17 employees, some franchisees. Then the franchisee
18 gets to choose from among those people who to
19 contract with for OSJ services; is that right?
20      A.   For the most part.
21      Q.   If it's a market group employee, then
22 that's something that generates income for the
23 market group?
24      A.   Yes.
25      Q.   And if it's with a franchisee it

Page 451

Nicolosi - direct
1
2  generates income for the franchisee?
3       A.   Yes.
4       Q.   Can you tell the panel, please, in
5  2000, well, to 2004, who was Mr. Marzano's OSJ?
6       A.   I don't know that I can recall.
7       Q.   Did he have just one OSJ during that
8  time period, or was it more than one?
9       A.   I can't answer your question.
10      Q.   Do you know whether or not he had, for
11 example, six OSJs in a four-year period?
12      A.   I can't answer that question.
13      Q.   You don't know?
14      A.   I don't recall.
15      Q.   If somebody keeps switching from one
16 OSJ to another, isn't that itself a compliance
17 issue?
18           You have to wonder why does he keep
19 switching?
20      A.   Could be.
21      Q.   In fact, it's something that American
22 Express doesn't permit, isn't it; switching from one
23 OSJ to another too frequently?
24      A.   We would limit that.
25      Q.   You would limit that. Right.

Page 452

Nicolosi - direct

1  So if Frank had six or seven OSJs in a
2  four-year period, would you agree that that would
3  have to be something that the market group
4  countenanced/permitted?
5     A.   We would have had to have approved
6  that.
7     Q.   Are you aware whether or not OSJs that
8  were contracting with Frank during the period 2000
9  to 2004 were resigning as OSJs, giving up the
10 position?
11    A.   I don't recall. I don't recall.
12    Q.   Do you recall Mary Beth Sharkey?
13    A.   Yes.
14    Q.   Was she an OSJ for Frank during some
15 period of time?
16    A.   I'd have to check that.
17    Q.   You don't recall?
18    A.   Right.
19    Q.   Was Mary Beth Sharkey an OSJ in 2004?
20    A.   Yes.
21    Q.   Was she an OSJ in 2003?
22    A.   I don't recall when she started.
23    Q.   How about Clarence MacMaster. Do you
24 recall Clarence MacMaster?

Page 453

Nicolosi - direct

1     A.   Yes.
2     Q.   Was he an OSJ?
3     A.   He was.
4     Q.   Do you know if he was an OSJ for Frank?
5     A.   I don't know.
6     Q.   Is Mr. MacMaster still an OSJ with a
7  Ameriprise now as it's known?
8     A.   No.
9     Q.   How about Robert Priest.
10    Do you remember Robert Priest as an OSJ
11 at American Express?
12    A.   I don't recall if Bob was an OSJ.
13    Q.   You do recall a Bob Priest. You don't
14 remember if he was an OSJ?
15    A.   I do recall a Bob Priest. Yes.
16    Q.   How about Stephen Gary, Steve Gary?
17    A.   Steve Gary was an OSJ. A registered
18 principal for us.
19    Q.   Do you know if he was a registered
20 principal for Frank?
21    A.   I don't know.
22    Q.   How about John Stolanski?
23    A.   He was a field compliance specialist.
24 He's a field compliance specialist.

Page 454

Nicolosi - direct

1     Q.   Which is a Series-24 employed by the
2  marketing group?
3     A.   Yes.
4     Q.   Do you know if he was the Series-24,
5  the OSJ for Frank during any period of time?
6     A.   I'd have to check that out.
7     Q.   The people we've just mentioned,
8  Sharkey, Priest, Gary, and Stolanski, are they still
9  all with American Express/ Ameriprise?
10    A.   As employees or just affiliated with
11 them?
12    Q.   Just affiliated with.
13    A.   Give me those names again.
14    Q.   You told us MacMaster is not.
15    A.   Right.
16    Q.   So leave him out. Mary Beth Sharkey?
17    A.   She is.
18    Q.   Bob Priest?
19    A.   No longer.
20    Q.   Steve Gary?
21    A.   He is still with us.
22    Q.   John Stolanski?
23    A.   He is no longer with us.
24    Q.   Was it, in fact, the case during the

Page 455

Nicolosi - direct

1  period 2000 to 2004 that the OSJs were charged with
2  compliance supervision of the practice of those
3  franchisees that contracted with
4  him for OSJ services?
5     A.   Yes.
6     Q.   And as part of that, every year there
7  would be a compliance audit, right?
8     A.   Yes.
9     Q.   And there would be a compliance audit
10 file crated by the OSJ for each franchisee that the
11 OSJ works for or works with?
12    A.   Yes.
13    Q.   And the compliance audit would have
14 addressed any compliance issues and set out a scheme
15 for curing any problems. And there would be a
16 follow-up to see whether or not they'd be taken care
17 of; is that right?
18    A.   Yes.
19    Q.   And if there were any serious issues,
20 then they would go up the line, up the compliance
21 line to the market group?
22    A.   Yes.
23    Q.   Do you recollect at any time during
24 2000 to 2004 there being an audit of Frank Marzano's

Page 456

Nicolosi - direct

1
2  office that related in compliance issues that had to
3  go up the line to the market group?
4      A.   No.
5      Q.   Now, let's get back to the internal
6  review.
7          Were you a part of the team undertaking
8  the internal review that you learned about sometime
9  in March of 2004?
10     A.   No.
11     Q.   Was anybody from the market group or on
12  your behalf a part of that team?
13     A.   No.
14     Q.   You say there was no representative of
15  the market group involved?
16     A.   To my recollection, no.
17     Q.   Was Mary Beth Sharkey involved in any
18  way in the internal review?
19     A.   I don't know what her role -- I don't
20  know if she was or not.
21     Q.   Do you know if she was a subject of the
22  internal review since it involved one of her
23  franchisees?
24          MR. ZARETSKY:  Objection.  I
25      think to the extent the internal review

Page 457

Nicolosi - direct

1
2  encompasses this issue we've been addressing,
3  to disclose subjects of it could be violating
4  the law.
5          THE CHAIRMAN:  Yes.
6          MR. CAMPBELL:  Mr. Chairman,
7      think about it.  The internal review is not
8      secret.  It's not private.  It's reported,
9      testified about.  The fact that Mr. Marzano
10     is a subject of the internal review purported
11     testified to, it's just a fact about the
12     internal review.
13         THE CHAIRMAN:  What about this
14     other individual?  What does she have to do
15     with this?
16         MR. CAMPBELL:  Well, she was his
17     OSJ.  If there's a compliance issue, one of
18     these obvious questions that will arise is,
19     well, did the Series-24, did the registered
20     principal fall down on the job.  Was the
21     registered principal also being reviewed for
22     potential failure to supervise?
23         THE CHAIRMAN:  I don't see the
24     relevance.  I'm sorry.
25         MR. CAMPBELL:  Okay.  I am just

Page 458

Nicolosi - direct

1
2  trying to identify the scope, to the extent I
3  can, without going beyond the bounds where
4  I've been told I can't go.
5      Q.   Did you have communications with Frank
6  about the internal review?
7      A.   When you say did I have communications,
8  to what respect?
9      Q.   With respect to the internal review.
10     A.   The content?
11     Q.   Just did you have communications with
12  Frank?
13     A.   Did I speak to Frank?  I did speak to
14  Frank.
15     Q.   About what did you speak to Frank in
16  connection with the internal review?
17     A.   That he had to make himself available.
18     Q.   Well, you're the person who told him
19  initially that he had to turn up to a meeting?
20     A.   Yes.
21     Q.   Tell the panel what you told him and
22  what Frank said to you during that conversation when
23  you first told him that he had to turn up for a
24  meeting.
25     A.   I have no recollection.

Page 459

Nicolosi - direct

1
2          THE CHAIRMAN:  I'm sorry, I can't
3      hear you.
4      A.   I have no recollection of that
5  conversation.
6      Q.   Did you tell him that he had to come to
7  a meeting downtown?
8      A.   Yes.
9      Q.   And that it was mandatory?
10     A.   Yes.
11     Q.   Mandatory meaning, you don't turn up
12  you're fired?
13     A.   No.
14     Q.   Mandatory in what sense?
15     A.   Required.
16     Q.   Such that if you don't do it, what are
17  the consequences?
18         MR. ZARETSKY:  I'm sorry.  Is the
19     question --
20     Q.   Are there consequences to not turning
21  up to a mandatory required meeting?
22         MR. ZARETSKY:  Just a
23     clarification.  I just wanted to know is he
24     asking the witness whether he told Mr.
25     Marzano that or is he just wanting to know

61 (Pages 456 to 459)

Nicolosi - direct

1  Mr. Nicolosi's state of mind at the time?
2      MR. CAMPBELL: I want to know
3  what he meant.
4      THE CHAIRMAN: State of mind, is
5  that what you're saying, Mr. Campbell?
6      MR. CAMPBELL: What he meant.
7  What did he mean when he said it was
8  mandatory.
9      THE CHAIRMAN: Go ahead, Mr.
10  Nicolosi.
11      THE WITNESS: You want me to
12  answer?
13      MR. ZARETSKY: If you can.
14  A.   What I meant, it was a
15  compliance-related issue. And he was required to
16  show up.
17  Q.   Did you tell him there will be any
18  consequences?
19  A.   I don't recall.
20  Q.   If he had not turned up, what did you
21  believe or intend would happen once you told him
22  that it was a mandatory meeting?
23  A.   What do I speculate would have
24  happened?

Nicolosi - direct

1  Q.   Well, would anything have happened as
2  you understand it?
3  A.   What I would speculate would have
4  happened?
5      MR. ZARETSKY: I don't think the
6  witness should be called upon to speculate,
7  Mr. Chairman. I'll object to that. All he
8  knows is speculation. That's not proper.
9      MR. CAMPBELL: He doesn't know.
10  Just speculation. He has to know what he
11  meant. He said it meant required. What does
12  required mean?
13      MR. ZARETSKY: He already
14  answered that question.
15      MR. CAMPBELL: No, he didn't.
16  It's a compliance-related meeting and it's
17  required that you show up.
18      What does required mean?
19      THE CHAIRMAN: Like the previous
20  question, if he didn't turn up, what would it
21  have meant to you, Mr. Nicolosi?
22      THE WITNESS: They would have
23  attempted to set up a meeting. Find out why
24  he didn't show up. And attempt to set up

Nicolosi - direct

1  another meeting.
2  Q.   So it wasn't required?
3  A.   It was required.
4      MR. CAMPBELL: Okay. I guess
5  that's as far as I'll get on that one.
6  Q.   Tell him anything else?
7  A.   I don't recall.
8  Q.   Tell him it was confidential?
9  A.   Probably.
10  Q.   Tell him not to tell anybody else, not
11  to discuss it with anybody?
12  A.   Probably.
13  Q.   You didn't just have this conversation
14  with Frank Marzano; did you?
15      You had it with about a dozen other
16  people?
17      MR. ZARETSKY: Objection. The
18  conversation in which Mr. Marzano was a
19  party?
20      MR. CAMPBELL: No. The
21  conversation where you called up advisors
22  during the same period of time in March 2004
23  and told them you have to turn up to a
24  compliance meeting. It's mandatory.

Nicolosi - direct

1      MR. ZARETSKY: I'm going to
2  object to anything beyond yes or no. But as
3  to yes or no, I won't object to that.
4  A.   Yes.
5  Q.   I think I used the number of about a
6  dozen. Is that about the right number?
7      MR. ZARETSKY: I'm going to
8  object to that. That's getting too specific.
9      THE CHAIRMAN: Without names,
10  about a dozen, give or take?
11      THE WITNESS: Approximately.
12      THE CHAIRMAN: Approximately.
13  That's generally.
14      MR. CAMPBELL: I take it, Mr.
15  Chairman, that you're indicating that if I
16  ask names there will be an objection and it
17  will be sustained?
18      THE CHAIRMAN: Unless you point
19  out the relevance of it.
20      MR. CAMPBELL: Well, let me ask
21  it without asking for the specific names.
22  See if anybody thinks it's relevant.
23  Q.   All of the people that you had this
24  conversation with to turn up to a meeting that was a

Page 464

1      Nicolosi - direct
2   mandatory compliance meeting, they were all
3   Italians; weren't they?
4            MR. ZARETSKY: Objection. Mr.
5   Chairman, what's the relevance in that?
6            THE CHAIRMAN: Mr. Campbell, I
7   don't remember seeing anything like that in
8   the pleadings.
9            Are you now raising a different
10  cause of action?
11           MR. CAMPBELL: I can't remember
12  if it's there. But I think we did mention
13  that only people of Italian surnames were
14  involved.
15           THE CHAIRMAN: I have to review
16  the pleadings. I just don't remember that.
17           MR. CAMPBELL: Can I still have
18  an answer to the question?
19           THE CHAIRMAN: No.
20           MR. ZARETSKY: I don't think I
21  can permit that to be answered, Mr. Chairman.
22           MR. CAMPBELL: Everybody was
23  Italian. What's wrong with that? How's that
24  get specific?
25           MR. ZARETSKY: I would instruct

Page 465

1   Nicolosi - direct
2   him not to answer.
3            THE CHAIRMAN: Mr. Chairman, you
4   want to point out where that's in the
5   pleadings that's become an issue before this
6   panel?
7            MR. CAMPBELL: Before going down
8   that track any more today, I will find that
9   out and show it to you, and then decide
10  whether or not there's any further to go.
11  Q.   Mr. Nicolosi, I take it that this
12  compliance investigation/compliance review that Mr.
13  Marzano was, quote, gone up to.
14           Withdraw that. I'd forgotten where I
15  was going.
16           Did Frank ask you what the subject of
17  the meeting was?
18  A.   I don't recall.
19  Q.   Did he ask you why he had to be there?
20  A.   Probably.
21  Q.   What's going on, questions like that?
22  A.   Hmm-hmm.
23  Q.   And you didn't tell him, right?
24  A.   I believe I told him it was compliance
25  related.

Page 466

1   Nicolosi - direct
2   Q.   And you wouldn't tell him anything
3   else?
4   A.   No.
5   Q.   Was there an issue of failure to
6   supervise in the internal review?
7            MR. ZARETSKY: Can I just have a
8   moment, please.
9            THE CHAIRMAN: Sure.
10           MR. ZARETSKY: Mr. Chairman, I'm
11  sorry, I just wanted to double-check the
12  FinCEN article and the letter because I
13  didn't want to invade that.
14           Can I have the question read
15  back. I don't think it's objectionable. I
16  want to just hear it again.
17           (Question read.)
18  A.   They did review the supervision.
19  Q.   Ultimately, are you the person
20  ultimately responsible for compliance in your market
21  group?
22  A.   Yes, I am.
23  Q.   You're not saying that you were
24  reviewed; are you?
25  A.   Yes, I am.

Page 467

1   Nicolosi - direct
2   Q.   Can you recollect how many
3   conversations you had with Mr. Marzano between that
4   initial conversation where you told him you had to
5   turn up to the first meeting and when Mr. Marzano
6   resigned?
7   A.   I don't recall.
8   Q.   Do you recall having any conversations?
9   A.   Yes.
10  Q.   Can you tell us what you recall was the
11  content of any of the conversations that you had
12  between that initial conversation and Frank's
13  resignation?
14  A.   Mostly --
15           MR. ZARETSKY: Can I just have
16  the question read back. I'm sorry.
17           (Question read.)
18           MR. ZARETSKY: Mr. Chairman, I
19  would want to have an admonition to the
20  witness in the article. Just because we've
21  been using it as sort of a guideline at
22  least. And I'm using it as a guideline for
23  what we think we can and cannot allow our
24  clients testify to, five of the things that
25  are enumerated that can't be, that are

63 (Pages 464 to 467)

Page 468

Nicolosi - direct

1
2    protected by this privilege among others are
3    communications preceding the filing of the
4    SAR or preparatory to it.
5            I just would want the witness to
6    be admonished if it has anything to do with
7    these matters raised by the Patriot Act, the
8    Bank Secrecy Act, things of that nature, that
9    he cannot disclose communications regarding
10   that.
11           THE CHAIRMAN:  With the
12   understanding that maybe communications that
13   he can disclose if they don't affect the Bank
14   Secrecy Act.
15           MR. ZARETSKY:  Correct.  I don't
16   know what the answer's going to be.  But I
17   just wanted that admonition to be there.
18           THE CHAIRMAN:  Do you understand,
19   Mr. Nicolosi?
20           THE WITNESS:  Yes.
21           THE CHAIRMAN:  Thank you.
22           MR. CAMPBELL:  Again, I'm going
23   to put on the record my objection to this
24   whole process.  I think it's just purely
25   obstructive since there has been no testimony

Page 469

Nicolosi - direct

1
2    in any way, shape, or form about the filing
3    of a SAR.  It is completely improper and
4    purely obstructive to interject the filing of
5    a SAR as a shield to asking questions.  And
6    the only time you hear about filing of a SAR
7    is from American Express putting its shield
8    up.  Nobody's gone anywhere near testifying
9    that there was or there wasn't.  Just
10   obstruction.  It's a good way to put forward
11   his witness inside the hearings that would
12   otherwise just not be allowed.
13           MR. ZARETSKY:  Just, with due
14   respect, Mr. Chairman...
15           THE CHAIRMAN:  Mr. Zaretsky, if I
16   may, Mr. Campbell, we did have witnesses
17   yesterday testify about possible violations
18   separate and apart from SARs.  So I think we
19   have managed to maneuver around that without
20   any problem.
21           MR. CAMPBELL:  Yes.  The point is
22   there's no evidence there was a SAR.  So if
23   it doesn't exist how can you use it as a
24   shield to going into the facts of a
25   conversation that he had with this guy who

Page 470

Nicolosi - direct

1
2    can testify to it.
3            THE CHAIRMAN:  Representations
4    made by counsel and officers of the court
5    that it may be an issue or violation of a
6    federal statute.  I can accept that.  And we
7    can proceed with the questions.
8            Before we do proceed, we do owe a
9    phone call.  Apparently there was a phone
10   call to the NASD administrator.  We're going
11   to take a few-minute break while Mr. Cohen
12   makes the phone call.
13           MR. GOOD:  Before we do that, it
14   is only appropriate that I apologize to the
15   panel.  I think earlier today I said some
16   things that maybe was inappropriate.  But as
17   a way of mea culpa, let me just tell the
18   panel that.  And I don't mean to characterize
19   what Mr. Campbell said, but at the time I
20   took Mr. Campbell's comments to be a little
21   grandstanding on his part, trying to kick
22   some dirt on American Express about their
23   inability to appear in May of this past year
24   for the hearings.  And that what was going on
25   this morning was in some way American Express

Page 471

Nicolosi - direct

1
2    being inappropriate in their conduct.
3            Number one, Mr. Campbell knows
4    darn well in May of this past year, this year
5    my mother passed away.  And that was the
6    reason why we were unable to go on.
7            ARBITRATOR COHEN:  Excuse me.  Is
8    this a conversation with the witness in the
9    room?
10           MR. GOOD:  If you want to excuse
11   the witness, that's fine.  That's okay.
12           THE CHAIRMAN:  Step outside Mr.
13   Nicolosi.  Because we do have some other
14   business transactions, that phone call I
15   mentioned.
16           (Whereupon, the witness left the
17   hearing room.)
18           MR. GOOD:  And frankly, it hit a
19   little raw nerve and was a little visceral of
20   a response.  And I just kind of felt watching
21   what was going on this morning, Mr. Campbell
22   kept placing the blame on us that we were
23   being unreasonable in our position.  And I
24   did not believe that.  And I responded likely
25   in an inappropriate way.  And I want to offer

64 (Pages 468 to 471)

Page 472

1    Nicolosi - direct
2    my apologies to the panel.
3         THE CHAIRMAN:  Thank you, Mr.
4    Good.  I don't believe that the panel took
5    any offense to anything that happened this
6    morning.  I know I didn't.
7         MR. GOOD:  I appreciate that.
8    But I think my emotions took over.  And that
9    was inappropriate and unprofessional.
10        THE CHAIRMAN:  It's an emotional
11   business.  Take a few-minute break while Mr.
12   Cohen makes that phone call.
13        (Short recess.)
14        THE CHAIRMAN:  We're adjourned
15   for the day.
16        (Time noted:  4:30 p.m.)
17
18
19
20
21
22
23
24
25

Page 473

1
2    September 14, 2005
3
4         I N D E X
5
6         WITNESSES
7
8    RESPONDENT'S  DIRECT  CROSS  REDIRECT  RECROSS
9    ANTHONY MAZZEI    258    269    294    298
10   FERDINAND RUPLIN  303    327    372    375
11   RICHARD KUNDRACIK 380    395    398
12   THOMAS NICOLOSI   400
13
14
15
16        E X H I B I T S
17
18   RESPONDENT'S
19   FOR ID. DESCRIPTION              PAGE
20   5                         311
21   6                         419
22   7                         426
23
24
25

Page 474

1
2         E X H I B I T S
3
4    CLAIMANT'S
5    FOR ID. DESCRIPTION                    PAGE
6    1                              337
7    2                              354
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 475

1
2         C E R T I F I C A T E
3
4
5
6         I, Robert Levine, Court Reporter
7    and Notary Public, hereby certify that
8    the proceedings herein are from the
9    notes taken by me in this matter of
10   the aforementioned case; and that this
11   is a correct transcription of the same.
12
13        IN WITNESS WHEREOF, I have
14   Hereunto set my hand this 15th day of
15   September, 2005.
16
17
18
19
20
21   _____
22        Robert M. Levine
23
24
25

65 (Pages 472 to 475)