CONDENSED COPY

```
1    NATIONAL ASSOCIATION OF SECURITIES DEALERS

2    CASE NO. 04-02723

3    ---------------------------------------------x

4    In the Matter of the Arbitration

5            -between-

6    AMERICAN EXPRESS FINANCIAL ADVISORS,

7                              Claimant,

8            -and-

9    FRANK PATRICK MARZANO,

10                             Respondent.

11   ---------------------------------------------x

12                    NASD

13                    One Liberty Plaza

14                    New York, New York

15                    December 5, 2005, 9:10 a.m.

16   B E F O R E:      MARTIN HUNGER, Chairman

17                     ROBERT COHEN, Arbitrator

18                     STEVEN J. PETRIE, Arbitrator

19

20               ROSENBERG & ASSOCIATES

21     Certified Shorthand Reporters & Videographers

22        425 Eagle Rock Avenue, Suite 201

23          Roseland, New Jersey 07068

24              (973) 228-9100

25          www.rosenbergandassociates.com
```

2656

1   A P P E A R A N C E S:
2
3   NASD
4   One Liberty Plaza
5   27th Floor
6   New York, New York 10005
7   Martin Hunger, Chairman
8
9   CARLET GARRISON KLEIN & ZARETSKY
10  Attorneys for Claimant
11  1135 Clifton Avenue
12  Clifton, New Jersey 07013
13  BY:  MICHAEL J. ZARETSKY, ESQ.,
14      ELIOT GOOD, ESQ.
15
16  SMITH CAMPBELL, LLP
17  Attorneys for Respondent
18  110 Wall Street
19  New York, New York 10005
20  BY:  THOMAS M. CAMPBELL, ESQ.
21
22  A L S O   P R E S E N T:
23
24  ROBERT M. LEVINE, CM
25  Court Reporter

2658

1   NASD Arbitration - December 5, 2005
2       THE CHAIRMAN:  -- Dahl as your
3   witness.
4       Mr. Dahl, just remind you, I'm sure
5   it's not necessary, but you're still
6   under oath.
7       THE WITNESS:  Thank you.
8
9   DIRECT EXAMINATION (cont'd)
10  BY MR. GOOD:
11      Q.   Mr. Dahl, do you have an opinion
12  regarding whether the least square regression
13  analysis performed and presented by Mr. Marzano
14  was correct?
15      A.   Yes, I do.
16      Q.   What is that opinion?
17      A.   My opinion is that it's incorrect.
18      Q.   What is the basis for that opinion?
19      A.   The first and primary basis for the
20  opinion is that the analysis of a shortened
21  period of time and a forecast based on a 14-
22  month period of time did not adequately capture
23  the factors that affect assets under management
24  for Mr. Marzano or any rep, particularly given
25  the 14-month period that was used.

2657

1   NASD Arbitration - December 5, 2005
2       THE CHAIRMAN:  On the record. Good
3   morning, gentlemen.
4       For the record, this is a
5   continuation of NASD arbitration 04-2723,
6   American Express Financial Advisors
7   against Frank Patrick Marzano.  This is
8   session number 23, I believe.  And
9   present in the room are on behalf of
10  American Express?
11      MR. ZARETSKY:  Michael Zaretsky.
12      MR. GOOD:  Eliot Good.
13      THE WITNESS:  Owen Dahl.
14      THE CHAIRMAN:  On behalf of Mr.
15  Marzano?
16      MR. MARZANO:  Frank Marzano.
17      MR. CAMPBELL:  And Tom Campbell.
18      THE CHAIRMAN:  And you the panel,
19  Mr. Petrie and Mr. Cohen and Mr. Hunger
20  are all present.
21      Ready to proceed?
22      MR. GOOD:  Yes.
23      THE CHAIRMAN:  Mr. Good, I believe
24  you you had Mr. --
25      THE WITNESS:  Dahl.

2659

1   NASD Arbitration - December 5, 2005
2       MR. GOOD:  You need to keep your
3   voice up so the panel can hear you.
4       THE WITNESS:  Absolutely.
5       Q.   Say that again, please.
6       A.   My opinion is that the 14-month
7   period of time that was used to project the
8   future in this case is too dissimilar from what
9   actually occurred and what we would expect to
10  occur on its own to receive any merit.
11      Q.   Explain that, please.
12      A.   Sure.  The first and primary reason
13  that there's a significant overforecasting of
14  assets under management during the period in
15  time that the stock market between the period
16  December 2003 to February 2004 -- exuse me --
17  December 2002 and February 2004 which form the
18  basis for the forecasting period was a period of
19  extremely strong asset growth.  The average
20  market indexes, the NASDAQ, the S&P, the Dow,
21  the Russell 1000, all rose on average by
22  slightly less than 40 percent on an annual
23  basis.
24      Q.   Let me stop you right there.
25      A.   Sure.

2660

1  NASD Arbitration - December 5, 2005
2  Q. When you talk about an
3  "overforecasting of assets," in order to
4  determine that and to use that phrase, what did
5  you do?
6  A. What we did is looked back at the
7  stock market indexes during the period in time
8  in question. And looked to see how the
9  supermarkets performed. We also looked,
10  particularly since we last spoke, at Mr.
11  Marzano's actual asset mix; that is, his equity
12  assets and his fixed income assets to understand
13  how these very strong stock market returns would
14  have affected his performance in terms of asset
15  under management growth.
16  Q. In evaluating Mr. Marzano's actual
17  asset mix, what did you determine?
18  A. What we determined was that Mr.
19  Marzano is right at 60 percent equity, 40
20  percent fixed income. And in the fixed income
21  product we included all annuities, including
22  variable annuities and money market products as
23  well. And just, that's not exactly accurate
24  because obviously annuities, variable annuities
25  have an equity component to them. But

2661

1  NASD Arbitration - December 5, 2005
2  particularly, for sake of being conservative, we
3  felt it was necessary to include them there.
4  Q. Now, what effect did the actual
5  asset mix have on your opinion relative to the
6  shortened period of time?
7  A. What we found is that, given that
8  asset mix, given the equity and bond markets
9  during the period of time in question, that Mr.
10  Marzano's assets rose purely from market returns
11  by a rate of 26.6 percent.
12  Q. And that would be 26.6 percent with
13  no new money being placed into the equation?
14  A. That's exactly right.
15  Q. Now, what period of time was it
16  that the market performed slightly less than 40
17  percent?
18  A. Between February 2003 and February
19  2004, in particular. But December 2002 to
20  February 2004, the specific time frame --
21  MR. CAMPBELL: I'm sorry. You say
22  December 2003?
23  THE WITNESS: December 2002.
24  MR. CAMPBELL: Okay.
25  Q. After that period of time, how did

2662

1  NASD Arbitration - December 5, 2005
2  the market perform?
3  A. Actually, the market has been best
4  characterized all the way through the end of
5  October as a sideways market. Market returns
6  were about 6 percent from the period February
7  2004 to October 2005. It's only actually in the
8  months of November, late in the month of
9  November that the stock market has surpassed the
10  February 29th number consistently.
11  Q. The February what number?
12  A. The February 2004, February 29,
13  2004 -- would it be of assistance to visually
14  show these numbers?
15  Q. I think it would be.
16  Did you prepare something to that
17  effect?
18  A. I did. I prepared a worksheet that
19  shows all of the indexes at set periods of time,
20  including February 2003, February 2004, February
21  2005 and October 31, 2005.
22  Q. Is that it?
23  A. Yes. This is it.
24  MR. GOOD: Mr. Chairman, for
25  purposes of examination and for

2663

1  NASD Arbitration - December 5, 2005
2  identification purposes may, I hand to
3  you Exhibit 1 which is entitled,
4  "AEFA/Marzano Historical Asset Analysis."
5  THE CHAIRMAN: I'm not sure it's
6  Exhibit 1.
7  MR. GOOD: I'm sorry.
8  ARBITRATOR PETRIE: Claimant's 11
9  for identification.
10  MR. GOOD: 11. I apologize.
11  (Document entitled, "AEFA/Marzano
12  Historical Asset Analysis" marked
13  Claimant's Exhibit 11 for identification
14  as of this date.)
15  MR. CAMPBELL: I don't know what
16  he's talking about, Mr. Chairman. I
17  haven't seen it and I don't have it now.
18  MR. GOOD: I will be happy to
19  provide it to you right now.
20  THE CHAIRMAN: Mr. Campbell, do you
21  want to take a few-minute break?
22  MR. CAMPBELL: I don't think a
23  short break would help us very much, Mr.
24  Chairman. As I said, I haven't seen the
25  exhibit before. And we'll just have to

2664

1    NASD Arbitration - December 5, 2005
2    wait and you see what the witness has to
3    say about it.
4        THE CHAIRMAN: Just wondering if
5    you need a few minutes by yourself. If
6    not, Mr. Good, you want to continue?
7        MR. GOOD: Thank you.
8    Q.  Mr. Dahl, would you walk me through
9    this analysis, please.
10   A.  Sure. The first box at the top of
11   this exhibit shows some commonly referred to,
12   commonly used equity index data, including the
13   Dow, the NASDAQ, S&P 500 and Russell 1000.
14   Q.  Why did you select those?
15   A.  Those are four commonly used.
16   Particularly the S&P 500, the Russell 1000 is a
17   broad market index. They tend to capture a
18   significant basket of this economy.
19        The Dow and the NASDAQ at the top
20   tend to be a little more specialized. The Dow
21   is a large cap index. The NASDAQ is a very
22   broad index as well, but has a lot of assorted
23   tech, energy, et cetera, products in there. So
24   by looking at sort of a broader index set we
25   wanted to make sure we weren't picking on, if

2665

1    NASD Arbitration - December 5, 2005
2    you will, a single index and using it
3    incorrectly.
4        What you can see, particularly in
5    terms of annual growth rates, is that the period
6    February 2003 to February 2004 corresponds
7    across the board with these index very, very
8    strong equity returns. The NASDAQ is at 51
9    percent. The other three are very close;
10   between 34 and 37 percent annual returns.
11   Q.  Let me stop you there for a moment.
12   A.  Okay.
13   Q.  Earlier you talked about a
14   shortened period of time for evaluation of the
15   information.
16   A.  Right.
17   Q.  What's significant about that
18   shortened period of time as to this annual
19   growth rate?
20   A.  When a regression analysis or any
21   comparative analysis is based on shortened
22   period of time, you run the risk that there are
23   variables within that set of data that don't
24   reasonably support the future.
25        In this case, it's clear, I think,

2666

1    NASD Arbitration - December 5, 2005
2    that equity returns in the high 30s on a
3    consistent annual basis are not appropriate.
4    And, in fact, as you look forward to the next
5    12-month period it's clear that's not what
6    happened.
7        In other words, the asset growth
8    going forward the next 12 months on Mr.
9    Marzano's book of business was nowhere near the
10   39.9 percent equity or the 26.6 percent blended
11   rate.
12   Q.  How does that affect the
13   evaluation; the calculation that Mr. Marzano
14   presented to the panel?
15   A.  He would end up, if not adjusting
16   for it, he would end up overcomputing his
17   estimated damages by overcomputing the expected
18   assets under management at any future given
19   time.
20   Q.  When you reviewed his calculation,
21   did he take into account a change in the equity
22   rate of return?
23   A.  No. As a matter of fact, implicit
24   in his regression analysis is that stock market
25   returns will continue at 39.9 percent

2667

1    NASD Arbitration - December 5, 2005
2    indefinitely.
3    Q.  How do you know that?
4    A.  Because it's a factor. The growth
5    in assets is a factor that is incorporated in
6    the assets under management number that he uses
7    to forecast off of.
8        In other words, as his assets
9    monthly change, part of that asset mix that he's
10   computing his future growth includes these
11   extremely high stock market returns.
12   Q.  Let me take you back to the model
13   itself that Mr. Marzano utilized.
14   A.  Sure.
15   Q.  Last week you indicated that the
16   least square regressive analysis utilized by Mr.
17   Marzano utilized only one variable.
18   A.  That's right.
19   Q.  And that variable was time?
20   A.  Correct.
21   Q.  Does that mean that the variable
22   relative to rate of return was not factored into
23   his equation?
24   A.  That's exactly right.
25   Q.  So there was an assumption that

2668

1    NASD Arbitration - December 5, 2005
2    turns out not to be correct in terms of the
3    modeling of his damage calculation that affects
4    the significance and the legitimacy of that
5    number?
6       A.   Yes.  Unless that specific variable
7    was considered, it is implicit in his analysis
8    that those equity returns will continue in the
9    future.
10      Q.   We'll get to what a better way of
11   doing that in a moment is.
12      A.   Sure.
13      Q.   Why don't you continue your
14   evaluation.
15      A.   As you move across that top box you
16   can see a couple of periods.  And these periods
17   were chosen to correspond to this case in
18   particular.  The first box shows you the next 12
19   months for comparative purposes.  And, as I
20   said, you can see the stock market returns were
21   virtually flat between the 28th of February 2005
22   and the 20th of February 2004.  Average growth
23   rate across the indices is about 3.4 percent.
24      Since February there has been some
25   improvement in the stock markets.  The average

2669

1    NASD Arbitration - December 5, 2005
2    rate of return on an annualized basis is about
3    6.6 percent.  In no case since February of '04
4    and October 31, 2005, and indeed, today, have
5    the stock market returns come anywhere near an
6    annualized 39.9 percent.
7       Q.   Now, let me bring you back to your
8    concept of a time frame utilized that's too
9    short.
10      A.   Right.
11      Q.   Is it more appropriate to have
12   evaluated and utilized a least square regression
13   analysis only when you've gone through a full
14   business cycle?
15      A.   It would have dramatically improved
16   the model to look at a full business cycle.
17      Q.   What is a full business cycle in
18   this instance?
19      A.   By definition, we typically think
20   of a full business cycle as the bottom of a
21   trough in a regression to the peak during an
22   essential period.
23      Q.   In light of the fact that Mr.
24   Marzano may not have had these clients over a
25   period of time of a full business cycle, how

2670

1    NASD Arbitration - December 5, 2005
2    should he have accounted for that in his
3    modeling or in his forecasting?
4       A.   The most important way, if you're
5    going to stick with a regression model, what Mr.
6    Marzano could have done to probably
7    significantly improve the model would have been
8    to also consider the implications or the effect
9    of, for example, a stock market index on his
10   assets under management.
11      In other words, to date, he's shown
12   there to be one important relationship; that
13   being a relationship of time to assets.  It
14   would have been an improvement for the model to
15   actually regress or compare the assets under
16   management with stock market returns.  That
17   would become a two-variable regression analysis.
18      Q.   When you say that "becomes a two-
19   variable analysis," that is not what Mr. Marzano
20   did?
21      A.   No.  That is correct.
22      Q.   What would you have had to have
23   done to do that two-variable analysis?
24      A.   If you recall, in Mr. Marzano's
25   work papers his regression analysis was

2671

1    NASD Arbitration - December 5, 2005
2    developed by pairing assets under management
3    with time for 14 separate periods.
4       Q.   Okay.
5       A.   To improve that, you would have
6    added a third comparison.  And that was assets
7    under management, time, and, for example, the
8    Standard & Poor's 500 index at the same point in
9    time.
10      Q.   Why the Standard & Poor's 500?
11      A.   You could do it with the Russell.
12   You can do it with the NASDAQ.  You can do it
13   with the Dow.  I picked that, the Standard &
14   Poor's 500, in this case, simply because it's
15   often considered a reasonable proxy for a broad
16   market index.
17      Q.   Are you saying then that that takes
18   into account the assets that grew on the basis
19   of the market return versus the dollars, new
20   dollars that clients have put into the equation?
21      A.   Yes.
22      Q.   Please go on with your analysis.
23      A.   Okay.  The second box, as you can
24   see, is the same type of analysis.  It's looking
25   at a couple of, excuse me, commonly referred to

2672

1  NASD Arbitration - December 5, 2005
2  bond index, including the Dow Jones Corporate
3  Bond Index and one that's often considered to be
4  a good proxy for a broad index, the Lehman
5  Aggregate Bond Index.
6       As you can see there, the annual
7  rates of growth. 5.3 percent during the period
8  of time at which Mr. Marzano's analysis was
9  done, it's actually been lower too in terms of
10 total returns since February of 2004. It was
11 about 1.4 percent on average, those two indexes,
12 during the next 12 months. And it's been
13 virtually flat since February of 2004.
14      Q.  What's the significance of that as
15 to Mr. Marzano's modeling of his valuation?
16      A.  As we mentioned previously, the
17 assets under management of Mr. Marzano are
18 roughly -- actually, I take that back. They're
19 almost exactly split 60-40 between equity assets
20 and fixed income assets.
21      So in order to understand the total
22 return on Mr. Marzano's portfolio it's more
23 appropriate to look at a weighted average of the
24 two asset classes. So we pulled the bonding
25 index to give us an idea as to what the returns

2674

1       NASD Arbitration - December 5, 2005
2  look at his book of business?
3       A.  We looked at statements as of
4  February 2004. And we looked at summary data as
5  of September 2005.
6       Q.  Now, you said "we." Who is we?
7       A.  I actually utilized two of my staff
8  members, two analysts on my staff to compile the
9  data.
10      Q.  Under your direction?
11      A.  Under my direction. Correct.
12      Q.  What were your directions?
13      A.  My directions were to take each
14 statement, pull out the equity mutual funds, the
15 fixed income products, leave all annuities in as
16 fixed income products. Also, to give me an idea
17 as to the magnitude of Class B shares, money
18 market products, real estate, other investments.
19      Q.  Did you have occasion to review
20 that information?
21      A.  I did.
22      Q.  Did you have occasion to test that
23 information?
24      A.  I did test it as well.
25      Q.  How did you test it?

2673

1       NASD Arbitration - December 5, 2005
2  on the 40 percent of his assets under management
3  were over this same period of time.
4       Q.  Go on.
5       A.  Box 3 is, we talked briefly about,
6  as you can see the weighting of assets in Mr.
7  Marzano's portfolio. That's column 1. The
8  rates of return which come directly from above,
9  this is a look effectively at the rate of return
10 on his assets during the period of time the
11 regression was run. And, as I mention, it's 26.1
12 percent.
13      The box below that looks at March
14 2004 through October 31, 2005. The same
15 weightings with the returns on the market as
16 calculated above. As you can see, the actual
17 returns, what I've termed here to be organic
18 growth, that being growth that does not come
19 from new clients is about 4 percent or 22.1
20 percent lower than during the forecasting
21 period.
22      Q.  Now, you also indicated that you
23 looked at Mr. Marzano's book of business.
24      A.  Correct.
25      Q.  For what period of time did you

2675

1       NASD Arbitration - December 5, 2005
2       A.  I pulled randomly statements of
3  approximately 25 of the 200. I believe there
4  were 253 statements. And looked at them
5  relative to the data inputs to ensure that they
6  were done correctly.
7       We also by summing the dollar
8  amounts felt that they were the same as the
9  dollar amounts on the summary pages provided by
10 American Express.
11      Q.  Did you find that information to be
12 accurate?
13      A.  Yes.
14      Q.  Now, in looking at that book of
15 business and utilizing that book of business as
16 to Mr. Marzano's calculation, any problem with
17 how we calculated it based upon what you found
18 in those statements?
19      A.  There's no specific mathematical
20 error in the formula that was provided by Mr.
21 Marzano. As I mentioned before, the
22 implications are not correct or cannot be
23 reasonably expected going forward.
24      Q.  The numbers that Mr. Marzano used,
25 are those gross numbers?

2676

1    NASD Arbitration - December 5, 2005
2    A.   Correct.
3    Q.   What does that mean; that he
4    utilized gross numbers?
5    A.   Well, the problem with using gross
6    assets under management and then gross dealer
7    concessions is that there's not necessarily a
8    linear, or otherwise an exact dollar-for-dollar
9    relationship between revenues generated by a
10   planner and take-home income.  This is
11   particularly the case as asset growth occurs and
12   client growth occurs.  And I don't have the data
13   to properly test this.  But it would have been
14   more appropriate to focus on a bottom line or
15   net income number, if you will.
16   Q.   Why is that?
17   A.   Different expense structures.  As
18   client growth occurs, you are not necessarily
19   going to take home on a dollar-for-dollar basis
20   every dollar that's earned in dealer
21   concessions.
22   Q.   Would splits of income with other
23   representatives or advisors affect that gross
24   dealer concession?
25   A.   Very much so.  Particularly if the

2677

1    NASD Arbitration - December 5, 2005
2    mix of assets under management changes between
3    effectively 100 percent controlled by Mr.
4    Marzano and a growth in secondary reps, if you
5    will, who are taking on more and more of the
6    book of business.
7          That it's reasonable as the client
8    base grows and your ability to service the
9    clients grows, you will end up paying more of
10   those gross dealer
11   concessions to your second and third
12   representatives.
13   Q.   And that would then affect and
14   change the modeling that was presented by Mr.
15   Marzano?
16   A.   Yes.
17          ARBITRATOR COHEN:  Can you clarify
18   that for me?  I followed you up until
19   now.  But I lost you.
20          How would a split of commissions or
21   sales credits affect the return, if, in
22   fact, the sales credit was X --
23          THE WITNESS:  Right.
24          ARBITRATOR COHEN:  -- and it was
25   divided in half.

2678

1    NASD Arbitration - December 5, 2005
2          THE WITNESS:  If I'm not mistaken,
3    Mr. Marzano calculated his dealer
4    concessions based on his historical
5    experiences which includes payments to
6    himself, and to the extent he has
7    commissioned reps, payments to them as
8    well.
9          As the assets under management
10   increases, particularly an increase from
11   70 million to 127 million, that's being
12   hypothecated.
13          ARBITRATOR COHEN:  So what you're
14   basically saying is that Mr. Marzano
15   would have less of a payout?
16          THE WITNESS:  Correct.
17          ARBITRATOR COHEN:  Thank you.
18   That's all I wanted to know.
19          ARBITRATOR PETRIE:  But to be
20   clear, you have no data in terms of what
21   proportion of the base period GDC was
22   being paid out and what data in terms of
23   what the subsequent period were paid out?
24          THE WITNESS:  That's true.  The
25   only data I have is market studies which

2679

1    NASD Arbitration - December 5, 2005
2    suggest you need about three
3    representatives on staff to support a
4    $127 million book of business.  Those
5    statistics are the Financial Planners
6    Association's 2005, what you call the top
7    reps' numbers.
8          ARBITRATOR PETRIE:  The data you
9    gave us on Friday or Wednesday?
10          THE WITNESS:  That's right.
11          MR. GOOD:  Mr. Petrie, I think
12   that's an interesting question.  And with
13   all due respect of the panel, let me just
14   point out to the panel that that is --
15          MR. CAMPBELL:  Objection, Mr.
16   Chairman.
17          MR. GOOD:  Wait a second.
18          MR. CAMPBELL:  Running commentary
19   from a lawyer, pointing things out to the
20   panel.  Inappropriate while we're in the
21   middle of testimony.
22          MR. GOOD:  That's information we
23   requested by way of discovery and
24   information that this panel suggested
25   that we did not need nor granted us the

2680

1  NASD Arbitration - December 5, 2005
2  opportunity. And that was, in fact,
3  asked for after Mr. Marzano's testimony.
4      THE CHAIRMAN: Is that something we
5  can do outside the presence of the
6  witness later on?
7      MR. GOOD: Thank you.
8      THE CHAIRMAN: Thank you.
9  BY MR. GOOD:
10     Q.  Continuing in Claimant's Exhibit
11  11, is there anything else at this point you'd
12  like to point out to the panel?
13     A.   Well, the bottom box we should
14  discuss really briefly. The use of a regression
15  analysis assumes effectively a continuation in
16  the variables, the relationship between the
17  assets under management, and the variable being
18  considered.
19         It does not include, for example,
20  the effects of lost assets, changing broker-
21  dealers, and the implications that might have on
22  a model. In other words, the analysis that's
23  presented in the regression assumes that 100
24  percent of the AEFA assets as of February 28th
25  would have reasonably come over to

2681

1  NASD Arbitration - December 5, 2005
2  MultiFinancial. If that's not the case, the
3  regression would not properly or adequately deal
4  with that issue either.
5      Q.  We'll come back to those specific
6  examples in a few moments.
7      A.  Sure.
8      Q.  Did you utilize Mr. Marzano's
9  historical asset presentation in order to
10  perform an analysis?
11     A.  I did. What I did was a twofold
12  test. First, I recreated effectively Mr.
13  Marzano's inputs to ensure that, as I mentioned
14  previously, the math was correct and that the
15  regression was correct.
16         And, as I said, there's no
17  mathematical or computational issues with the
18  sets of data as presented. What I then did was
19  ran a multiple regression analysis that included
20  the effects of the stock market returns during
21  the 14-month period.
22     Q.  Did you do that as an exhibit?
23     A.  I did. There's actually two
24  separate sets of exhibits. It's Exhibit 3,
25  which is the output exhibit.

2682

1  NASD Arbitration - December 5, 2005
2      Q.  Okay.
3      A.   And the stapled exhibit that you
4  have there that shows the calculations in the
5  regression, I have one in my briefcase.
6      Q.  Would you grab the one in your bag.
7      ARBITRATOR PETRIE: Remind you, Mr.
8  Good, that neither Claimant's 11 or any
9  of these have been offered, so the panel
10  isn't looking at them.
11     MR. GOOD: I understand. I didn't
12  think it was appropriate to offer it
13  quite yet. I thought I would do it at
14  the completion of the testimony.
15     ARBITRATOR PETRIE: If you talk
16  about box 1, box 2, box 3, the panel is
17  not looking at the exhibit.
18     MR. GOOD: Okay. Thank you.
19     Q.  Is this the multiple regression
20  forecast that you have presented?
21     A.  Yes.
22     Q.  That you developed?
23     A.  Yes.
24     MR. GOOD: At the wise counsel of
25  Mr. Petrie, let me go ahead and move

2683

1  NASD Arbitration - December 5, 2005
2  Claimant's Exhibit No. 11 in evidence now
3  at this point.
4      THE CHAIRMAN: Mr. Campbell, do you
5  want to be heard?
6      MR. CAMPBELL: I don't really have
7  an objection other than the fact that I
8  didn't get it previously. And I suspect
9  that won't be good enough to keep it out,
10  Mr. Chairman. So let's take it for what
11  its worth.
12     THE CHAIRMAN: Claimant's No. 11
13  now in evidence.
14     (Claimant's Exhibit 11 previously
15  marked for identification, received in
16  evidence as of this date.)
17     MR. GOOD: Thank you.
18     For purposes of identification, let
19  me hand to Mr. Campbell what we will call
20  Claimant's Exhibit No. 12.
21     Q.  Mr. Dahl, would you explain what
22  that is, please?
23     A.  Yes.
24     ARBITRATOR COHEN: Excuse me again,
25  Mr. Good. Mr. Petrie's point I think

2684

1  NASD Arbitration - December 5, 2005
2  should be elaborated on a bit. Perhaps
3  it's not the legal procedure that you're
4  used to, but I think that if your
5  exhibits were presented to the other
6  counsel and the other counsel has taken
7  the position that, yes, he's going to
8  accept, or no, he's not going to accept,
9  Mr. Campbell, with your permission, we
10  would like to see those exhibits and work
11  along with you. I understood that the
12  witness is presenting to the panel, not
13  to Mr. Good.
14      MR. GOOD: I understand.
15      ARBITRATOR COHEN: And we're sort
16  of sitting here and just waiting.
17      MR. GOOD: Then let me do the
18  following, if I might. Here. I have an
19  extra exhibit here that I need to make
20  copies of. Let me go ahead and please do
21  that. Because I thought I had enough
22  copies for everybody. And then I'll
23  present them all to the panel, as well as
24  to Mr. Campbell.
25      ARBITRATOR COHEN: Mr. Chairman, is

2685

1  NASD Arbitration - December 5, 2005
2  that all right? Mr. Campbell, is that
3  okay?
4      THE CHAIRMAN: Sure. That's fine.
5      MR. GOOD: Thank you. Please
6  excuse me.
7      MR. CAMPBELL: As long as I get a
8  chance to object, Mr. Chairman.
9      ARBITRATOR PETRIE: Going off the
10  record.
11      (Short recess.)
12      THE CHAIRMAN: Back on the record.
13      MR. GOOD: I'm going to hand to Mr.
14  Campbell what we'll mark as Claimant's
15  13.
16      ARBITRATOR PETRIE: Are we up to
17  12?
18      THE CHAIRMAN: Mr. Good, did you
19  say 13?
20      MR. GOOD: It will be 13. I marked
21  another one as No. 12 that I haven't
22  given to the panel yet.
23      ARBITRATOR PETRIE: But you've
24  given it to him?
25      MR. GOOD: I just gave him a copy.

2686

1  NASD Arbitration - December 5, 2005
2      ARBITRATOR PETRIE: 12 and 13.
3      THE CHAIRMAN: Will there be more
4  exhibits following 13?
5      MR. GOOD: There may be one more.
6  And I can actually mark that as well
7  right now.
8      THE CHAIRMAN: While we're doing
9  this housekeeping, Mr. Good --
10      MR. GOOD: Yes.
11      THE CHAIRMAN: -- do you have
12  witnesses after Mr. Dahl?
13      MR. GOOD: We do. We have four
14  advisors starting at 1:30 today. It will
15  be 1:30, 1:45, 2:00, and 2:15. And then
16  likely we will be completed.
17      THE CHAIRMAN: And that's on
18  telephone, I assume?
19      MR. GOOD: On telephone,
20  unfortunately. Yes.
21      THE CHAIRMAN: You anticipate
22  finishing with Mr. Dahl in time for Mr.
23  Campbell to do his cross-examination?
24      MR. GOOD: I absolutely do.
25      THE CHAIRMAN: Perfect. Fine. Give

2687

1  NASD Arbitration - December 5, 2005
2  us time this afternoon to do our
3  deliberations and your close?
4      MR. GOOD: Yes, sir.
5      THE CHAIRMAN: Good. We're on
6  schedule. Excellent. Thank you.
7      (Series of output data marked
8  Claimant's Exhibit 12 for identification
9  as of this date.)
10      (Document consisting of a least
11  squares regression analysis by Mr. Dahl
12  marked Claimant's Exhibit 13 for
13  identification as of this date.)
14      (Document consisting of an analysis
15  of monthly changes in assets marked
16  Claimant's Exhibit 14 for identification
17  as of this date.) BY MR. GOOD:
18      Q. Mr. Dahl, tell us what Claimant's
19  Exhibit 13 is, please?
20      A. Just so I'm clear, 13 is the
21  stapled package?
22      Q. Yes.
23      A. Exhibit 13, my understanding is
24  that Mr. Marzano used the Excel formula to
25  calculate his least squares regression. So we

2688

1    NASD Arbitration - December 5, 2005
2    stuck with the Excel product. And actually used
3    Excel's multiple regression product to include a
4    second variable in the model for calculating
5    assets under management growth.
6         Q. So you developed, you did this
7    based on in response to Mr. Marzano's
8    calculations?
9         A. Yes. That, and Excel is an
10   accepted tool for calculating such variables.
11        Q. Tell me what Claimant's Exhibit 12
12   is.
13        A. Claimant's Exhibit 12 is a series
14   of outputs between February 29, 2004 and
15   December 2, 2005, using this improved regression
16   analysis where we now considered both stock
17   market returns as well as date in calculating
18   assets under management or
19   forecasting assets under management.
20        Q. Historically, looking back, based
21   upon actual returns?
22        A. That's exactly right.
23        We used, if you look back to
24   Claimant's 13, the second page there shows you
25   the inputs that were calculated or used. Column

2689

1    NASD Arbitration - December 5, 2005
2    1, assets under management, and column 2, date,
3    are identical to the inputs in Mr. Marzano's
4    calculation.
5         Q. And that's based upon information
6    that Mr. Marzano provided to us?
7         A. Yes, it was. I did not
8    independently verify those numbers.
9         Q. Explain what Exhibit No. 14 is.
10        A. I'm sorry?
11        Q. I didn't give it to you.
12        A. That's 12, I believe. Oh, I'm
13   sorry. Now I understand. Mr. Campbell has 14.
14        MR. GOOD: I apologize. Here you
15   go, Tom. I thought I had given it to
16   him.
17        THE WITNESS: There's two boxes on
18   exhibit --
19        Q. Just explain what it is.
20        A. On Exhibit 14 the top box is an
21   analysis of the monthly changes in Mr. Marzano's
22   assets and the monthly change in stock returns.
23        Q. And it's based upon information and
24   numbers developed by Mr. Marzano that he
25   presented?

2690

1    NASD Arbitration - December 5, 2005
2         A. That's exactly right.
3         MR. GOOD: I'd like to hand to the
4    panel what would be Claimant's Exhibits
5    12, 13, and 14 and move them, introduce
6    them into evidence.
7         THE CHAIRMAN: Mr. Campbell?
8         MR. CAMPBELL: I've never seen them
9    before, Mr. Chairman. I won't know what
10   they are and what they mean until the
11   witness testifies. Other than an
12   objection they were not previously
13   provided to me, I don't have an objection
14   it to.
15        THE CHAIRMAN: Claimant's 12, 13
16   and 14 are all in evidence.
17        (Claimant's Exhibits 12 through 14
18   inclusive, previously marked for
19   identification, are received in evidence
20   as of this date.)
21        MR. GOOD: The multiple regression
22   forecasting would be No. 12. The
23   two-page is No. 13. And historical asset
24   analysis will be 14.
25        THE CHAIRMAN: Thank you.

2691

1    NASD Arbitration - December 5, 2005
2         ARBITRATOR PETRIE: Not to be
3    confused with Exhibit 11 which has the
4    same caption on it.
5         MR. GOOD: Right.
6         THE CHAIRMAN: Okay, Mr. Good.
7         MR. GOOD: Yes. Thank you.
8         Q. Does it pay to start with Exhibit
9    No. 13, Mr. Dahl?
10        A. Yes.
11        Q. Would you explain to the panel
12   Exhibit No. 13, please.
13        A. Exhibit No. 13 is a two-page
14   document that includes an improvement on Mr.
15   Marzano's original regression analysis to
16   include the impact of the S&P 500 and its
17   relationship to his assets under management
18   growth.
19        Q. Now, you used the word
20   "improvement."
21        Tell the panel what you mean by the
22   word "improvement."
23        A. By adding another variable that
24   clearly has direct and positive relationship
25   with asset

2692

1    NASD Arbitration - December 5, 2005
2    growth, we increased the ability of the model
3    to explain changes in historical asset under
4    management numbers.
5        In this case, Mr. Marzano's, the
6    explainability went from his original model
7    which appeared to explain 93 percent of all
8    changes in assets variability to 99.25 percent
9    of the change in assets under management now
10   being explained by this current model.
11       Q.  Is there a mathematical symbol or
12   something that you call that?
13       A.  That's termed an r-squared. It's a
14   measure of the variability between expected and
15   actual outcomes when a mathematical equation is
16   run against historical data.
17       Q.  Now, I believe that Mr. Marzano
18   testified previously that the r-squared factor
19   that he utilized was 93. Now that sounds pretty
20   good.
21       A.  Right.
22       Q.  What was the r-squared factor based
23   upon the information you developed?
24       A.  99.25.
25       Q.  Tell me what the difference is

2693

1    NASD Arbitration - December 5, 2005
2    between that and what the significance of that
3    is to the model.
4        A.  It means that the model now better
5    explains variability in assets under management
6    growth at the time.
7        Q.  When you say "better explains,"
8    what does that mean?
9        A.  It means that when we look back at
10   the historical 14 months that are being utilized
11   in this case, and look at actual assets under
12   management growth by using two variables instead
13   of one, we now have a better ability to explain
14   changes in the assets under management growth on
15   a month-by-month basis. So that going forward
16   we now know that by adding the second variable
17   we have a model that better explains projections
18   or forecasted asset growth.
19       Q.  What is it that made it, to use
20   your phrase, better? What made this model
21   better?
22       A.  It explains a higher percentage of
23   asset variability or historical variability in
24   the actual monthly asset growth.
25       Q.  Through the use of what

2694

1    NASD Arbitration - December 5, 2005
2    information?
3        A.  Stock market returns, as well as
4    time.
5        Q.  Does that make the model that you
6    developed statistically more significant?
7        A.  It is a statistically more
8    significant model, yes.
9        Q.  What does the phrase statistically
10   significant mean for the panel?
11       A.  The test of statistical
12   significance is an important part of applying
13   regression analysis. It implies that the model
14   which is ultimately simply a hypothesis about
15   how the future will unfold can be better
16   explained or likely explained by using or
17   considering the variables that are in a specific
18   model. And when a model is statistically not
19   significant, then its ability to forecast
20   historical factors is lower, and in this case,
21   much lower than what a model like this would
22   suggest.
23       Q.  Would you go through your worksheet
24   here, Exhibit No. 13.
25       A.  Sure.

2695

1    NASD Arbitration - December 5, 2005
2        ARBITRATOR COHEN: Mr. Good, I'm
3    having some difficulty hearing the
4    witness.
5        Can I ask for a favor, please.
6        MR. GOOD: Whatever you need,
7    please. Would you like me to switch
8    seats? Why don't we do that. Not a
9    problem. That makes sense.
10       Let's do that.
11       Q.  Are you ready?
12       A.  You bet.
13       Q.  Go ahead. Please explain your
14   worksheet, Exhibit 13.
15       A.  Let's start with the second page,
16   the back stapled page.
17       This is the series of inputs which
18   we've discussed previously. Column Nos. 1 and 2
19   are identical, if I'm not mistaken, to Mr.
20   Marzano's input data in his original regression
21   analysis.
22       Q.  Keep your voice up.
23       A.  You bet.
24       Column No. 3 is the addition of a
25   third set of variables, that being the Standard

---

2696

1   NASD Arbitration - December 5, 2005
2   & Poor's 500 for each of the specified dates in
3   the middle column.
4        So sort of to continue the
5   discussion in terms of a regression analysis, we
6   are considering the implications of time and
7   market growth on the change in the first column,
8   that being assets under management.
9        Q.   Okay.
10       A.   The first page provides a number of
11  outputs that are calculated by using a
12  regression analysis such as this. The multiple
13  regression equation is the equation for the line
14  that explains the data set.
15       I believe Mr. Marzano testified to
16  the line being a best fit line or a line that
17  minimizes the difference between actual data and
18  forecasted data. As you can see, that line is
19  there.
20       The second column over provides
21  some data.
22       Q.   What is that second column called?
23       A.   Independent analysis. I'm sorry.
24  That would be second box over.
25       Q.   Right.

---

2697

1   NASD Arbitration - December 5, 2005
2        A.   It provides some data relative to
3   each of the inputs and how they are relevant to
4   the output. In this case, the output is the
5   assets under management.
6        Q.   Explain what it is you're looking
7   to do there.
8        A.   The model here tells us that both
9   of these factors, both date and time, excuse me,
10  time and the Standard & Poor's index alone are
11  very important explaining factors in the
12  modeling of assets under management growth.
13       Q.   Okay.
14       A.   There are a couple of additional
15  tests here. The test, particularly
16  statistically significance, that are included on
17  this page. But really, the focus of this
18  analysis should be on the first two points.
19       Q.   Okay.
20       A.   Two variables highly correspond
21  with the assets under management growth. And
22  they have a strong degree of explaining power in
23  terms of forecasting. And a final note: They
24  should both be considered together. You should
25  not run a model of just one of these two

---

2698

1   NASD Arbitration - December 5, 2005
2   variables.
3        Q.   Bring me down to the bottom of the
4   page and explain what that is, please.
5        A.   The line you see there is the line
6   that is forecasted by use of the mathematical
7   equation shown slightly above it. 29.6 times
8   date plus 63.0 four times Standard & Poor's.
9        Q.   I don't have any idea what that
10  means. So please explain to the panel in
11  somewhat understandable terms, in layman terms
12  --
13       A.   I'll do by best.
14       Q.   -- what it is you're showing here.
15       A.   What the mathematical equation
16  shows is the relationship, the mathematical
17  relationship between Standard & Poor's and any
18  specific time and assets under management and
19  date at any specific time and assets under
20  management.
21       It tells you effectively at a given
22  time at a given rate for the Standard & Poor's
23  500, your closing price for the Standard &
24  Poor's 500, what the outcome would be for
25  expected assets under management at that point

---

2699

1   NASD Arbitration - December 5, 2005
2   in time.
3        It's done by looking historically
4   over the 14 months that are included in the data
5   set. And by effectively developing a
6   mathematical relationship between change in one
7   variable, this being Standard & Poor's or time,
8   and the outcome assets under management.
9        Q.   Let me stop you here.
10       Previously you testified that using
11  those 14 months was inappropriate because it was
12  a shortened time frame.
13       A.   Right.
14       Q.   Why is it appropriate for you to
15  utilize that 14 months?
16       A.   It would be far better to use a
17  longer period of time.
18       Q.   Okay.
19       A.   The assets under management data
20  was not available over the longer period of
21  time. And we were simply, to be honest with
22  you, looking at Mr. Marzano's work and the
23  reasonableness of it.
24       By holding constant or by adding
25  Standard & Poor's as a variable, we're able to

2700

1    NASD Arbitration - December 5, 2005
2    hold constant the effect of the stock market
3    returns on his asset growth, and thereby,
4    effectively improve the model over that
5    shortened period of time because we've taken
6    that wild fluctuation in the market out of the
7    equation.
8        Q.    So the adding of the S&P 500
9    improves the statistical significance of the
10   modeling of the equation?
11       A.    Yes, it did.
12       Q.    Anything else on this first page?
13       A.    No.
14       Q.    Let me ask you to take a look at
15   Claimant's No. 12.
16       A.    Yes.
17       Q.    And explain to the panel what that
18   exhibit is, please.
19       A.    This is the regression analysis
20   looking forward, using the mathematical equation
21   that was forecasted, using Excel's multiple
22   regression analysis.
23           We then looked at the Standard &
24   Poor's 500 over a series of time, dates over a
25   series of time through to December 2nd. And

2701

1    NASD Arbitration - December 5, 2005
2    forecasted the expected, based on that
3    mathematical equation, the expected assets under
4    management for each of these periods of time.
5           Column 1 shows you a series of
6    dates that would be in the future or in the
7    future relative to the stopping point of the
8    regression analysis. That is from the point of
9    leaping up, which is February 29, 2004, how does
10   this linear line forecast assets, given the
11   occurrences in the stock market.
12       Q.    Why did you select these dates?
13       A.    They're actually quarterly dates
14   through 9/30. And I included 10/31 and
15   12/2/2005 simply to effectively update the data.
16       Q.    Please explain --
17       A.    Sure.
18       Q.    -- what these numbers show.
19       A.    The dates, as we move toward the
20   corresponding S&P 500 is provided for each of
21   those dates. Based on the relationship between
22   assets under management and time, there's a
23   forecasting of actual assets that would be
24   expected going forward from these dates.
25           The output as you can see is

2702

1    NASD Arbitration - December 5, 2005
2    growing from 69.2 million to 95.8 million over
3    the 18. 20 months. The column aside that is an
4    inclusion of some statistical data that gives
5    you an idea as to what our expected parameters
6    around those based on the model inputs are.
7           It basically says starting in
8    February 29th that anything between 68.3 and
9    about 70.2 million, if it's within the realm of
10   the population data, this is a statistical tool
11   that allows us to get a handle on reasonableness
12   of an output relative to actual occurrences.
13       Q.    Now, this forecasting includes an
14   assumption; is that correct?
15       A.    Yes.
16       Q.    What is that assumption?
17       A.    The primary assumption here is that
18   100 percent of the asset base of Mr. Marzano
19   would have carried forward with him to
20   MultiFinancial. There's no implication, there's
21   no ability for this model as structured to
22   account for the single or one-time effects of
23   moving assets to the new broker-dealer.
24       Q.    So this would assume either Mr.
25   Marzano staying at AEFA and what the effect of

2703

1    NASD Arbitration - December 5, 2005
2    the market would be on his book of business at
3    that point, or 100 percent of the assets
4    traveling with him to MultiFinancial?
5        A.    Yes.
6        Q.    What else does this show us?
7        A.    I think that's it. I think we've
8    covered everything. It kind of shows, the way
9    to probably best look at this is the last two
10   columns; the plus or minus one standard
11   deviation.
12           The model says better than a
13   specific output is that the model explains
14   assets under management for the current period
15   of somewhere between 94.8 and $96.8 million.
16   That would be the reasonable realms of the
17   model's explaining powers.
18       Q.    Now, these numbers are not the end
19   result of how you would evaluate the value of
20   his book of business; is it?
21       A.    No.
22       Q.    What else do you need to consider?
23       A.    This is based on Mr. Marzano's
24   testimony. But it's my understanding that
25   approximately 210 clients had been added in the

2704

NASD Arbitration - December 5, 2005

1 two years immediately prior to leaving American
2 Express.
3 Q.   What does that mean?
4 A.   It means our calculation shows he
5 had about 253 clients on February 29, 2004. It
6 means these clients are less than, on average,
7 less than two years with Mr. Marzano. There is
8 a very real effect of time and your retention of
9 assets. There is a natural tendency for clients
10 to change advisors over time. I believe, in
11 fact, Mr. Marzano's own analysis suggests a
12 five-year lifespan for his clients.
13 What this means is that since Mr.
14 Marzano was at most four years into a
15 relationship with his clients, and based on the
16 number of clients he added in the two years
17 prior to leaving and his actual client numbers,
18 probably significantly less than four years into
19 a relationship he had not begun to experience
20 natural attrition of his client base. That is a
21 factor that should have been considered in
22 any meaningful analysis as well.
23 Q.   In studies in the practice that you
24 do, is there a percentage of business that when

2705

NASD Arbitration - December 5, 2005

1 an advisor leaves one broker-dealer and goes to
2 another, is there an identifiable percentage for
3 whatever reason --
4 A.   Right.
5 Q.   -- that does not follow that
6 broker?
7 MR. CAMPBELL: Objection, Mr.
8 Chairman. I don't think this witness is
9 qualified to give that particular
10 opinion. He has not testified about his
11 background, his experience, or anything
12 to do with competitive hiring,
13 competitive environment in moving from
14 one broker-dealer to another. Valuing
15 practices, yes. Litigation support, yes.
16 But I see no evidence that he's an
17 expert for that subject.
18 MR. GOOD: If the panel will
19 recall, I began to go down that road with
20 him last week, to go through those issues
21 and everybody said we think he's an
22 expert. And I never went any further
23 with that issue. But I can develop that
24 if that's what the panel wants. But

2706

NASD Arbitration - December 5, 2005

1 we did, in fact, head down that road.
2 THE CHAIRMAN: I understand. And
3 we'll let you continue your questioning.
4 MR. CAMPBELL: With all due
5 respect, Mr. Chairman, why don't we let
6 him go down the road and let's see if he
7 is an expert on that subject as opposed
8 to what he covered last time.
9 ARBITRATOR PETRIE: I think we just
10 ruled on that point. And given that
11 we've qualified this witness as an expert
12 in valuation, and valuation is obviously
13 something that takes into account
14 attrition among other things, we're
15 satisfied that he can talk to this.
16 THE CHAIRMAN: If in impeaching
17 him, Mr. Campbell, you need to bring that
18 out, feel free to do so. But we're
19 allowing Mr. Good to continue.
20 Q.   Do you recall the question?
21 A.   I do.
22 Q.   Go ahead.
23 A.   There is one specific study that's
24 performed regularly, I want to say annually, but

2707

NASD Arbitration - December 5, 2005

1 it might be by annually, by a company called FP
2 Transitions. And FP Transitions is, they're
3 really a business broker, for lack of a better
4 way of describing them. But they did publish a
5 report. The last one that I saw was in 2002. And
6 the report suggests about a 5 percent attrition
7 rate when a dealer, excuse me, when an advisor
8 leaves broker-dealers.
9 Q.   And that 5 percent are assets that
10 are free to leave, and easy to transfer by ACAT
11 or whatever way, without taking into account any
12 other type of limitations or negative financial
13 impacts of a financial product on a client?
14 A.   It would be my belief that that's
15 correct. It is not quite as clear as that in
16 the data. I want to just qualify that.
17 Q.   All right.
18 So at a minimum, 5 percent ought to
19 have been evaluated or at least accounted for in
20 this instance, correct?
21 A.   Yes. There had to be some
22 transitory impact. And the 5 percent is the
23 best market data that's available that I'm aware
24 of.

ROSENBERG & ASSOCIATES     (973) 228-9100
www.rosenbergandassociates.com

2708

1  NASD Arbitration - December 5, 2005
2  Q. Are we aware of certain transitory
3  limitations from Mr. Marzano's own testimony
4  that you have been able to determine?
5  A. Right. There are some specific
6  issues related to a significant set of the
7  assets.
8  Claimant's Exhibit 11, I believe,
9  has a summary that might be helpful to refer
10  back to.
11  Q. Then let's go to Claimant's No. 11.
12  A. I apologize for putting it at the
13  very top and very bottom of the list. But the
14  assets left at AEFA, client transferred assets
15  not subject to redemption to MultiFinancial, I
16  note there's a typo. The "not" shouldn't be
17  there. I apologize for that.
18  These are client transferred assets
19  that are subject to redemption at AEFA. This
20  number is generated in the following way: It
21  was my understanding that Mr. Marzano testified
22  there are about $4 million in assets that he
23  concedes are locked up, if you will, at American
24  Express. And but for that lockup, would have
25  transferred to him at MultiFinancial.

2709

1  NASD Arbitration - December 5, 2005
2  Q. Let me stop you there.
3  You said it's your understanding
4  that Mr. Marzano testified. From what do you
5  base your understanding?
6  A. Those are discussions with counsel.
7  Q. Now, did you read Mr. Marzano's
8  testimony as well?
9  A. I didn't read that day's testimony.
10  Q. Okay.
11  A. That's since I finished.
12  Q. Go on.
13  A. The 4 million, it's also my
14  understanding Mr. Marzano testified that that
15  number's inflated because it includes -- it's a
16  number as of September 2005. So what I did was,
17  based on the market returns up above, I
18  calculated what the gain on the asset base was
19  and reduced those assets accordingly to 3.73
20  million as shown in the top line there.
21  ARBITRATOR PETRIE: Excuse me. I'm
22  a little confused as to what's the
23  difference between your first line there:
24  Client transfer assets subject to
25  redemption, MultiFinancial, and the last

2710

1  NASD Arbitration - December 5, 2005
2  line, assets at AEFA subject to
3  redemption charges.
4  THE WITNESS: Good question.
5  ARBITRATOR PETRIE: Is the first
6  line assets that didn't move, presumably
7  because they were subject to redemption
8  charges?
9  THE WITNESS: That's right.
10  Of the 18 million in assets that
11  didn't move, that would be the component,
12  it was originally, I believe, looked at
13  and believed to be, and we've seen the
14  data suggest about 6 million in assets.
15  Of which Mr. Marzano, I believe, has
16  testified is slightly incorrect. Or a
17  couple of client accounts that shouldn't
18  be included in that base. So we adjusted
19  it to his oral testimony of $4 million.
20  And adjusted it downwards from there.
21  The second part of that, the 3.9
22  million is, we reviewed the $11-plus
23  million that remained in the accounts and
24  looked at what level of those assets --
25  these are clients who did not move money

2711

1  NASD Arbitration - December 5, 2005
2  over to MultiFinancial, were also locked
3  up by Class B mutual funds/annuities.
4  So the 3.9 million is, if you
5  think of it as the 18 million, is made up
6  of a subset of clients. The 3.7 million
7  is that subset of clients who did move
8  some of their money over to plaintiff,
9  while the 3.9 million is that subset of
10  clients who moved no money to
11  MultiFinancial.
12  ARBITRATOR PETRIE: So that's the
13  differential. It's a different client
14  universe between the two numbers?
15  THE WITNESS: Yes. That's correct.
16  ARBITRATOR COHEN: So effectively
17  what you're saying is that $7.6 million
18  worth of assets stayed there because they
19  were subject to redemption?
20  THE WITNESS: They were $7.6
21  million of assets that were locked up.
22  It's not my testimony that they stayed
23  there with any certainty.
24  There's really two classifications
25  of assets here: The 3.9 million that we

2712

NASD Arbitration - December 5, 2005

1  know for certain stayed there based on
2  Mr. Marzano's testimony, and an
3  additional 3.9 million which would have
4  been subject to significant redemption
5  charges.
6       ARBITRATOR PETRIE:  In other words,
7  what caused some confusion, at least for
8  me, was the word less in front of the
9  last line.
10      THE WITNESS:  Right.
11      ARBITRATOR PETRIE:  These are all
12  added?
13      THE WITNESS:  Right, right.
14      Q.  Now, you also have additional names
15  of certain clients.
16      A.  Right.
17      Q.  Tell me what the significance is of
18  that being there.
19      A.  The five clients that are listed
20  here, it is my understanding that none of these
21  five clients had any intention of moving assets
22  to MultiFinancial by Mr. Marzano's departure.
23      The asset numbers that are included
24  here are not the asset totals that you'll find

2713

NASD Arbitration - December 5, 2005

1  on their statements.  They are adjusted to
2  remove all of their locked up securities, if you
3  will.  All of the securities that would be
4  included in the redemption charges.  I did that
5  so we would avoid
6  double-counting of the assets.
7      Q.  And the total that you come to?
8      A.  Slightly over $11 million.
9      Q.  Now, what's the significance of
10 that number relative to the analysis and a total
11 that was presented by Mr. Marzano?
12      A.  The forecasting tool, the
13 regression forecasting tool effectively assumes
14 that when you jump off from February 29th to
15 March 1st or from March 31st to April 1, 2004,
16 you continue on the same trendline as you were
17 before.
18      The same asset base, the reduction
19 in assets will effectively reduce or drop the
20 line down in parallel fashion, pretty much in
21 similar fashion to Mr. Marzano's testimony prior
22 about how he raised the line.  This would
23 suggest an actual reduction in the line should
24 be accounted for and considered.

2714

NASD Arbitration - December 5, 2005

1       Q.  14.
2       A.  Sure.  I think we talked about the
3  top of 14.
4       Q.  Let's go to Claimant's Exhibit No.
5  14.
6       Tell us what Exhibit No. 14 is and
7  how that fits together with your analysis here.
8       A.  Sure.
9       The top box, monthly assets per
10 Marzano's work papers is simply the assets under
11 management, indeed that we've been discussing
12 this morning.
13      The third column over shows the
14 difference on a monthly basis between the
15 numbers provided by Mr. Marzano, 5.9 million,
16 2.9, et cetera.
17      The middle column shows the market
18 growth based on our projected 26.1 percent
19 growth rate in assets.
20      And the final column is really
21 simply the monthly change minus the market
22 growth to give you an idea as to what the asset
23 growth on a client basis was for the period of
24 time examined.

2715

NASD Arbitration - December 5, 2005

1       Q.  Okay.
2       A.  The second box is our summary of
3  the financial statements -- excuse me -- the
4  broker's statements as provided.
5       As you can see, we had total assets
6  in March of 2004.  We reviewed total asset
7  statements totaling 70.2 million.  In fact,
8  actually almost 70.3 million.  In September of
9  2005 those AEFA assets were 18.6 million.
10      As you move down, column by column,
11 fixed assets and annuities were 32 percent in
12 2004, 38 percent in 2005.  Equities were 60.3
13 percent in 2004, 50.5 in 2005.
14      Money market, as I mentioned
15 before, we included that as a component in the
16 fixed income products was 7.7 percent to 11.3
17 percent.
18      We also looked at clients greater
19 than 60 years old per the statements and clients
20 that reported on their AEFA filing to be relying
21 on assets as a source of income.
22      And I need to clarify something
23 that I stated in our first session.  It appears
24 to me that we had an original statement that

2716

1   NASD Arbitration - December 5, 2005
2   included a number of duplicate accounts. And
3   the effect of that was to skew our first
4   analysis of the data. We since corrected that.
5       Q.   What is the correction?
.6      A.   The correction is to reduce the
7   client assets, I believe it was my testimony the
8   client assets, saved assets, if you will, was
9   roughly 30 percent. As you can see, it's
10  actually in March of 2004 about 13 percent.
11      Q.   Okay.
12      A.   It's higher, interestingly, the
13  money that stayed over appears to be higher now.
14  In other words, more people with saved assets
15  stayed with American Express than left and went
16  to MultiFinancial as a percentage of the total
17  asset base.
18      Q.   Now, based upon your testimony
19  today, those last two indicia, the client assets
20  greater than 60 years old and client assets
21  relying on saved assets, what is the statistical
22  significance, what is the significance of that
23  information relative to the modeling of the
24  damage calculation?
25      A.   As I mentioned previously, we're

2717

1   NASD Arbitration - December 5, 2005
2   looking at a very short period of time here in
3   terms of what we're regressing. And during that
4   period of time there is clearly strong growth in
5   Mr. Marzano's client base. So much so that his
6   average client has not been with him a
7   significant amount of time. As a result, the
8   level of redemptions hadn't started to grow
9   towards the industry average.
10      In other words, his client base
11  hadn't aged and started moving the assets. But
12  they're getting really close. Particularly with
13  about a quarter, slightly under a quarter of his
14  total asset base clients over the age of 60,
15  it's reasonable to assume that some of those
16  will begin to redeem their securities. And that
17  redemption may be at a significantly higher rate
18  than his current rate. And that's another factor
19  that should be considered in a forward-looking
20  model.
21      Q.   What about the second item, client
22  assets relying on saved assets, what is the
23  significance of that?
24      A.   It's a similar test. It's a
25  similar consideration. Because the information,

2718

1   NASD Arbitration - December 5, 2005
2   assuming that it's correct on the American
3   Express Financial Advisors planning statements,
4   required them to indicate where their principal
5   source of income is.
6       It gives us further evidence as to
7   whether or not these are clients that will be
8   reducing their assets or living off of saved
9   assets, or continuing to increase their asset
10  base by adding to their mix or adding to their
11  portfolio.
12      Q.   So at least, in part, part of your
13  opinion is that the analysis done by Mr. Marzano
14  is an incomplete analysis?
15      A.   Yes. I would agree with that
16  statement.
17      Q.   Now, do you have an opinion as to
18  what the regression analysis ought to show as of
19  -- what is it that the regression analysis shows
20  as of 10/31 of '05?
21      A.   For that?
22      Q.   The one that you performed.
23      A.   And I'll refer back to Claimant's
24  Exhibit 12. The second to last line which, as
25  you can see, shows an input for the Standard &

2719

1   NASD Arbitration - December 5, 2005
2   Poor's of 12/07 shows estimated assets at 10/31
3   of about 91.2 million.
4       The regression as run with those
5   two inputs suggests assets under management of
6   somewhere between 90.2 and 92.2 million would be
7   reasonable based on those two input factors in
8   the regression model.
9       Q.   What was the regression analysis
10  number that Mr. Marzano utilized?
11      A.   127 million, including the
12  additional 9 million, the linear increase.
13      Q.   Now, from this number, from this
14  91.2 to 92.2, that is, again, assuming that 100
15  percent of the assets moved over or stayed with
16  Mr. Marzano, correct?
17      A.   Yes, it is. Yes.
18      Q.   From this point how do you now
19  complete the analysis after that?
20      A.   Based on the mathematical equation
21  here and those additional assets, you would
22  subtract those from this output dollar-for-
23  dollar.
24      Q.   What does that number then become?
25      A.   It would actually be -- let me just

2720

1    NASD Arbitration - December 5, 2005
2  refer back, I apologize, to Exhibit 11.
3         11 million less than 90 or 92
4  million would give you a number of between 80 or
5  81 million as an indicated assets under
6  management base.
7       Q.  Do you recall what Mr. Marzano has
8  today?
9       A.  I have not reviewed the statement.
10  But it's my understanding it's about 94 million
11  as of September 30th, if I'm not mistaken.
12       Q.  Greater than what the multiple
13  regression forecasting would demonstrate?
14       A.  That's correct.
15       Q.  And therefore, he would have no
16  damages?
17       A.  That's absolutely right.
18       Q.  Now, other factors relative to how
19  the numbers could be affected and moved to a
20  client asset, would errors in contacting clients
21  or delays in contacting clients by Mr. Marzano
22  have an effect?
23       A.  I think it's undeniably in evidence
24  that Mr. Marzano believes it did have that
25  implication. It's reasonable to assume that the

2721

1    NASD Arbitration - December 5, 2005
2  failure to contact clients upon leaving would
3  have a negative impact on your ability to
4  maintain clients.
5       MR. GOOD: If the panel would give
6  me a moment...
7       THE CHAIRMAN: Sure.
8       MR. GOOD: May we step outside for
9  a moment because we may be close to
10  completed.
11       THE CHAIRMAN: You want to take a
12  morning break?
13       MR. GOOD: That will be fine.
14       THE CHAIRMAN: Back in 10, 15
15  minutes.
16       MR. GOOD: Yes.
17       (Short recess.)
18       THE CHAIRMAN: Mr. Good, back on
19  the record.
20       MR. GOOD: Thank you. Just a few
21  more questions. BY MR. GOOD:
22       Q.  Owen, I want to show you Claimant's
23  Exhibit No. 7 that has previously been
24  introduced into evidence.
25       MR. GOOD: And, for the panel, that

2722

1    NASD Arbitration - December 5, 2005
2  is entitled, "Clients That Had Invested
3  With aEFA And Opened Accounts At
4  MultiFinancial." It's Claimant's Exhibit
5  No. 7.
6       THE CHAIRMAN: Yes. Give Mr.
7  Campbell a moment.
8       MR. GOOD: Yes, of course.
9       MR. CAMPBELL: All right.
10       Q.  Owen, have you had an opportunity
11  to review Claimant's Exhibit No. 7?
12       A.  Yes, I have.
13       Q.  Now, what does that information,
14  what does that information develop for you?
15       A.  This is a list of clients by ID
16  number and dollar amounts in accounts as of
17  September 2005 for clients who left, who opened
18  accounts at MultiFinancial with Mr. Marzano, but
19  retained some asset balance at American Express
20  Financial
21  Advisors.
22       Q.  Does that information on Claimant's
23  Exhibit No. 7 correlate to a number?
24       A.  Yes.
25       Q.  That you've utilized in your

2723

1    NASD Arbitration - December 5, 2005
2  calculations?
3       A.  Yes. It's the top line. Going
4  back to Claimant's Exhibit 11...
5       Q.  11?
6       A.  The top line in the bottom box,
7  3,734,000. It is the 6 million minus 2 million
8  as testified to by Mr. Marzano of assets that he
9  disputes the validity of on this list.
10       Q.  I understand.
11       A.  Adjusted for a 4 percent market
12  growth rate over a period of time, September-
13  October 2005 back to March 2004.
14       Q.  Now, the bottom number on
15  Claimant's Exhibit No. 11, the 3.9 million --
16       A.  Yes.
17       Q.  -- now that number are assets that
18  stayed at American Express with no
19  MultiFinancial accounts, correct?
20       A.  That's exactly right.
21       Q.  How did you develop that
22  information?
23       A.  We have a spreadsheet with the
24  clients listed and the assets by type. And we
25  cross-referenced the clients, the total clients

2724
1     NASD Arbitration - December 5, 2005
2  that stayed with American Express, or maintained
3  accounts I should say, as of September 2005 at
4  American Express against this client list here.
5  The clients who are not on this list.
6        MR. ZARETSKY: "This" meaning?
7     Q.   Meaning?
8     A.   Exhibit 7 list.
9        Constitutes our subset we were
10  chatting about earlier with the 11 and change
11  million dollars' worth of clients who had assets
12  at American Express and did not open accounts at
13  MultiFinancial.
14     Q.   But you went into the actual
15  account statements?
16     A.   We did.
17     Q.   And reviewed those?
18     A.   That's right.
19     Q.   So you went into the March of '04
20  and '05 account statements that were presented
21  to you?
22     A.   In the March of '04 statements that
23  were provided to us for all the clients who
24  maintained accounts at American Express and are
25  not on this list.

2725
1     NASD Arbitration - December 5, 2005
2     Q.   And that's how that number of 3.9
3  million was developed, off of the actual account
4  statements?
5     A.   That's exactly right.
6     Q.   That number 3.9 represents not the
7  total number of assets, but only those assets
8  that are locked up as annuities, B shares, or
9  insurance, or money that would have a negative
10  financial impact on a client to transfer?
11     A.   That's right. It's significantly
12  annuities and B shares. Yes.
13     Q.   Now, one other issue that I want to
14  discuss with you that Mr. Marzano testified to.
15  And that is a discount rate.
16     A.   Right.
17     Q.   Now, notwithstanding the fact that
18  the regression analysis that was done as a
19  complete analysis demonstrates that there are no
20  damages to Mr. Marzano, the discount rate of GDC
21  that Mr. Marzano utilized was 5 percent.
22        Is that a correct figure?
23     A.   This is an area that we spend a
24  preponderance of our time on in a valuation
25  field. A 5 percent discount rate, a rate that's

2726
1     NASD Arbitration - December 5, 2005
2  reflected by U.S. Government bonds has no place
3  in the forecasting of assets under management in
4  broker-dealers' concessions and the present
5  valuing of those cash flows back to today.
6     Q.   Now, while I have little doubt that
7  the panel understands what a discount rate is --
8     A.   Yes.
9     Q.   -- explain, by using a 5 percent
10  discount rate, what Mr. Marzano is telling the
11  panel and why that's an incorrect percentage and
12  assumption.
13     A.   Implicitly, Mr. Marzano is saying
14  that by investing $2.0 million in an asset
15  that's secured by his prospective client base,
16  that $33 million in clients that he's purporting
17  to have lost as a result of this action, a
18  reasonable investor would accept a five-year
19  return of 5 percent on an asset that's secured
20  by such assets.
21        Another way of looking at it is, if
22  Mr. Marzano had a choice between investing $2
23  million in a $33 million book of business or $2
24  million in a government/stock market, he should
25  accept the exact

2727
1     NASD Arbitration - December 5, 2005
2  same rate of return between those two
3  investment choices.
4     Q.   In your practice and in your
5  experience, is that a correct number?
6     A.   No.
7     Q.   Is that a correct valuation that a
8  representative or advisor ought to be paying --
9     A.   No.
10     Q.   -- for this book of business?
11     A.   No.
12     Q.   Why not?
13     A.   The risks associated with a
14  forecasted cash flow that is based on assets
15  under management and eventually gross dealer
16  concession and then should have been net income,
17  is a forecast that is inherent with significant
18  forecasting risk, not surprisingly. And there's
19  no way effectively around that.
20        At the end of the day, a forecast
21  is only as good as your forecast of the future.
22  We don't know what the stock market will do on
23  an ex-ante basis as we sit here at February
24  2005. We don't know what asset growth rates are
25  going to be.

2728

1   NASD Arbitration - December 5, 2005
2       There are significant competitive
3   issues in the market that we're familiar with
4   such as an increase in the number of reps and
5   advisors on an annual basis. These factors are
6   all factors that eventually affect the discount
7   rate or the rate of return required to discount
8   a future set of cash flows back to present
9   value.
10      Q.   Does that include the calculations
11  that he did before about the stock market
12  growth, that period of time that there was an
13  abnormally high growth versus a period of time
14  where the market was moving sideways or slower?
15      A.   Yes.
16      Q.   And that's one of the reasons why a
17  5 percent discount rate is inappropriate?
18      A.   That's right.
19      Q.   What about the amount of money that
20  didn't move?
21      A.   Again, these are all factors,
22  particularly when you're talking about
23  transition of a book of business either from one
24  broker-dealer to another or in the case of the
25  sale of a practice from one advisor to another.

2729

1   NASD Arbitration - December 5, 2005
2       These are all factors that have
3   significant implications on the rates of return
4   that
5   are necessary to induce an investor to purchase
6   a book of business.
7       Q.   Other factors, aging of the book of
8   business?
9       A.   Yes.
10      Q.   Whether individuals are using money
11  to purchase second homes or other types of
12  consumer oriented investments or luxuries?
13      A.   Yes. Very much so.
14      Q.   What about change in employment
15  status?
16      A.   The change, you're talking about
17  the client base?
18      Q.   Yes.
19      A.   Those can all be implications that
20  affect the future of growth in assets. Also
21  factors such as, for example, relative
22  profitability of one planner's book of business
23  versus another. Relative duration or relative
24  age of the base or book of business. Younger or
25  new books of business have higher risks going

2730

1   NASD Arbitration - December 5, 2005
2   forward as far as forecasting goes.
3       Q.   And therefore, the assets under
4   management utilized by Mr. Marzano were
5   incorrect, correct?
6       A.   Correct.
7       Q.   Yes?
8       A.   Yes.
9       Q.   And the discount factor utilized by
10  Mr. Marzano was incorrect?
11      A.   Yes.
12      Q.   And that's because he didn't take
13  these factors into account in developing his
14  discount factor?
15      A.   That's exactly right.
16      Q.   In your experience and in your
17  business, what is an appropriate discount factor
18  for a book of business like Mr. Marzano's and
19  why?
20      A.   The typical rates of return for
21  very similar books of business that we value on
22  a regular basis is about 18 to 22 percent.
23  That's for the sale of a practice.
24      Now, there's a couple of things
25  that are important to note here. There's not a

2731

1   NASD Arbitration - December 5, 2005
2   direct correlation between a sale of a practice
3   and Mr. Marzano's transferrance from broker-
4   dealer. Therefore, we would have spent a lot
5   more time analyzing the rate of return issue if
6   it was relevant.
7       But as I mentioned to begin with,
8   we don't see that there's an assets under
9   management deficiency here. And, so really, the
10  discount rate issue, if we were to run the
11  model, would be moot. There are no asset losses.
12  If there were, however, we would need to
13  develop a rate of return that's consistent with
14  the risks associated with Mr. Marzano's
15  forecast.
16      To give you an example of the
17  implications, if you run the same analysis as
18  Mr. Marzano's with an 18 percent discount rate,
19  the damages calculation is 25 percent lower. If
20  you run it somewhere in between 5 and 18
21  percent, just for sake of argument, 12 percent,
22  the rate of return is 15 percent lower.
23      MR. GOOD:  Mr. Chairman, I have
24  nothing further of the witness at this
25  moment.

2732

1   NASD Arbitration - December 5, 2005
2        THE CHAIRMAN:  Thank you.
3        Mr. Campbell, do you need a few
4   moments?
5        MR. CAMPBELL:  I'm going to try and
6   proceed, Mr. Chairman.  Because of the
7   newness of these numbers, and we're
8   still, these exhibits we're still trying
9   to understand them, I'm going to have a
10  lot of interaction with Frank as I do
11  this.  But to try and move it along,
12  rather than go out and get a list and
13  come back in, we'll just try to work it
14  as we go.  So Frank may be supplying some
15  of the questions directly.
16
17  CROSS-EXAMINATION
18  BY CAMPBELL:
19      Q.   Just to pick up on that last point,
20  Mr. Dahl, can you distinguish for me the
21  differences between valuing a practice and
22  measuring damages?
23       Are those two different functions?
24      A.   It would depend.  Are you asking
25  generally or specifically?

2733

1   NASD Arbitration - December 5, 2005
2      Q.   Yes, generally.
3      A.   In general, we depend on the case.
4   There are many times where a valuation or,
5   excuse me, valuation is specific or pertinent to
6   the calculation of damages.
7      Q.   Well, for example, if you were
8   valuing Frank's practice for purposes of buying
9   it, employed by another advisor who wants to
10  know what's an appropriate price to pay for
11  Frank's practice, you
12  would come up with one number, right?
13      A.   Yes.
14      Q.   And perhaps it would use the
15  typical factor, I think you said 16 to 18
16  percent for what was that, 16 to 18 percent?
17      A.   I believe it was 18 to 20.
18      Q.   Eighteen to 20?
19      A.   Sixteen would be a little bit low
20  for a practice of this nature.
21      Q.   What is that, 18 to 20?
22      A.   It reflects the rate of return that
23  would be required by an investor to induce him
24  to purchase Mr. Marzano's practice.
25      Q.   Of course if someone were

2734

1        NASD Arbitration - December 5, 2005
2   purchasing Frank's practice, Frank wouldn't be
3   there anymore.  It wouldn't be Frank working the
4   practice, growing the practice, developing the
5   practice, right?  It would be the new buyer?
6      A.   Well, actually, that's not
7   necessarily the case.  And it's not typically
8   the way these books of business are sold.
9   They're sold on the net.  And they're sold with
10  very specific provisions about what assets stay.
11      Q.   The assets that stay, in fact, the
12  selling advisor usually hangs around to help
13  keep the assets in place for some period of
14  time, right?
15      A.   Yes.
16      Q.   But of course the rate of growth in
17  the assets, new assets as opposed to market
18  growth, the rate of growth in the assets, that
19  will be determined by the new owner and his or
20  her abilities and performance, right?
21      A.   Yes.
22      Q.   Will no longer be determined by
23  Frank's, because Frank is no longer growing that
24  business?
25      A.   That's true.

2735

1        NASD Arbitration - December 5, 2005
2      Q.   That's right.
3        But you know in this case we're
4   dealing with Frank throughout; aren't we?
5      A.   Yes.
6      Q.   And you testified, I think, on one
7   of your exhibits, I just want to make sure I
8   understand it, because you testified a lot about
9   the asset growth due to market performance.
10      A.   Right.
11      Q.   But the bottom line is, as I look
12  at Claimant's Exhibit 14, you got that in front
13  of you?
14        The bottom line is using the
15  numbers that you have on this exhibit in the top
16  box --
17      A.   Right.
18      Q.   -- which I'll come to in a minute.
19        But you have calculated the average
20  adjusted change, net of market performance, at
21  just a little over $2 million?
22      A.   Yes, that's correct.
23      Q.   And that's Frank's performance;
24  isn't it?
25        Frank brought in an average of a

2736

NASD Arbitration - December 5, 2005
1. little over $2 million in new assets, either new
2. clients or new assets from old clients every
3. month?
4.
5.     A.   Certainly no evidence to suggest
6. otherwise, no.
7.     Q.   And, of course, if you're valuing
8. the business you couldn't assume that the new
9. owner would do the same?
10.    A.   I think I follow.  I apologize.
11. What do you mean?
12.    Q.   If you're valuing the business for
13. purposes of it being sold to a new advisor, you
14. couldn't assume in doing your valuation that the
15. new advisor would continue that 2 million per
16. month?
17.    A.   Oh, I see.  I apologize.
18.         No.  The forecasting model that you
19. used, the cash flow or earnings approach would
20. use some presumed growth rate that would have
21. reflected market growth, as well as a different
22. new asset growth reflective of the purchasing
23. individual's ability to grow a business.
24.    Q.   And that might be zero?
25.    A.   Yes.  It's very case-specific.  Yes.

2737

NASD Arbitration - December 5, 2005
1.
2.    Q.   Do you have any reason to utilize
3. as an assumption in doing a trend analysis,
4. let's say Frank in March of 2004 had
5. approximately $79 million in assets, if you were
6. going to trend that forward using the numbers
7. that you had available, is there any reason why
8. you wouldn't assume $2 million average per month
9. asset growth for the number of months between
10. March '04 and today, December '05?
11.    A.   There's a couple of reasons I've
12. testified to that also need to be considered.
13.         As I mentioned previously, this is
14. a very new book of business with a very short
15. lifespan of client relationship with Frank; at
16. least relative to the data that's been provided.
17. That is 200, and this number is rough, I believe
18. it was 210 clients in the last two years were
19. added to Frank's book. There's 253 clients on the
20. record as of February 2004. In other words, only
21. 43 clients predate two years prior.  The
22. attrition rate in clients is a function of time
23. as well.  And it's a time frame that has not been
24. developed yet in Frank's or Mr. Marzano's book of
25. business.

2738

NASD Arbitration - December 5, 2005
1.
2.         So the factors such as that, such
3. as I mentioned previously, age of client, also
4. need to be considered before I would be
5. comfortable opining $2 million in assets growth
6. in perpetuity.
7.    Q.   So if Frank had a relationship,
8. let's say going back, five or six or eight or 10
9. years with those clients, then you would feel
10. better in projecting forward that he was going
11. to have a lower attrition rate?
12.    A.   Well, again, this is speculative as
13. I sit here because these are not factors that I
14. considered specifically.  But I think you need
15. to differentiate between the relationship as a
16. financial advisor and a relationship in another
17. sense.
18.         There are, I don't want you to get
19. the idea that I've analyzed this, specifically
20. this case, but these are all factors that need to
21. be considered when valuing a book of business.
22.    Q.   In fact, there are studies that
23. look at the degree of trust that clients have in
24. their relationships; aren't there?
25.    A.   There are, I suppose there are some

2739

NASD Arbitration - December 5, 2005
1.
2. anecdotal studies.  I'm personally not, I'm
3. certainly not an expert in that.  I wouldn't
4. comment on them.
5.    Q.   So you don't know about any such
6. studies?
7.    A.   Only sort of in a third party way.
8. I've never reviewed such a study.
9.    Q.   To the extent that you do know,
10. which relationship is the one that you've heard
11. about that is the one that is the closest
12. relationship clients have with a particular
13. kind of professional?
14.    A.   One more time.  I apologize.  I
15. didn't quite get the thrust of the question.
16.    Q.   Maybe I should ask it a different
17. way.
18.    A.   Okay.
19.    Q.   Have you ever heard that the
20. relationship between accountant and client is
21. the closest relationship between a client and a
22. professional?
23.         MR. GOOD:  Objection as to whether
24. he's ever heard it.  If he's asking is
25. there a study that he's aware of or if

2740

1    NASD Arbitration - December 5, 2005
2    there is a basis for it, other than
3    something he heard.
4        Q.   Is there anecdotal information that
5    you have, that you've collected in your
6    experience in your business either as an expert
7    witness or as business --
8        A.   I think I've heard the statement
9    once or twice. I think that's about as far as I
10   can possibly testify to.
11       Q.   And, of course, you know that Frank
12   was a CPA for many years before he was a
13   planner?
14       A.   I realize that. Yes.
15       Q.   And many of his clients came from
16   his CPA practice?
17       A.   If that's true, I'll take your word
18   for it.
19       Q.   It's not something you looked at?
20       A.   No.
21       Q.   So you don't know what proportion
22   of the clients came from his CPA practice
23   relationship?
24       A.   No. But it would explain the very
25   strong growth rate in his first four years. No

2741

1    NASD Arbitration - December 5, 2005
2    question about it. It would also suggest
3    there's a limit to the amount of those assets
4    would grow going forward. There's a point in
5    time obviously when you've exhausted the prior
6    relationships.
7        Q.   Can't have more than 100 percent,
8    right?
9        THE CHAIRMAN: One at a time, Mr.
10   Campbell.
11       Q.   Once 100 percent of the CPA clients
12   become planning clients, then that's not going
13   to be an area of much growth anymore?
14       A.   Well, you'll certainly not go over
15   100 percent. That's for sure.
16       Q.   Now, I think you told us that you
17   spend about a third of your time doing
18   litigation support?
19       A.   Yes. That would be accurate.
20       Q.   In litigation support as opposed to
21   factor used, the rate of return that you looked
22   for in a sale of a practice situation, what is
23   an appropriate discount factor to use for a
24   five-year damage number as opposed to sale of
25   practice number?

2742

1    NASD Arbitration - December 5, 2005
2        MR. GOOD: Let me just object to
3    the form of the question. He's tying, and
4    the question's not clear to me, but it may
5    be to Mr. Dahl. But what he said was his
6    litigation practice and valuation and
7    rate of return, his litigation practice
8    may not be just dealing with rates of
9    return on the sale of practices.
10       And I just want to clarify the
11   question. If you understand it, I
12   suspect you can answer it.
13       THE WITNESS: Okay.
14       THE CHAIRMAN: Can you answer?
15       A.   Okay. The question, if I'm not
16   mistaken, is if there a different rate of return
17   that's used in forecasting cash flows in a
18   commercial damages case versus a valuation case.
19       Q.   Actually, I didn't ask you about a
20   rate of return. I asked you about a discount
21   rate.
22       A.   I apologize. I used those terms
23   interchangeably.
24       Q.   Okay.
25       A.   The answer is, yes, as I testified

2743

1    NASD Arbitration - December 5, 2005
2    to in direct. The 18 percent number is an
3    appropriate number in terms of the rate of
4    return for the
5    business. Whether or not that rate of return is
6    appropriate in this case would depend on a
7    fairly more lengthy analysis than was
8    appropriate in this case. Since, as I
9    mentioned, we determined there not to be
10   damages.
11       But, in my experience and in
12   practice, the point is to match the forecasting
13   risks and the cash flows associated with that
14   forecasting risk with the discount rate chosen.
15       As an example, if you're looking at
16   a commercial damages case or a lost profits case
17   that is resulting from a fire in a building
18   where it took you 18 months to get the building
19   back up and running, you had a certain occupancy
20   rate and a certain proven stable cash flow, a
21   discount rate of 6 or 7 percent might be
22   appropriate because the forecasting risks are
23   much, much different than they are in this case.
24       So the real point of the discount
25   rate is you need to match the rate used with the

2744

1    NASD Arbitration - December 5, 2005
2    forecasting associated with the commercial
3    damages case.
4       Q.   Is one of the variables one of the
5    factors taken into consideration market return
6    in determining --
7       A.   In determining the appropriate
8    discount?
9       Q.   Yes.
10      A.   Market return is a factor in
11   determining a rate of return for a book of
12   business, yes.  Expected returns.
13      Q.   And the average market return
14   according to your Claimant's Exhibit 11 is 4
15   percent?
16      A.   Yes.
17      Q.   Do you know what factor, well, do
18   you know where Frank got his, the discount rate
19   that he used?
20      A.   I believe he testified it was a
21   Treasury maturity rate; is that correct?
22      Q.   Five-year rate?
23      A.   I apologize.  Yes.
24           You know, first of all, that
25   discount rate is used in consistency over the

2745

1    NASD Arbitration - December 5, 2005
2    next five years in the forecasting period.
3           The rate of return that's
4    appropriate in a forward-looking model and a
5    commercial damages case of this nature is a
6    forward-looking model, is an expected average
7    market rate adjusted for additional risks,
8    adjusted upwards or downwards for additional
9    risks.
10          But the 4 percent return is the
11   actual growth in his asset numbers over a
12   20-month period.  Or 18-month period, I apologize.
13   Whereas, a rate of return that should be used
14   over the five-year forecasting period used by
15   Mr. Marzano should reflect expected future
16   returns in the market.
17      Q.   If I can direct your attention to
18   Claimant's Exhibit, I think it's Claimant's
19   Exhibit -- beg your pardon -- Respondent's
20   Exhibit 12.
21          Do you have a copy there?
22      A.   Yes.
23          MR. GOOD:  We actually just handed
24   him one.
25          THE WITNESS:  Just provided me one.

2746

1    NASD Arbitration - December 5, 2005
2       Q.   If you can turn to the page
3    numbered 3.  It's in the lower right-hand corner
4    that you're looking at.
5           MR. ZARETSKY:  Mr. Chairman, page
6    No. 3 was never admitted the panel may
7    recall.
8           MR. CAMPBELL:  No, no.  I don't
9    mean that.  This one.  The one with --
10   not that one, Mr. Petrie.
11          MR. MARZANO:  Page 5.
12          MR. CAMPBELL:  It's page 5.
13          THE CHAIRMAN:  Mr. Campbell?
14          MR. MARZANO:  Yes.
15          MR. CAMPBELL:  That's the one.
16   Frank's copy is out of order.  I
17   apologize.
18      Q.   If you look at the box on the
19   right-hand side, Mr. Dahl.
20      A.   Yes.
21      Q.   Isn't it correct that the
22   calculation, the lost GDC per future year over a
23   number of years, over five years, 462,798?
24      A.   Right.
25      Q.   That should mean no asset growth

2747

1    NASD Arbitration - December 5, 2005
2    beyond the numbers included in the box; isn't
3    it?
4       A.   That's correct.  Going forward. But
5    it assumes a significant asset growth during the
6    period of time that was used to project to 9/05.
7       Q.   It does that.
8           But we've already established that
9    2 million a month is the average during that
10   period, right?
11      A.   Yes.  Although, I believe that 127
12   that's shown there would be a growth rate
13   significantly higher than 2 million a month.
14      Q.   Well --
15          MR. GOOD:  Excuse me.  The panel
16   can't hear you.  So you need to raise
17   your voice and keep your voice up?
18          THE CHAIRMAN:  Thank you.
19          MR. GOOD:  Why don't you repeat
20   your last statement.
21          THE WITNESS:  I believe though, you
22   mentioned the $2 million a month growth
23   rate, if I'm not mistaken, the growth
24   rate is significantly higher than $2
25   million a month during that 9/30/05

2748

1    NASD Arbitration - December 5, 2005
2    period in March of '04. I just want to
3    clarify that point. You mentioned $2
4    million a month. And I'm not sure where
5    that number comes from.
6        Q.   Well, the 2 million a month comes
7    from Claimant's Exhibit 11?
8            MR. MARZANO: 14.
9        Q.   Claimant's Exhibit 14, your
10   calculation of the adjusted change?
11       A.   Sure. But it doesn't come from the
12   exhibit where you calculate your present value
13   where you use your discount rate.
14       Q.   That's correct.
15       A.   Okay.
16       Q.   The question I asked you was, in
17   fact, Frank's number $462,798 per year of lost
18   GDC for five years, assumes no growth in assets
19   above the 127,000,658?
20       A.   That's true.
21       Q.   So, how much you would grow, how
22   much you would lose just assumes no change?
23       A.   Right. Yes.
24       Q.   Although you know that the
25   testimony is that except for the events that

2749

1    NASD Arbitration - December 5, 2005
2    occurred in 2004, Frank's assets grew in a
3    fairly consistent rate during the prior period
4    that he was at American Express?
5        A.   Yes. They did during the 14 months
6    that Mr. Marzano showed.
7        Q.   But, in fact, you looked at
8    Claimant's Exhibit 14. It covers the months
9    from 12/3/2002 onwards. But you are employed as
10   an expert to do an analysis on behalf of
11   American Express, right?
12       A.   Right.
13       Q.   So all of the data for 2002 was
14   available to you if American Express wanted to
15   make it available?
16       A.   I suppose it would have, yes.
17       Q.   Did you look at --
18       A.   No.
19       Q.   -- the asset growth in 2002?
20           And same would be true for 2001.
21   The data's there. American Express has it?
22       A.   But you didn't -- actually, I saw
23   Mr. Marzano's testimony on asset growth. And I
24   don't dispute it in any fashion.
25       Q.   But you understand, Mr. Marzano

2750

1    NASD Arbitration - December 5, 2005
2    only has available to him a limited amount of
3    data. And he didn't want to guess for the prior
4    month for which he didn't have the data?
5        A.   No, I wasn't aware of that at all.
6        Q.   So he starts in December '02. And
7    he testified because he had data from December
8    '02 forward.
9        A.   Right.
10       Q.   American Express has the data for
11   all of 2002. All of 2001 and all of, in fact,
12   his entire career at American Express.
13           MR. GOOD: Let me just object to
14   the characterization that whatever Mr.
15   Marzano's testimony was. This gentleman
16   wasn't here for his testimony. And while
17   he may have reviewed his, at least part
18   of his testimony, if not all of his
19   testimony, he doesn't know what Mr.
20   Marzano has or had in front of him. And,
21   in fact, I would suggest to the panel
22   none of us do. And the reason being we
23   asked for that information. It wasn't
24   provided to us. We asked for it in
25   discovery at the time that he gave us a .

2751

1    NASD Arbitration - December 5, 2005
2    damage calculation.
3            MR. CAMPBELL: Mr. Chairman, this
4    isn't an objection.
5            MR. GOOD: And now we don't have
6    it. What Mr. Campbell can testify about,
7    what he did or didn't have as he moved
8    on, is inappropriate.
9            MR. CAMPBELL: Mr. Chairman, that
10   comment was inappropriate. Frank
11   testified at length where he got these
12   numbers and why there's a gap here and
13   why he started in December. And
14   what we don't have, we cannot produce.
15           THE CHAIRMAN: Mr. Campbell, you
16   can continue your questions.
17           MR. CAMPBELL: Thank you, Mr.
18   Chairman.
19       Q.   In fact, if you look at Exhibit 12,
20   the trend analysis for assets under management
21   page?
22       A.   Yes.
23       Q.   Which page is that?
24       A.   This is page 4.
25       Q.   Your page 4?

2752

1    NASD Arbitration - December 5, 2005
2       A.   Yes.
3       Q.   Frank's page 4, too. We're on the
4    same page, at least, this time. There's a gap
5    between December '02 and April '03.
6          We don't have January, February, or
7    March on Frank's Exhibit 12, right?
8       A.   Right.
9       Q.   But you have used 40,000,354 for
10   each of the months, December 2002 through --
11      A.   Well, I believe that's in the same
12   fashion --
13      Q.   April?
14      A.   -- as Mr. Marzano.
15         What I did was recreate his own
16   inputs. It may not be shown on your graph. But
17   it must have been there or you would have
18   dramatically reduced your line by applying zeroes
19   to those first three months.
20      Q.   Or he could have added 2 million
21   per month for each of those three months using
22   his average, right?
23      A.   That would have got him to a number
24   lower than the April '03 46 million because I
25   believe there was -- it would have gotten you to

2753

1    NASD Arbitration - December 5, 2005
2    about the same number. It's basically a linear
3    relationship.
4       Q.   Let me ask you a few more questions
5    on Exhibit 12.
6       A.   Is that page 4?
7       Q.   No. Your Exhibit 14.
8       A.   I'm sorry.
9       Q.   Claimant's Exhibit 14.
10      A.   Okay.
11      Q.   I had a few questions about the
12   second box there.
13      A.   Okay.
14      Q.   You've got clients' assets relying
15   on saved assets. The last entry on the page.
16      A.   Right.
17      Q.   Where did you get that number?
18      A.   American Express provided a
19   spreadsheet with a number of boxes that were
20   corresponding to a questionnaire that's provided
21   when the client -- I believe it's when the
22   client first initiates or first opens their
23   account. And one of the clients on the box is,
24   you know, specific to primary sources of income.
25   And what I did, the spreadsheet showed each of

2754

1    NASD Arbitration - December 5, 2005
2    the answers from these questions. And what I
3    did was highlight the questions where they were
4    primarily relying on it. Saved assets. And
5    some of those totals.
6       Q.   That's a summary exhibit that
7    American Express provided you. It's not data
8    that you went back to the original client
9    responses and gathered for yourself?
10      A.   No. They provided me a blank
11   client response form and then the input data.
12      Q.   Do you know how many of the clients
13   responded with that information from among the
14   253 clients, roughly, in total?
15      A.   It's my recollection as I sit here
16   that 100 percent of the boxes were filled out on
17   the spreadsheet as provided.
18      Q.   Well, that spreadsheet wouldn't
19   tell you what assets they're saying they're
20   relying on; would it?
21      A.   No. Just simply, it refers to
22   saved assets investment income. It's a primary
23   source of income.
24      Q.   But you had the statements for all
25   of Frank's clients available to you?

2755

1       NASD Arbitration - December 5, 2005
2       A.   Yes.
3       Q.   For the period in question?
4       A.   Right.
5       Q.   Did you attempt to determine from
6    those statements what the monthly average
7    withdrawal rate was?
8       A.   No. I didn't have the statements
9    on month-by-month history. Statements as of
10   March 2004 that I've reviewed.
11      Q.   Oh. You didn't look at any of the
12   statements for 2002, 2003, or 2004?
13      A.   For the clients? No.
14      Q.   So you don't know what the actual
15   withdrawal rate was?
16      A.   No.
17      Q.   So you couldn't correlate the
18   number of clients or the total assets for the
19   clients who said check the box or allegedly
20   check the box saying that they were relying on
21   saved assets?
22         You couldn't correlate that with
23   what the actual withdrawals were?
24      A.   No.
25         MR. CAMPBELL: One minute, Mr.

2756

1    NASD Arbitration - December 5, 2005
2    Chairman.
3         THE CHAIRMAN: Sure.
4         Q.   Now, you also testified that the
5    asset types, the percentage of fixed income
6    versus equities was almost exactly 60-40?
7         A.   Yes. Very, very close.
8         Q.   How did you come to that number?
9         A.   We looked at the statements as of
10   March '04 for each of the clients on Frank
11   Marzano's client list. We broke out the equity
12   mutual funds and equity from fixed income
13   products, including fixed income, mutual funds,
14   bonds and annuities and money market funds. And
15   then the sum of those totals over the total of
16   the accounts represents the
17   60-40 split.
18        Q.   Yes.
19             So if we look at Claimant's 14, the
20   box at the bottom where it's got equity, mutual
21   funds/stock, you got 60.3 percent?
22        A.   Right.
23        Q.   And if we look at, so you just took
24   that as a gross number?
25        A.   That is the total number from the

2757

1    NASD Arbitration - December 5, 2005
2    statements, yes.
3         Q.   Did you do a Morningstar analysis
4    at the mutual funds in question that the clients
5    had their money invested in?
6         A.   No, no. They were all reflected on
7    the statements as equity mutual funds. We went
8    no deeper.
9         Q.   Are you aware that in some cases
10   what's designated an equity mutual fund may, in
11   fact, have some portion of the assets invested
12   in cash?
13        A.   Yes.
14        Q.   And some portion of the assets
15   invested in bonds?
16        A.   Yes.
17        Q.   So that if you looked at what the
18   actual assets/holdings were, you'd get a
19   clearer picture. There would be some?
20        A.   That's partly the reason why we
21   left the annuities in the fixed income products.
22   We knew it was an offset.
23        Q.   Explain what you mean by that.
24        A.   Sure. The annuities which variable
25   annuities have an equity component to them were

2758

1    NASD Arbitration - December 5, 2005
2    not included. We did not break out the equity
3    component of the annuity product. We left them
4    as fixed income product and left all the mutual
5    funds with mutual funds products.
6         Remember, the equity mutual funds
7    to be termed equity mutual funds, I would assume
8    would require a preponderance of their assets be
9    invested in the equity markets even though
10   admittedly there would be a small, or smallish
11   component of those assets that are fixed income
12   and product.
13        Q.   For example, preferred stocks would
14   be considered an equity, even though they're
15   more like a fixed income product?
16        A.   I agree that they're more like a
17   fixed income product. As I sit here today, I
18   can't testify as to how they're treated in an
19   equity mutual fund.
20        Q.   You could have done a Morningstar
21   analysis and got a breakdown within each mutual
22   fund what proportion was actually in equities?
23        A.   For each.
24        Q.   Including annuities in Morningstar?
25        A.   It would have been possible to do

2759

1    NASD Arbitration - December 5, 2005
2    that. It would have been possible to do that.
3         Q.   But you didn't do it?
4         A.   No.
5         Q.   With respect to 2002, you know what
6    the market performance was in 2002?
7         A.   Not off the top of my head. No. I
8    note that there is -- well, actually, I take
9    that back. I was going to say there was a
10   couple of data points. I know that from
11   December 2002 to March of 2003, data is there.
12   But between January and December 2002, no.
13        Q.   You're not aware that the market
14   was down about 28 percent in 2002 for the year?
15        A.   As I sit here today, I could not
16   verify or confirm that number. And I would just
17   note some of the testimony about rate of returns
18   over the historical period of time have been
19   somewhat questionable. So I would caution you to
20   go back and look, at least enter into evidence
21   any suggestion that that was a rate of return to
22   be sure we're all talking about the same rates.
23        Q.   You're saying you don't know?
24        A.   No.
25        Q.   What the market rate of return was

2760

NASD Arbitration - December 5, 2005

1  NASD Arbitration - December 5, 2005
2  in calendar?
3       A.   No.
4       Q.   2002?
5       A.   Not as I sit here.
6       Q.   If you assume it was down 28
7  percent, it's a hypothetical question now since
8  we don't have a real number, and if Frank's
9  assets were up significantly during that period
10 of time, would that have significantly, and if
11 you inputted those numbers into your analysis,
12 would that have significantly changed the
13 outcome?
14       MR. GOOD: Let me object to the
15 form of the question. It puts facts not
16 in evidence and outside the scope of what
17 this individual was working on and
18 looking at. If that was information that,
19 Mr. Marzano or Mr. Campbell thought would
20 be significant, then that's information
21 they should have made available to us.
22 They didn't. It's not information they
23 have here, short of this assumption and
24 hypothesis, has no real basis. We don't
25 know whether it's real or not.

2761

NASD Arbitration - December 5, 2005

1  NASD Arbitration - December 5, 2005
2       MR. CAMPBELL: Mr. Chairman, it's
3  perfectly appropriate to ask an expert
4  witness to change the numbers and tell us
5  whether or not, in his opinion, those
6  changed assumptions would change the
7  outcome.
8       Whether or not they are
9  significant, the answers are significant,
10 of course is up to the panel to
11 determine. But certainly it's
12 appropriate to ask an expert witness a
13 hypothetical question, did you take this
14 into consideration, no. If you did,
15 would that change that outcome. Answer,
16 yes or no. That's not beyond the scope
17 of the evidence. That is just a question
18 as to whether or not different
19 assumptions would lead to different
20 results. And the panel can determine for
21 itself whether or not these assumptions
22 he was asked to take into consideration
23 are assumptions that you have or will hear
24 before the end of the testimony.
25       MR. GOOD: That's exactly the

2762

NASD Arbitration - December 5, 2005

1  NASD Arbitration - December 5, 2005
2  reason why it's inappropriate. Because
3  Mr. Campbell is asking this panel now to
4  bootstrap information that is not in
5  evidence and he has no support for. And
6  is asking you to take it, not only as
7  fact, but asking you to take it for the
8  truth of the matter asserted. And
9  therefore, it's inappropriate.
10      MR. CAMPBELL: Mr. Chairman --
11      THE CHAIRMAN: Mr. Campbell, I'm
12 going to let you continue.
13      THE WITNESS: I think the
14 appropriate way to answer that question
15 is that it certainly points out the need
16 for a proper regression analysis to
17 consider an extended period of time and a
18 full business cycle.
19      And it further indicates the
20 problems that we definitely have with the
21 14-month regression. The implications
22 for the model are as written; that the
23 asset under management growth Mr. Marzano
24 had is fully and completely as a result
25 of new business.

2763

NASD Arbitration - December 5, 2005

1  NASD Arbitration - December 5, 2005
2       But, again, as I stated before,
3  this regression model, even as improved
4  in the new version with the two
5  variables, is still an inconsistent and
6  an incomplete way of looking at assets
7  under management.
8       Q.   So the answer is, yes, in fact, it
9  would significantly change the outcome if all of
10 the increase in assets attributable to Mr.
11 Marzano in 2002 came from new business?
12      MR. GOOD: Objection.
13      Q.   Is that correct?
14      MR. GOOD: That's not this
15 witness' answer. That's Mr. Campbell's
16 answer. So I move to strike Mr.
17 Campbell's comments.
18      MR. CAMPBELL: It wasn't a comment.
19 It was a question.
20      THE CHAIRMAN: The objection is
21 sustained to the question.
22      Q.   Yes or no; if the market was down
23 28 percent and Mr. Marzano's assets were up
24 significantly in 2002, would it change the
25 outcome significantly?

2764

NASD Arbitration - December 5, 2005

1   NASD Arbitration - December 5, 2005
2       A.   Yes.
3       MR. CAMPBELL:   Thank you.  That's
4   all I wanted, Mr. Chairman.
5       Q.   And, of course, as you asserted,
6   the more data you have, the better --
7       A.   Yes.
8       Q.   -- your result.
9       And the numbers for 2002 for Mr.
10  Marzano, clients' assets under management total
11  return, all available to American Express,
12  right?
13      A.   I can only presume so.
14      Q.   Now, Mr. Marzano testified that by
15  approximately --
16      ARBITRATOR COHEN:   Go ahead, Mr.
17  Campbell.
18      Q.   The testimony from Mr. Marzano was
19  that by about November or December of 2004 he
20  had over, basically all of the assets that were
21  coming over from American Express, approximately
22  $59 million by the end of November, certainly by
23  December of 2004. And, as you know, because
24  you've reviewed the testimony, his testimony is
25  that he has approximately 93 million, $94

2765

1   NASD Arbitration - December 5, 2005
2   million by what, the end of September of 2005?
3       A.   Right.
4       Q.   Which is a 34-$35 million increase
5   between December '04 and October '05.
6       What has the market performed in
7   that period?
8       A.   The market has been sideways during
9   that period.
10      Q.   Sideways?
11      A.   Yes. Best characterized that way.
12      Q.   Does it look like, what, the bulk
13  of that increase will be new money? It would
14  have to be.
15      A.   I have no way of making a basis.
16  Just looking at the Standard & Poor's 500
17  between 12/31/04 and 10/30 just to confirm, it
18  was very much sideways.
19      Q.   But if Frank were accumulating at
20  new assets of approximately 2 million a month in
21  that time period, he would have added what, $18
22  million?
23      A.   Hmm-hmm.
24      Q.   Is that right?
25      A.   Yes.

2766

1   NASD Arbitration - December 5, 2005
2       Q.   Because he did better than that
3   too; didn't he?
4       A.   I'm relying on the numbers you gave
5   me that that sounds right, yes.
6       Q.   He was up 35 million, difference
7   between 94 and 59?
8       A.   Okay.
9       Q.   Do you agree, in the context of
10  valuing a practice, that there's a difference
11  between a mature practice, value a practice for
12  purposes of determining how it might perform
13  going into the future, there's a difference
14  between a mature practice where the advisor has
15  accumulated assets, built a practice basically
16  to the point where he can't grow any more
17  without adding a lot more new people and he's
18  living off of the assets that he's already got,
19  not adding significantly every year, and a
20  practice that is in that growth asset gathering
21  stage where he's still building up to the
22  plateau where he will find it hard to add new
23  assets and service the assets he's already got?
24      A.   Yes.
25      Q.   And you agree that Frank has a

2767

1   NASD Arbitration - December 5, 2005
2   fairly new practice?
3       A.   Yes.
4       Q.   Four, five years old.
5       And he was in that asset-gathering,
6   growing stage; wasn't he?
7       A.   It appears that way. Yes.
8       Q.   If you value the future projected
9   growth of the second type of practice, it's
10  going to come to a much higher projected number
11  than the projected future growth of the first
12  kind of practice that is mature, and basically
13  ticking over with little added new --
14      A.   Yes, it was. The biggest issue is
15  that forecasting growth rates for the two
16  practices is a different process, in that there
17  are many other factors, many factors that you
18  consider in the mature business that you
19  wouldn't consider in the growth business, and
20  vice versa. And this is particularly pertinent
21  when looking at historical data to develop trend
22  analysis without consideration of factors going
23  forward.
24      Q.   In the case of Frank, or, as we
25  said, you had more data available, American

2768

NASD Arbitration - December 5, 2005

1   Express had more data available to it as far as
2   historical trend is concerned than Frank did,
3   but as to going forward, we all have the same
4   data as for the period March 2004 to November-
5   December of 2005, right?
6       A.   Right.
7       Q.   Because that's already occurred?
8       A.   Right.
9       Q.   It's no longer projection, it's
10  historical. And so the information we're
11  looking at just now, the 59 million in December
12  of 2004 versus 93 million by October 2005 is not
13  projection. That's actual growth during the
14  period of time?
15      A.   I don't believe those numbers are
16  in dispute, no. I don't believe I've seen any
17  numbers though, personally, other than the
18  February '04 number and the September-October
19  '05 number.
20      Q.   So you don't know what happened in
21  each of the months in between?
22      A.   Right, right.
23      Q.   Let me just do a couple of
24  background questions while Frank figures out

2769

NASD Arbitration - December 5, 2005

1   some other ones for me to ask on a more
2   technical basis.
3       Can you tell us what proportion of
4   your valuation business, going back to your
5   resume now, what proportion of it is AEFA
6   related?
7       ARBITRATOR COHEN:  Is what
8   related?
9       MR. CAMPBELL:  AEFA related.
10      A.   American Express related? I have
11  personally valued three American Express
12  Financial Advisor practices in the last four
13  years.
14      Q.   So a small proportion is American
15  Express related?
16      A.   Yes.
17      Q.   How about the litigation support
18  part of your business. I think you said one-
19  third of your practice is litigation support.
20      What proportion of that is American
21  Express related?
22      A.   This is the first time I've ever
23  testified on behalf of American Express.
24      Q.   Okay, good.

2770

NASD Arbitration - December 5, 2005

1       How about your firm though. Does
2   your firm do more than you do personally?
3       A.   Yes. We do some compensation
4   consulting work and other consulting work. As I
5   sit here, I have no idea whether anybody at Moss
6   Adams has ever testified on behalf of American
7   Express other than myself. I can tell you that
8   as of the point in time we were contacted by
9   American Express, we had no active engagements.
10  Because as is common practice, we have to do a
11  conflicts check.
12      Q.   How much are you being paid here to
13  appear here?
14      A.   $245 per hour.
15      Q.   If I can direct your attention to
16  Claimant's Exhibit 11 again, the box at the
17  bottom of the page.
18      A.   Yes.
19      Q.   The assets in dispute as you
20  labeled it.
21      A.   Hmm-hmm.
22      Q.   The number there, the 3.902 million
23  number.
24      A.   Right.

2771

NASD Arbitration - December 5, 2005

1       Q.   Does that include nonproprietary B
2   shares?
3       A.   I believe it does not. It does
4   not. It absolutely does not. I apologize for
5   the uncertainty. It includes annuities and AEFA
6   B shares.
7       Q.   AEFA B shares and annuities?
8       A.   Right.
9       Q.   And could it include assets that
10  have transferred over to Frank?
11      A.   No. Those are, none of those
12  assets
13  transferred over to Frank. Those are all
14  assets that are on the March 2005 financial
15  statements for AEFA.
16      Q.   March?
17      A.   Sorry. September 2005.
18      Q.   September 2005 statements for all
19  of the clients that still have assets at AEFA?
20      A.   Right.
21      Q.   Are you saying you went through
22  each of the statements and had added them up
23  separately?
24      A.   That's right. Yes.

2772
1    NASD Arbitration - December 5, 2005
2    Q.   You didn't look at any summary from
3  American Express?
4    A.   No.
5    Q.   Didn't look at the scorecard or
6  anything like that?
7    A.   No.
8    Q.   Where is the exhibit that gives the
9  performances?  Claimant's Exhibit 11.
10   A.   Yes.
11   Q.   Where it says organic growth in
12 assets.
13   A.   Right.
14   Q.   Where you come up with an average
15 rate of 26.1, in fact, if the weighting equity
16 versus
17 fixed income were 50-50, would that
18 significantly change the average number in the
19 right hand of that column?
20   A.   It would.
21   Q.   Left-hand column of that box, I
22 mean?
23   A.   If it were 50-50, the rate would go
24 from 26.1 to 22.7.  I don't know if that's
25 significant.  But that's the change.

2773
1    NASD Arbitration - December 5, 2005
2    Q.   Thank you.
3    The bottom box, the assets in
4  dispute box of Claimant's 11, were you given the
5  client names there?
6    A.   Yes.
7    Q.   You did not make any specific
8  determination that any of these clients, in
9  fact, said they weren't going to come over?
10   A.   No, I didn't.
11      THE CHAIRMAN: Mr. Campbell, I'm
12 having trouble hearing.
13      MR. CAMPBELL: What I asked, Mr.
14 Chairman, did the witness specifically
15 determine whether any of those clients
16 said they weren't going to come over, or
17 were they just given the names to
18 include?
19      THE WITNESS: Counsel represented
20 to myself that those were names that have
21 been or will be entered into evidence.
22 That's the box called assets in dispute.
23   Q.   Now, about commission splits, you
24 testified a little bit about commission splits.
25      What data did you review to

2774
1    NASD Arbitration - December 5, 2005
2  determine what proportion of Frank's GDC
3  encompassed in commission splits?
4    A.   I might have testified to this.  If
5  not, I apologize, I didn't review it all.  The
6  comment is more specific to market evidence
7  which is that asset growth rate of the type
8  that's being described would normally expect to
9  see more than a single advisor's sharing in the
10 gross dealer commissions.
11      If, historically, Mr. Marzano's
12 practice had been growing as rapidly as it
13 obviously has been, the percentage of GDC that
14 effectively Mr. Marzano keeps as the sole
15 account rep is going to change as the asset
16 risks increases.
17      And it's possible we didn't review
18 any data.  But it's possible and probable based
19 on market data that that GDC number should be
20 reviewed in light of the need to add new reps
21 who are also earning on a commission basis.
22   Q.   So his expenses for managing that
23 practice would go up you would expect?
24   A.   It is possible.  And, yes, I would
25 expect.

2775
1    NASD Arbitration - December 5, 2005
2    Q.   But you don't know whether or not,
3  in fact, Frank couldn't handle a bigger client
4  base?
5    A.   No.  The comment is entirely based
6  on market evidence.
7    Q.   Is it your understanding that Frank
8  Marzano's practice was a transactional practice,
9  generating GDC via trading and other
10 transactions?
11   A.   No.  I was not aware of that.  And
12 didn't review any data that would suggest so.
13   Q.   Do you know how he generates his
14 income, the GDC number at American Express?
15   A.   In terms of tracking new clients
16 and investing money for?
17   Q.   Are you aware that 80-plus percent
18 of Frank's income comes from asset management
19 fees, financial advisory fees?
20      MR. GOOD: Objection, objection.
21      THE CHAIRMAN: Do you know?
22   A.   Yes, yes.  I apologize.  Yes.
23      ARBITRATOR COHEN: That number
24 was what, Mr. Campbell, what percentage
25 you used.

2776

NASD Arbitration - December 5, 2005

1  MR. CAMPBELL: Frank's telling me I
2  used the number -- it was probably too
3  high.
4   Q.   At the time he left American
5  Express, do you know what proportion of Frank's
6  GDC number at American Express was from
7  financial advisor fees?
8   A.   Now that I understand the question,
9  I actually have to withdraw my last comment.
10  No, I wasn't aware of the
11  percentage in any regard as to split between
12  fees and --
13   Q.   Transactions?
14   A.   Transactions fees.
15   Q.   Do you agree, based on your
16  experience in dealing with financial, valuing
17  practices, that a planner, an advisor who
18  generates a majority of his income from advisory
19  fees rather than transactions can manage, in
20  fact, a bigger client base?
21   A.   There's truth to what you said. But
22  I will say this: The data that we looked at to
23  compare Mr. Marzano was a select set of the
24  overall database that would support, that would

2777

NASD Arbitration - December 5, 2005

1  include a higher percentage of people in the same
2  boat, if you will. The comparison isn't to the
3  broad index of average financial planners, but to
4  that specialized set of financial planners that
5  are particularly, primarily comparable to Mr.
6  Marzano.
7   Q.   You mean in how they generate and
8  what proportion of their fees will be generated
9  from advisory rather than transaction?
10   A.   That's right. Yes.
11   Q.   Not specifically to Mr. Marzano's
12  actual capacities?
13   A.   No.
14   Q.   In fact, did you get from American
15  Express, Mr. Marzano's actual GDC under his
16  advisor number for each year?
17   A.   No. I took Mr. Marzano's data
18  verbatim.
19   Q.   You know that how the reporting
20  system works though, right?
21  So that if Mr. Marzano shows an
22  actual of 2003, I think it's in Exhibit 12, page
23  1, that's the GDC analysis.
24   A.   Right.

2778

NASD Arbitration - December 5, 2005

1   Q.   If he shows for 2003, 718,000, that
2  is the actual amount paid to him. So if he was
3  getting a 50 percent split on some of his
4  business that includes 50 percent, doesn't
5  include 100 percent?
6   MR. GOOD: Objection. What's the
7  basis?
8   MR. CAMPBELL: I asked him if he
9  knows how the reporting system works.
10   A.   Yes, I do.
11   Q.   Right.
12  And if he got 780,000 GDC, some of
13  that is made up of 100 percent, some of it's made
14  up of whatever the commission split was. It's
15  just what Frank was paid?
16   A.   Yes.
17   MR. CAMPBELL: Thank you.
18   MR. GOOD: I object to that. We
19  don't know that because we haven't been
20  provided with that documentation that we
21  asked for over and over and over again.
22  Move to strike.
23   MR. CAMPBELL: Mr. Good, of
24  course, goes too far. We are talking

2779

NASD Arbitration - December 5, 2005

1  about the American Express numbers, what
2  American Express paid Frank. Numbers that
3  American Express has had, always has, and
4  are reflected in the 1099s given to Frank
5  by American Express.
6   MR. GOOD: That's not the point.
7  His damage calculation --
8   THE CHAIRMAN: Next question, Mr.
9  Campbell.
10   MR. CAMPBELL: Now, Mr. Chairman, I
11  just want to take a minute to go through
12  my notes.
13   THE CHAIRMAN: Sure.
14  Mr. Campbell, are you going to need
15  a few minutes? You want to take a short
16  break?
17   MR. CAMPBELL: I'm going to try to
18  finish now, Mr. Chairman. I don't think
19  it will take very long.
20   Q.   You made a comment, Mr. Dahl, about
21  I think you said a 5 percent attrition rate, an
22  average 5 percent attrition rate when advisors
23  moved broker-dealers?
24   A.   Right.

2780

1    NASD Arbitration - December 5, 2005
2    Q.   Was I right in my understanding
3    that you were not saying that that was only the
4    attrition rate for any particular reason, that
5    the overall attrition rate --
.6   A.   That's right.
7    Q.   So some of that attrition rate is
8    attributable to assets that couldn't move.  Some
9    is attributable to other reasons?
10   A.   Yes.  There's no breakdown of the
11   reasons.
12   Q.   Do you know what the attrition rate
13   was you calculated from the data that you've had
14   made available to you?
15        Is it what Frank's attrition rate
16   was?
17   A.   On a percentage basis?  No.  I know
18   it was roughly 17 million, or at least --
19   actually, I misspoke.  I believe it's 18 million
20   in assets that did not come over.
21   Q.   From the 79 million leading to
22   approximately what, 23 percent, 24 percent?
23   A.   I believe that's from the 70.2
24   million.
25   Q.   You said that the delays in

2781

1    NASD Arbitration - December 5, 2005
2    contacting clients would have a negative, would
3    have an adverse impact on the ability to move
4    assets?
5    A.   Actually, I believe Mr. Marzano
6    said that in testimony.
7    Q.   I think, and your testimony was you
8    agreed?
9    A.   Right.  Yes.
10   Q.   And it's based on your experience
11   overall; is that right?
12   A.   Yes.  And also on my experiences in
13   the professional and financial services
14   industry.  And my experience when I don't
15   contact clients.
16   Q.   And, for example, if an advisor
17   were to move from one broker-dealer to another
18   and didn't have any of the files relating to the
19   clients that he serviced at the first broker-
20   dealer, you think that that would adversely
21   impact his ability to re-establish the business
22   at the new broker-dealer?
23        MR. GOOD:  Objection.  Question
24        of files doesn't necessarily mean that an
25        individual can't be contacted.

2782

1    NASD Arbitration - December 5, 2005
2        MR. CAMPBELL:  Objection, Mr.
3    Chairman.  Now he's trying to educate the
4    witness.
5        THE CHAIRMAN:  Okay, gentlemen.
6    You want me to send the witness out?
7        MR. CAMPBELL:  I think we should
8    stop right there, Mr. Chairman.  If
9    that's the objection, I say that's not an
10   objection.  That's just a comment.
11       THE CHAIRMAN:  Overruled.
12       Answer the question if you can, Mr.
13   Dahl.
14   A.   Can I ask for a clarification?
15       When we're talking about files,
16   what are we specifically talking about?
17   Q.   The client file.  Everything in the
18   client file.
19   A.   Does that include all the contact
20   information, electronic records, your Rolodex,
21   and everything else?
22   Q.   Name and telephone number.  Let's
23   assume he has the name and telephone number.
24   Doesn't have anything else.
25   A.   Does the client have their

2783

1    NASD Arbitration - December 5, 2005
2    statements?
3        I'm trying to get some information.
4    It's something I haven't thought about.
5    Q.   Maybe they do; maybe they don't.
6        It would matter if the client had
7    to wait until the next month to get a statement.
8    And then the advisor tried to get a copy of the
9    statement from the client.  That would matter;
10   wouldn't it?  Because it extends the period of
11   time during which the assets don't transfer?
12   A.   You said maybe they do; maybe they
13   don't.
14       Do the clients have a current
15   statement?
16   Q.   That's what I'm saying:  Maybe they
17   do; maybe they don't.  Some clients keep them;
18   some clients don't.  Some clients rely on their
19   advisor to keep those records for them.
20       MR. GOOD:  Objection.
21   Q.   Isn't that right?
22   A.   I'm not sure I know that answer to
23   that question.
24       MR. CAMPBELL:  I think the lawyer
25   educated you very well and focused the

2784

1      NASD Arbitration - December 5, 2005
2  clarifications.
3          MR. GOOD: Objection.
4          THE CHAIRMAN: Strike the last
5  comment.
6          MR. GOOD: Thank you.
7      Q.   In making your determination,
8  valuing a practice in the context of a planner's
9  moving from
10  one broker-dealer to another, would it make a
11  difference, would it have significantly impacted
12  your valuation of the business if the planner
13  involved, the planner who's making the move had
14  a restrictive covenant?
15     A.   A restrictive covenant is an asset
16  of the business. The value of such restricted
17  covenant has always been in doubt. It's
18  something we don't place a great deal of
19  emphasis on truthfully when we're valuing
20  practices because the enforceability of such
21  covenants is an issue. There are a lot of
22  issues outside the valuation.
23          And, frankly, the personal choice
24  of the individual client is an issue. So to the
25  extent the restrictive covenant is there, it's

2785

1      NASD Arbitration - December 5, 2005
2  not something that's generally weighted
3  significantly in valuing a practice. When we
4  value them for purposes of allocating asset
5  value between asset classes on a balance sheet,
6  it's the last thing we allocate value to. And
7  it's limited to a small percentage of the
8  overall value.
9      Q.   Are you saying that if you have a
10  practice that involves a restrictive covenant on
11  the person who's moving from one broker-dealer
12  to
13  another. And let's assume for purposes of the
14  question that the restrictive covenant is
15  enforceable and is going to be enforced. And
16  you have the same practice, only there's no
17  restrictive covenant at all. In fact, there's
18  the opposite; there's a piece of paper saying
19  that the clients belong to the advisor and the
20  advisor can do whatever he wants. He can move
21  all the assets without interference if he wants,
22  if he leaves.
23          Are you saying that the practice
24  will be valued the same in both cases?
25          MR. GOOD: Objection. Again, it

2786

1      NASD Arbitration - December 5, 2005
2  assumes facts not in evidence. And Mr.
3  Campbell is providing a commentary about
4  something that --
5          MR. CAMPBELL: Objection, Mr.
6  Chairman.
7          THE CHAIRMAN: Mr. Campbell,
8  could we have --
9          MR. CAMPBELL: I want the witness
10  out of the room this time.
11          THE CHAIRMAN: That's a different
12  question. Mr. Dahl, can you step outside
13  please.
14          MR. CAMPBELL: Thank you, Mr.
15  Dahl. I apologize. (Whereupon, the
16          witness left the
17  hearing room.)
18          MR. CAMPBELL: It's a purely
19  hypothetical question, Mr. Chairman.
20          THE CHAIRMAN: Let Mr. Good
21  finish, please.
22          MR. GOOD: It is a hypothetical
23  question. But, again, he's attempting to
24  bootstrap information in putting facts
25  that don't correlate to this case. He's

2787

1      NASD Arbitration - December 5, 2005
2  characterizing what he thinks a document
3  says. It's not what the document says
4  that may or may not be at issue in this
5  case. And he's given it a spin to
6  something.
7          If he wants to correlate it to this
8  case, then let him use the language
9  that's in this case. If he's not, then
10  he's putting facts that are not in
11  evidence. It's irrelevant. And it's
12  beyond the scope of appropriate
13  examination of this witness.
14          MR. CAMPBELL: Mr. Chairman, that
15  was really kind of closing, his own
16  commentary on what is in evidence. The
17  reality is that if you don't believe the
18  hypothetical is very relevant, then you
19  will just discount it. And I know that
20  and he knows that.
21          If I say assume American Express is
22  going to pay Frank and help him to carry
23  the boxes over to his new firm, and that
24  is something you know isn't in evidence,
25  then of course you discount the whole

2788

1   NASD Arbitration - December 5, 2005
2   question.
3       It is perfectly appropriate for me
4   to ask a hypothetical question that I
5   will later argue to you incorporates
6   evidence that you have heard or that has
7   been placed before you in support of Mr.
8   Marzano's claim.
9       It's not appropriate for him to
10  say, oh, Tom, you can't say that because
11  that part isn't proved. That's for you
12  to decide; not for Mr. Good to decide or
13  for me. I develop the hypothetical. If
14  I go too far the panel will know that I'm
15  into an area of fantasy or will just
16  discount the answer. It's not a valid
17  objection to a hypothetical question.
18  It's a valid objection to what conclusions
19  you can draw. But that's for both sides
20  to argue to you.
21      MR. GOOD: Well, it is a valid
22  objection. Because again, he's creating
23  facts that he's attempting to bootstrap
24  and argue. And he's using it as a basis
25  for use in closing argument within this

2789

1   NASD Arbitration - December 5, 2005
2   matter. And he's trying to pick up a
3   nugget of information or something that
4   has no real bearing to what this case is.
5       And if he wants to put a
6   hypothetical in front of the individual,
7   have him use the document. Otherwise, if
8   he's not doing that, he's just creating
9   something that he's trying to bootstrap
10  and use in order to change the scope and
11  the focus of this. And that is closing
12  argument. He can argue that.
13      MR. CAMPBELL: Mr. Chairman,
14  obviously this is not a fact witness.
15  I'm not using him to put in any facts.
16  Hypothetical is hypothetical. It doesn't
17  make any sense to argue that I'm trying
18  to put in a fact through this witness.
19  And then I'll argue to you that that is
20  the fact that we should rely on. I'm just
21  getting a copy of the exhibits for my next
22  question.
23      THE CHAIRMAN: We're going to
24  overrule the objection. And I'll go get
25  the witness.

2790

1   NASD Arbitration - December 5, 2005
2       MR. CAMPBELL: Thank you, Mr.
3   Chairman.
4       THE CHAIRMAN: Continue.
5       (Question read.)
6   A.  If you indulge me, I want to answer
7   that in two parts.
8       Part number 1 is, no, I'm not
9   saying that. I have, in fact, said there is
10  value in a restrictive covenant. Second part of
11  the question is that more prescient than the
12  restrictive covenant is the client's personal
13  choices. And that clients, even in light of a
14  restrictive covenant, choose for personal
15  reasons to leave or stay.
16  Q.  Are you saying that in your -- with
17  respect to files, I asked you about it earlier,
18  are you saying that it is irrelevant whether or
19  not the advisor is able to have copies of the
20  files when he
21  moves from one broker-dealer to another it's
22  irrelevant to his ability to transfer the assets
23  to reduce that attrition rate, so the 5 percent
24  average --
25  A.  I don't think I said it's

2791

1   NASD Arbitration - December 5, 2005
2   irrelevant. I said there's a lot of important
3   information, particularly affecting your ability
4   to contact your client base.
5       The statement issue I would have to
6   ponder how long are you without statements. What
7   statements are you talking about. What file
8   data are you particularly concerned about.
9       I'm not sure that I'm necessarily
10  qualified to sit here and answer those
11  questions.
12  Q.  So the longer it takes you to
13  reassemle the data you need from the files, the
14  more adverse impact you would suffer; is that
15  what you're saying?
16      Less time, the less adverse impact;
17  the more time, the more adverse impact?
18  A.  Again, the statement is certainly
19  outside of my area of expertise as a financial
20  expert, as a financial testifying expert.
21      MR. CAMPBELL: Mr. Chairman, I
22  think I'm finished. Maybe we can just
23  take that one-minute break. And then
24  I'll confirm that I'm finished.
25      THE CHAIRMAN: How about five

2792

1    NASD Arbitration - December 5, 2005
2    minutes.
3        (Short recess.)
4        THE CHAIRMAN: Back on the record.
5    Mr. Campbell.
6        MR. CAMPBELL: No further
7    questions, Mr. Chairman.
8        THE CHAIRMAN: Mr. Good.
9        MR. GOOD: I have nothing further.
10       THE CHAIRMAN: Okay.
11       ARBITRATOR PETRIE: I have some.
12       THE CHAIRMAN: The panel has a few
13   questions for you.
14       ARBITRATOR COHEN: Just for
15   clarification.
16       THE CHAIRMAN: Mr. Cohen will
17   start.
18       ARBITRATOR COHEN: First of all,
19   Mr. Dahl, thank you for for coming in
20   again.
21       THE WITNESS: Glad to be here.
22       ARBITRATOR COHEN: Twice I heard
23   the term attrition rate at 5 percent.
24       THE WITNESS: Right.
25       ARBITRATOR COHEN: Are we referring

2793

1    NASD Arbitration - December 5, 2005
2    to how much business is lost in a
3    transition?
4        THE WITNESS: Well --
5        ARBITRATOR COHEN: According to
6    your study?
7        THE WITNESS: According to a study
8    that's published, actually not by Moss
9    Adams but by a company called FP
10   Transition, the effect of changing of the
11   broker-dealers has the impact of losing 5
12   percent of a book of business.
13       ARBITRATOR COHEN: The reason I ask
14   is, that in my limited experience with
15   it, I would have anticipated and I
16   believe that the rate for account
17   representatives in brokerage firms is
18   considerably more.
19       Does this study include all account
20   executives, all registered personnel, or
21   is this limited to broker-dealer people?
22       THE WITNESS: You know, as I sit
23   here I can't recall. The data is
24   presented in terms of assets. And it's
25   one of the issues we always had with FP

2794

1    NASD Arbitration - December 5, 2005
2    Transitions and their data sources, is
3    that they're not as complete as you
4    probably would like in terms of
5    explanation.
6        But I did read the study. And the
7    way the study is presented is the
8    implications on a financial advisor's
9    practice of changing affiliation is the
10   term that they use. And they present a
11   number that in the first three months you
12   can expect a 5 percent decline.
13       ARBITRATOR COHEN: Thank you, Mr.
14   Petrie.
15       ARBITRATOR PETRIE: Mr. Dahl, on
16   Claimant's 14 I just want to clarify one
17   thing.
18       We have an adjusted change month by
19   month.
20       THE WITNESS: Yes.
21       ARBITRATOR PETRIE: The first, one
22   line shows an adjusted change of $4.4
23   million. That's to a three-month number.
24       THE WITNESS: That's correct.
25       ARBITRATOR PETRIE: So when you

2795

1    NASD Arbitration - December 5, 2005
2    calculated the 2 million 14 down at the
3    bottom of that column, did you weight it
4    as three months or one month.
5        THE WITNESS: I did not.
6        ARBITRATOR PETRIE: What would be
7    the effect of that?
8        THE WITNESS: It actually inflates
9    the $2 million number because you get all
10   of that growth. Actually, the 5.9
11   million is a four-month growth number.
12   If we had the months we would have
13   calculated properly. It would have
14   brought the average increase and average
15   assets down, probably down below the 2
16   million number that's shown there.
17       ARBITRATOR PETRIE: In other words,
18   if correctly calculated, this number
19   would be a little smaller, the monthly
20   additional per assets.
21       THE WITNESS: Yes.
22       ARBITRATOR PETRIE: On that same
23   exhibit, assets under management
24   analysis, the second box.
25       THE WITNESS: Yes.

2796

NASD Arbitration - December 5, 2005

1   ARBITRATOR PETRIE: We heard what
2   you said about working from small data
3   sets. And I'm wondering whether we should
4   give much weight at all to the third and
5   fourth columns of numbers here. September
6   2000, 5 percent of total. Other than to
7   observe that for the numbers down at the
8   bottom, bottom two rows, client assets
9   greater than 60 years old and clients'
10  assets relying on saved assets, that what
11  this data would suggest is that from an
12  aggregate mix as of March 2004, 5 percent
13  of a client block to clients over the age
14  of 60, if a greater percentage of that
15  remained at American Express, then for
16  the average to work out, some smaller
17  percentage would have gone to the new
18  asset base, right?
19      THE WITNESS: Well --
20      ARBITRATOR PETRIE: Would have
21  transferred to MultiFinancial.
22      THE WITNESS: I applaud you. You
23  lost me.
24      ARBITRATOR PETRIE: You think the

2797

NASD Arbitration - December 5, 2005

1   question was too convoluted. If we went
2   from 23 to 31 percent.
3       THE WITNESS: Yes.
4       ARBITRATOR PETRIE: Doesn't that
5   imply that for the assets that did
6   transfer, that the clients over the age
7   60 would be something under 25?
8       THE WITNESS: I think what it
9   implies, and maybe we're saying it in a
10  different way, I think what it implies
11  that there was a greater number of
12  clients over the age of 60 who kept their
13  assets in American Express.
14      ARBITRATOR PETRIE: Right.
15      THE WITNESS: Financial advisors.
16      ARBITRATOR PETRIE: And the flip
17  side of that is that the assets that did
18  move, we have a greater proportion of
19  clients who are under --
20      THE WITNESS: Younger assets. I
21  think that's correct.
22      Just to clarify your comment about
23  the inappropriateness perhaps of the
24  asset mix data, the fixed asset money

2798

NASD Arbitration - December 5, 2005

1   market fund.
2       ARBITRATOR PETRIE: I haven't
3   gotten to that comment yet. I'm going
4   to. But I haven't asked you that question
5   yet.
6       THE WITNESS: Go right ahead.
7       What was your first comment though
8   so that I understand it?
9       ARBITRATOR PETRIE: You told us
10  that looking at a small data set we can
11  value the regression analysis and refer
12  to the fact that you had 14 data points.
13  or Mr. Marzano provided 14 data points
14  going into this regression.
15      THE WITNESS: Right.
16      ARBITRATOR PETRIE: And I noted
17  that what we're comparing here is $70
18  million as of March 2004 versus 18 as of
19  March 2005.
20      So, I would assume, unless you tell
21  me I'm wrong, that the March 2004 numbers
22  are more representative.
23      THE WITNESS: I see what you mean.
24  Of the total aggregate?

2799

NASD Arbitration - December 5, 2005

1       ARBITRATOR PETRIE: Yes.
2       THE WITNESS: Yes. That would
3   reflect a client base, Mr. Marzano's
4   client base on a better basis, for sure.
5   I think the only comparison that between
6   March and September are those comparative
7   numbers that you suggested previously. I
8   think the higher fixed asset annuity
9   number as a percentage of total assets is
10  reflective of those locked up assets that
11  didn't come over as well.
12      So they are sort of comparisons
13  between the two points that point to some
14  of the things that we experienced or
15  witnessed in the data itself.
16      ARBITRATOR PETRIE: Okay. Well,
17  that leads us directly into the asset
18  allocation question.
19      THE WITNESS: Sure.
20      ARBITRATOR PETRIE: We talked about
21  the mix being approximately 60 percent
22  equity, 40 percent fixed. And we see
23  from this data that, okay, that that
24  seems plausible. Maybe 50 to 60 percent

2800

1  NASD Arbitration - December 5, 2005
2  equity, obviously subject to the issues
3  we've talked about earlier: That is, an
4  equity fund might have some fixed in it
5  but a variable annuity might have some
6  equity in it.
7       So there's a certain amount of
8  noise in that data. But something on the
9  order of half or a little more of the
10 assets appear to be equity. And
11 something on the order of half or a
12 little less than the equities appear to
13 be fixed?
14       THE WITNESS: Right.
15       ARBITRATOR PETRIE: When you recap
16 the regression analysis on Claimant's 14
17 you used equity variable as an additional
18 variable, but not fixed income returns.
19       THE WITNESS: Yes.
20       ARBITRATOR PETRIE: Why?
21       THE WITNESS: The correlation is
22 the only thing that matters in the
23 regression analysis, not the actual
24 returns.
25       In other words, we weren't dollar-

2801

1  NASD Arbitration - December 5, 2005
2  for-dollar reducing the inputs. We were
3  simply measuring the relationship between
4  its change in assets and the change in
5  the stock market.
6       If the relationship is -- excuse me
7  -- from the asset mix was zero fixed
8  income. For example, zero equity, 100
9  percent fixed income for example. Then
10 there would be no or very little
11 correlation in the S&P 500.
12       The correlation analysis or
13 measurement captures the differential
14 between the actual assets and the actual
15 assets allocation, and the way they
16 respond to the Standard & Poor's 500.
17 Similar fashion how you measure the
18 correlation between Standard & Poor's 500
19 and a mutual fund that was mixed in terms
20 of asset base.
21       ARBITRATOR PETRIE: I understand.
22       THE WITNESS: Okay.
23       ARBITRATOR PETRIE: Maybe I didn't
24 make my question quite clear.
25       Let me phrase it this way: You've

2802

1  NASD Arbitration - December 5, 2005
2  added the original regression analysis
3  that Mr. Marzano presented used only date
4  as its independent variable. And you
5  suggested that we should add the S&P 500
6  and another independent variable and
7  prove the r-squared subject to we still
8  only have 14 data points going in. So
9  that we know that r-squared is of limited
10 value, subject to the data set.
11       What would the conclusions have
12 been had you put in the S&P as an
13 aggregate index?
14       THE WITNESS: Now I understand.
15       ARBITRATOR PETRIE: Because again,
16 the asset mix is certainly not
17 predominantly either equity or fixed. It
18 is somewhere in between.
19       THE WITNESS: Right. It would have
20 had very, very little impact on the data
21 because the data set, because the fixed
22 income over that period of time is
23 virtually flat. Very, very small changes
24 in the fixed income data.
25       I believe it's Exhibit 11 indicates

2803

1  NASD Arbitration - December 5, 2005
2  the annual growth rates, especially since
3  2004, have been about flat. 0.2 percent.
4  The growth rates between February of
5  '04-February '05 were about 1 percent.
6  And growth rates prior to '04 were about
7  5.3 percent during the regression period.
8       So to the extent there was an
9  impact, it would have been very muted in
10 my opinion.
11       ARBITRATOR PETRIE: Now, I'm a
12 little confused. Because we clearly have
13 an upward trend in these numbers. So if
14 we put in another intermittent variable
15 that's flat, isn't that going to have an
16 effect?
17       THE WITNESS: Muted. As again
18 because what you have is a growth in
19 assets that is not correlated or very
20 marginally correlated with the change in
21 the Lehman Index or the Dow Jones
22 Corporate Bond Index.
23       And, obviously, I didn't run the
24 calculations. So that is an opinion.
25 But I believe what you would see is that

2804

NASD Arbitration - December 5, 2005

1
2  the analysis itself wouldn't change
3  materially, or not significantly at the
4  very least.
5      ARBITRATOR PETRIE: It says on
6  Exhibit C-13 that there was knowledge of
7  correlation, which is not a surprise,
8  given that independent variabiles are
9  market prices and time.
10     THE WITNESS: That's right.
11     ARBITRATOR PETRIE: I notice that
12  we didn't put in an adjustment for that.
13  We didn't put in any variables or any
14  adjustments that might be appropriate for
15  another correlated independent series.
16     THE WITNESS: Right.
17     ARBITRATOR PETRIE: The question
18  is, would it matter?
19     And, in particular, I'm concerned
20  about the fact that we've made a big
21  point of for the period of time that we
22  have actual assets under management
23  numbers, the growth rate in the markets
24  with the 60-40 mix was 26 percent. And
25  for the period that we're trying to

2806

NASD Arbitration - December 5, 2005

1
2      THE WITNESS: It would -- the
3  outcome?
4      ARBITRATOR PETRIE: Yes, the
5  outcome.
6      THE WITNESS: The outcome would be
7  -- let me think about that for a second,
8  if I may.
9      ARBITRATOR PETRIE: Okay.
10     THE WITNESS: It would make it
11  lower. It's probably on the magnitude of
12  9 percent, 10. Maybe 15 percent.
13     ARBITRATOR PETRIE: So your
14  projected assets under management had you
15  taken into account the other correlation,
16  it would be lower. And now you're
17  thinking 9, 10, 15 percent?
18     THE WITNESS: About 15 percent,
19  right.
20     ARBITRATOR PETRIE: I see that
21  under the box multiple regression
22  equation, we've got standard errors as
23  well as the coefficients for the data in
24  the S&P. And those standard errors are
25  pretty large as a portion of the

2805

NASD Arbitration - December 5, 2005

1
2  project, it's 4 percent.
3      So with such a dramatic change in
4  at least one of the independent variables
5  here, does the fact that we haven't done
6  anything about the other correlation
7  significantly affect the result?
8      THE WITNESS: I think it does. And
9  I think it goes further to show why a
10  regression analysis was probably the
11  wrong approach to be taken in the first
12  place.
13     ARBITRATOR PETRIE: What effect
14  would that have on your conclusion?
15  Numerically, can you estimate?
16     THE WITNESS: I can't. I
17  apologize. As I sit here I could not
18  estimate it. It would be at a 95 percent
19  confidence would know that it's
20  significant. Whether it's a 10 percent
21  impact or 5 percent impact, I don't know.
22     ARBITRATOR PETRIE: But would you
23  sitting here today be able to tell us
24  whether it would make your result higher
25  or lower?

2807

NASD Arbitration - December 5, 2005

1
2  coefficient. In particular for date,
3  standard errors, 8 versus a coefficient
4  of 29 and the S&P standard errors,
5  roughly, 11 versus coefficient of 63.
6      How much noise? So we've got some
7  noise in the coefficients. Again, not a
8  surprise, given the small data set. But
9  that's what we have?
10     THE WITNESS: Right.
11     ARBITRATOR PETRIE: How much noise
12  should we anticipate that would cause in
13  the quality of the projected assets
14  resulted from your regression?
15     THE WITNESS: I couldn't testify to
16  that as I sit here. I'm not sure how
17  much noise on a combined basis.
18     The one thing that I would suggest,
19  though, is that the statistic as high as
20  it is suggests that there's significant
21  statistical significance, if you will, in
22  the data outcomes. That's about as far
23  as I can go to answering your question
24  though.
25     ARBITRATOR PETRIE: So the large